James P. Gitkin, Esq. (FL Bar No. 570001)
Salpeter Gitkin, LLP
One East Broward Boulevard – Suite 1500
Fort Lauderdale, FL 33301
Tel. (954) 467-8622
Fax (954) 467-8623

Geoffrey R. Kaiser, Esq. *(Pro Hac Vice To Be Filed)*
Kaiser Law Firm, PLLC
926 RXR Plaza
Uniondale, New York 11556-0926
Tel. (516) 570-3071
Fax (516) 570-3071

Attorneys for [under seal]


# UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF FLORIDA

### CASE NO. _____

| | | |
|---|---|---|
| UNITED STATES OF AMERICA and THE STATE OF FLORIDA, *ex rel.* [UNDER SEAL] | ) ) ) ) | **COMPLAINT FOR VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT [31 U.S.C. §§ 3729 *et seq.*] and FLORIDA FALSE CLAIMS ACT [§§ 68.081 *et seq.*, Fla. Stat.]** |
| Plaintiffs, | ) ) | |
| vs. | ) ) | **(FILED IN CAMERA AND UNDER SEAL)** |
| [UNDER SEAL], | ) ) | |
| Defendant. | ) ) | |
| ------------------------------------------------------- | | |

**UNITED STATES DISTRICT COURT**

**FOR THE SOUTHERN DISTRICT OF FLORIDA**

CASE NO. _____

| | |
|---|---|
| UNITED STATES OF AMERICA and THE STATE OF FLORIDA *ex rel.* JACK CARREL, MAURICIO FERRER and SHAWN LOFTIS, | ) ) ) ) ) |
| Plaintiffs, | ) ) |
| vs. | ) ) |
| AIDS HEALTHCARE FOUNDATION, INC., | ) ) |
| Defendant. | ) ) ) |

**COMPLAINT FOR VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT [31 U.S.C. §§ 3729 *et seq.*] and FLORIDA FALSE CLAIMS ACT [§§ 68.081 *et seq.*, Fla. Stat.]**

**(FILED IN CAMERA AND UNDER SEAL)**

-------------------------------------------------------------

Plaintiffs-Relators Jack Carrel, Mauricio Ferrer and Shawn Loftis (collectively, "Relators"), through their attorneys of record, on behalf of the United States of America and the State of Florida, for their Complaint against Defendant AIDS Healthcare Foundation, Inc. ("AHF"), allege based upon personal knowledge, relevant documents, and information and belief, as follows:

I.       **NATURE OF THE ACTION**

1.       This is an action to recover damages and civil penalties on behalf of the United States of America and the State of Florida arising from false and/or fraudulent statements, records, and claims made and caused to be made by AHF and/or its agents, employees and co-conspirators in violation of the Federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.* and Florida False Claims Act, §§ 68.081 *et seq.*, Fla. Stat.

2.      As set forth in detail below, AHF knowingly engaged in multiple complementary, yet distinct, fraudulent schemes designed to defraud federal health care programs and to manipulate, misappropriate and enhance grant proceeds received from the Health Resources and Services Administration ("HRSA") and the Centers for Disease Control and Prevention ("CDC"), two agencies located within the U.S. Department of Health & Human Services ("HHS").   AHF's conduct is made even worse by the fact that these funds were entrusted to AHF for the purpose of assisting a vulnerable patient population consisting of individuals living with HIV/AIDS, of whom there are more than 1.1 million residing in the United States.

3.      AHF's misconduct falls into two general categories: (1) fraudulent acts, misrepresentations and omissions of material fact designed to secure and enhance funding provided by federal and state agencies; and (2) violations of grant terms and conditions to which AHF falsely certified compliance and that were prerequisites to AHF's receipt of federal funds.

4.      Within the first category, AHF's misconduct included the following:

a. AHF conducted an organization-wide criminal effort to enhance funding from federal health care programs in violation of the anti-kickback statute (42 U.S.C. § 1320a-7b(b)) by paying unlawful financial inducements to employees and patients in order to generate referrals to AHF's various service centers, including clinical services, insurance services, pharmacy services and testing services.   The resulting illegal referrals caused millions of dollars in fraudulent payments by federal health care programs, including Medicare and Medicaid, as well as HIV/AIDS assistance programs funded by HRSA and CDC.

b.  AHF fraudulently included HIV test results obtained pursuant to a general testing program with the State of Florida within a CDC HIV testing program specifically targeting gay men whenever testing in the other program produced a positive result for a gay man.  AHF did this because the terms of the CDC grant program mandated a 2% HIV positivity rate to ensure proper testing of the target population and CDC's per test reimbursement amount was far higher than in the general testing program.  Through this fraudulent practice, AHF falsified the CDC test program results while also billing the CDC for test kits and staff that were being paid for under the other contract.

c.  AHF falsified its reporting to the Florida agencies charged with administering HRSA grant proceeds by inflating its spend rate to create the false impression that AHF was spending 100% of its grant monies evenly throughout the year.  AHF did this so that the level of grant funding it received would not be reduced from one year to the next.

d.  AHF falsified its reporting to Florida agencies charged with administering CDC grant proceeds regarding the per test cost incurred by AHF for HIV testing.  AHF did this by providing inflated cost figures for the purpose of generating additional grant funding.

It is believed that as a result of this fraudulent course of conduct, AHF received millions of dollars in federal and state funds to which it was not legally entitled.

5.      Within the second category, AHF's misconduct included the following:

    a.   AHF's systematic violation of the federal anti-kickback statute, described in paragraph 4(a) above, also violated the terms and conditions of the grants awarded to AHF, and requires that AHF return all federal grant proceeds that it received during the period of its fraudulent conduct.

    b.   AHF defrauded the 340B Drug Pricing Program, administered by the Office of Pharmacy Affairs within HRSA, by fraudulently diverting drugs purchased at a steep discount through that program and reselling those drugs through AHF pharmacy outlets to individuals who were not patients of AHF in order to profit on the spread between the reimbursement amount and the 340B drugs' artificially low acquisition costs.   AHF's participation in other HRSA and CDC grant programs while simultaneously defrauding the 340B Drug Pricing Program was inherently fraudulent, violated the terms and conditions of the grants awarded to AHF, and requires that AHF return all federal grant proceeds that it received during the period of its fraudulent conduct.

    c.   AHF knowingly failed to maintain separate accounts for HHS grant proceeds, as required by the terms and conditions of those grants, but rather comingled all grant monies that it received within a single account.

    d.   AHF knowingly failed to maintain the internal accounting controls required to support payment of expenses with grant proceeds, and either

did not possess or could not produce documentary backup justifying those expenses, in violation of grant requirements.

e.   AHF knowingly failed to maintain the internal accounting controls required to track whether the services it was providing were being billed to the correct grant, and as a consequence, AHF frequently charged expenses, including staff, medical and laboratory costs, incurred in connection with a grant to the wrong grant program or double-billed a grant program for these costs.

It is believed that as a result of AHF's knowing violation of grant terms to which it falsely certified compliance and that were express conditions of its receipt of federal funds, AHF received millions of dollars in federal grant proceeds to which it was not legally entitled.

6.    The fraudulent practices described above constituted "false and fraudulent" claims under the Federal Civil False Claims Act ("FCA"), 31 U.S.C. §§ 3729, *et seq*. and Florida False Claims Act, §§ 68.081 *et seq.*, Fla. Stat.  Such claims cheated the government and unlawfully enriched AHF.  Therefore, Plaintiffs/Relators Jack Carrel, Mauricio Ferrer and Shawn Loftis seek to recover all available damages, civil penalties, and other relief for violations alleged herein.

## II.    <u>PARTIES</u>

7.    Plaintiff/Relator Jack Carrel ("Relator Carrel") resides in Louisiana and was the Director of Public Health, Southern Bureau for AHF, from August 9, 2012 to August 1, 2013. In that position, Relator Carrel was responsible for program implementation, coordination, and evaluation of the prevention division as well as providing guidance to program staff on budget management, supervision of personnel and volunteers, patient/client relations, community

relations and on the oversight and management of prevention program administration in the Southern Bureau. Plaintiff/Relator Mauricio Ferrer ("Relator Ferrer") resides in Florida and was a Senior Program Manager in the Southern Bureau of AHF, from May 17, 2011 to in or about August 2012. In that position, Relator Ferrer was responsible for supervising the daily functions and administrative operations of prevention and testing programs in Florida, including launching and growing Prevention Program Services throughout the Bureau and supervising Program Managers for the Out of the Closet Thrift Store-based HIV test site programs, and two Mobile Testing Units (MTUs). Plaintiff/Relator Shawn Loftis ("Relator Loftis") resides in New York and was the Grants Manager, Southern Bureau for AHF, from January 2, 2013 to August 16, 2013. In that position, Relator Loftis was responsible for day-to-day fiscal management of sponsored projects.

8.      AHF is a California corporation headquartered in Los Angeles, California. AHF conducts business operations within the State of Florida from offices, care centers and pharmacy outlets located throughout the state, including Ft. Lauderdale, Miami, Pensacola, Ft. Meyers, Orlando, Tampa, Delray Beach and Jacksonville. AHF describes itself as a global organization providing cutting-edge medicine and advocacy to more than 200,000 patients in 28 countries. AHF states that it is the largest provider of HIV/AIDS medical care in the United States.

## III.   JURISDICTION AND VENUE

9.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1367, and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730. Under 31 U.S.C. § 3730(e), there has been no statutorily relevant public disclosure of the "allegations or

transactions" in this Complaint.  Relators are the original sources of the facts and information alleged in this Complaint.

10.     This Court has personal jurisdiction over the Defendant pursuant to 31 U.S.C. § 3732(a) because that section authorizes nationwide service of process and because the Defendant has minimum contacts with the United States.  Moreover, the Defendant can be found in this District and transacts business in this District.

11.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and 1395(a) and 31 U.S.C. § 3732(a) because the Defendant can be found in and transacts business in this District. At all times relevant to this Complaint, Defendant regularly conducted substantial business within this District, maintained employees in this District, and/or made significant sales within this District. In addition, statutory violations, as alleged herein, occurred in this District.

## IV.     APPLICABLE LAW

### A.     Federal and State False Claims Acts

12.     The FCA was originally enacted during the Civil War and was substantially amended in 1986. Congress enacted the 1986 amendments to enhance and modernize the government's tools for recovering losses sustained by frauds against it. The amendments were intended to create incentives for individuals with knowledge of fraud against the government to disclose the information without fear of reprisals or government inaction, and to encourage the private bar to commit resources to prosecuting fraud on the government's behalf.

13.     The FCA prohibits knowingly presenting or causing to be presented to the federal government a false or fraudulent claim for payment or approval. 31 U.S.C. § 3729(a)(1)(A).[1]

---

[1] Citations are to the renumbered liability provisions of the FCA, as effected by the Fraud Enforcement and Recovery Act of 2009 (Publ. L. No. 111-21, [May 20, 2009]).

Additionally, it prohibits knowingly making or using a false or fraudulent record or statement "material to a false or fraudulent claim" paid or approved by the federal government, or "material to an obligation to pay" money to the government and further prohibits knowingly concealing and improperly avoiding or decreasing "an obligation to pay" money to the government. 31 U.S.C. § 3729(a)(1)(B) and (G).  The FCA also prohibits two or more parties from conspiring to defraud the government by getting a false or fraudulent claim allowed or paid. 31 U.S.C. § 3729(a)(1)(C).  Any person who violates the FCA is liable for a civil penalty of up to $11,000 for each violation, plus three times the amount of the damages sustained by the United States. 31 U.S.C. § 3729(a).

14.     The FCA does not require direct contact between a defendant and the government.  By its terms, the FCA imposes liability on any person who presents or *causes* to be presented a false or fraudulent claim to the government (or false statement in support of a false or fraudulent claim). See 31 U.S.C. § 3729(a).

15.     To "cause" an FCA violation, it is not necessary that a defendant's fraudulent conduct be the last in the series of events that results in financial loss to the government. As applied by the courts, the standard for "causation" under the FCA is whether the submission of a false or fraudulent claim was "reasonably foreseeable" from a defendant's actions. Under this standard, a defendant's fraudulent conduct can occur anywhere in the chain of events leading to financial loss by the government, and can be an indirect, as well as direct, cause of the loss. Moreover, the defendant need not be the recipient or beneficiary of the false claim. All that is required is that the defendant, by its fraudulent conduct, set in motion a series of events which results in a reasonably foreseeable loss to the government.

16.     The FCA, 31 U.S.C. § 3729(a)(1)(C), makes any person, who conspires to defraud the United States by getting a false or fraudulent claim allowed or paid, liable for three times the amount of the damages the government sustains and a civil monetary penalty of up to $11,000 per claim for claims made on or after September 29, 1999.

17.     The FCA defines a "claim" to include any request or demand, whether under contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States government provides any portion of the money or property which is requested or demanded, or if the government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested.

18.     A "false claim" is defined by statute to include any claim that incorporates items or services resulting from a violation of the federal anti-kickback statute (42 U.S.C. § 1320a-7b(b)):

> (g) In addition to the penalties provided for in this section [i.e., 42 U.S.C. § 1320a-7b] . . . a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of [31 U.S.C. §§ 3729 et seq.]

19.     The FCA allows any person having information about an FCA violation to bring an action on behalf of the United States, and to share in any recovery. The FCA requires that the complaint be filed under seal for a minimum of 60 days (without service on the defendants during that time) to allow the government time to conduct its own investigation and to determine whether to join the suit.

20.     The Florida False Claims Act, §§ 68.081 et seq., Fla. Stat., is modeled after the FCA, and its liability provisions are virtually identical.  Similarly to the FCA, any person who violates, or conspires to violate, the Florida False Claims Act is liable for three times the amount

of the damages sustained by the State of Florida.  In addition, a violator faces a civil penalty of up to $11,000 per claim.

**B.**      **The Federal Health Care Programs**

21.      The health care programs described in the paragraphs below, and any other government-funded healthcare programs, shall be referred to as "Federal Health Care Programs."

22.      The Medicare Program, Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, *et seq.*  ("Medicare") is a health insurance program administered by the United States that is funded by taxpayer revenue.  Entitlement to Medicare is based on age, disability or affliction with certain diseases.  The program is overseen by the United States Department of Health and Human Services ("HHS") through the Centers for Medicare and Medicaid Services ("CMS").  Medicare provides for payment of hospital services, medical services, durable medical equipment and prescription drugs on behalf of Medicare-eligible beneficiaries.

23.      Claims submitted to Medicare for payment, whether submitted on a paper CMS-1500 Claim Form, or electronically, carry certifications of truth and accuracy.  The paper Claim Form carries a certification that the billing information on the form is true, accurate and complete, and that the provider submitting the form did not knowingly or recklessly disregard or misrepresent or conceal material facts. UBS-04 CMS-1450 Form.  The Claim Form further states that the person or entity submitting the form "understands that misrepresentation or falsification of essential information as requested" by the form "may serve as the basis for civil monetary penalties and assessments and may upon conviction include fines and/or imprisonment . . . ." *Id.* Those who submit claims electronically are likewise required to certify that the claims are "accurate, complete and truthful" and to "acknowledge that all claims will be paid from Federal funds, that the submission of such claims is a claim for payment under the Medicare program

and that anyone who misrepresents or falsifies or causes to be misrepresented or falsified any record or other information relating to that claim . . . may, upon conviction, be subject to a fine and/or imprisonment under applicable Federal law." Medicare Claims Processing Manual, Chapter 24, 30.2.

24.     When providers enroll in the Medicare Program, they further agree as follows:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to this supplier. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the supplier's compliance with all applicable conditions of participation in Medicare.

Medicare Enrollment Application, at p. 31 (Emphasis added).

25.     The Medicaid Program, Title XIX of the Social Security Act, 42 U.S.C. §§ 1396-1396v ("Medicaid") is a health insurance program administered by the United States and individual states and is funded by federal, state and local taxpayer revenue.  The Medicaid Program is overseen by HHS through CMS.  Medicaid was designed to assist participating states in providing medical services, durable medical equipment and prescription drugs to financially needy individuals that qualify for Medicaid.  The Medicaid program pays for services pursuant to plans developed by the States and approved by HHS through CMS.  42 U.S.C. §§ 1396a(a)-(b).   States pay doctors, hospitals, pharmacies, and other providers and suppliers of medical items and services according to established rates. 42 U.S.C. §§1396b(a)(1), 1903(a)(1). The federal government then pays each state a statutorily established share of "the total amount expended ... as medical assistance under the State plan." See 42 U.S.C. §1396b(a)(1). This federal-to-state payment is known as Federal Financial Participation.

26.     Florida maintains a federally-approved Medicaid program to reimburse health care charges made by physicians and other health care providers for the treatment of many low-income Florida citizens not covered by Medicare or private insurance.  Claims submitted to the Florida Medicaid Program cause payments to be made by both the United States and Florida. The United States and Florida contribute approximately half the cost of each claim submitted to the Florida Medicaid Program.  Providers apply to participate in the Florida Medicaid Program and agree as a condition of both participation and payment to comply with all the policies and procedures of the Florida Agency for Health Care Administration ("AHCA"), which administers the Medicaid Program in Florida.  Medicaid providers must sign a provider agreement promising that the provider will comply with all laws and rules governing the delivery and reimbursement of services or goods to Medicaid recipients.  Florida Medicaid, Provider General Handbook, at 2-12.  Each claim submitted to the Medicaid Program, whether electronically or on a paper claim form, carries a certification that the claim complies with all federal and state laws and regulations; that the services for which reimbursement is claimed "were medically indicated and necessary to the health" of the patient; that the information contained in the claim "is true, accurate and complete," and that the provider understands "that payment and satisfaction of [the] claim will be from Federal and State funds and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal or State laws." Florida Medicaid, Provider Reimbursement Handbook, CMS-1500.

27.     AHCA policies and procedures bar Medicaid payments resulting from fraud or abuse.  "Abuse" includes practices that result in unnecessary cost to the Medicaid program and may include "a violation of state or federal law, rule or regulation."  Florida Medicaid, Provider General Handbook, at 5-3.  "Fraud" is defined as "an intentional deception or misrepresentation

13

made by a person with the knowledge that the deception results in unauthorized benefit to herself or himself or another person" and also includes "any act that constitutes fraud under federal or state law." Id. "Overpayment" is defined as "any amount that is not authorized to be paid by the Medicaid program whether paid as a result of inaccurate or improper cost reporting, improper claims, unacceptable practices, fraud, abuse or mistake." Id.

28.     AHCA requires "repayment for inappropriate, medically unnecessary, or excessive goods or services from the person furnishing them, the person under whose supervision they were furnished, or the person causing them to be furnished." Id.

29.     To participate in Medicare and Medicaid, providers must be duly licensed and authorized by the States in which they practice to render professional services. See Medicare General Information, Eligibility and Entitlement, Chapter 5, 70.3; Florida Medicaid, Provider General Handbook, at 2-3.

30.     HRSA and CDC provide federal funding to community-based organizations like AHF, either directly or indirectly through State agencies, for programs designed to expand medical care for people living with HIV/AIDS and to increase awareness of HIV status.

31.     HRSA provides much of its funding through the Ryan White HIV/AIDS Program ("Ryan White"), which is the largest Federal program focused exclusively on HIV/AIDS care. According to the HRSA website, Ryan White is for individuals living with HIV/AIDS who have no health insurance, have insufficient health care coverage, or lack financial resources to get the care they need. The majority of Ryan White funds support primary medical care and essential support services, and a smaller portion also supports technical assistance, clinical training, and research on innovative models of care.

32.     The legislation that created Ryan White specifies a number of Parts to meet the needs of different communities and populations.   **Part A** provides emergency assistance to certain metropolitan and other areas that are most severely affected by the HIV/AIDS epidemic. **Part B** provides grants to the States, the District of Columbia and certain U.S. territories.   **Part C** provides comprehensive primary health care in an outpatient setting for people living with HIV disease.   **Part D** provides family-centered care involving outpatient or ambulatory care for women, infants, children, and youth with HIV/AIDS.   **Part F** provides funding for other programs, including training programs for providers treating people with HIV/AIDS.

33.     Ryan White works with cities, states, and local community-based organizations to provide HIV-related services to more than half a million people each year.   AHF received a portion of its Ryan White funding in direct HRSA grants and another portion through various Florida state and county agencies, including the Florida Department of Health HIV/AIDS Program ("Florida DOH").   On information and belief, AHF was a recipient of Ryan White grant funds over a period of years totaling millions of dollars.

34.     Of the more than 1.1 million people living with HIV/AIDS, an estimated 240,000 are unaware of their HIV-positive status.   According to the CDC, increasing the number of people who are aware of their HIV status is a key strategy in preventing infections.   In order to achieve this goal, the CDC provides funding for expanded HIV testing programs aimed, in part, at significantly increasing the number of persons who are tested in jurisdictions having a high rate of HIV among disproportionately affected populations.   AHF participated in some of these CDC-funded HIV testing programs and, on information and belief, it received CDC grant funds over a period of years totaling millions of dollars.

35.     AHF's entitlement to HRSA and CDC grant funds was contingent upon its compliance with standard terms and conditions that attached to all HHS grants.  In applying for and accepting HHS grant funds, AHF certified its compliance with these terms and conditions. In general, the requirements that apply to the recipient of grant funds, including public policy requirements, also apply to sub-recipients and contractors under grants.  As will be explained further below, AHF knowingly and repeatedly violated many of these requirements, which rendered its acceptance and use of grant proceeds fraudulent.

36.     Standard terms and conditions of HHS grants are set forth in federal regulations and supplemented by the HHS Grants Policy Statement ("HHS GPS").  As stated in the HHS GPS:

> HHS grant awards generally are made to organizations. The organization is legally accountable for the performance of the award and the expenditure of funds. . . In signing a grant application, [the organization's authorized representative] agrees that the organization will assume the obligations imposed by applicable Federal statutes and regulations and other terms and conditions of the award, including any assurances, if a grant is awarded. These responsibilities include accountability both for the appropriate use of funds awarded and the performance of the grant-supported project or activities as specified in the approved application. (HHS GPS at I-6).

37.     The Notice of Award ("NOA") is the legal document indicating an award has been made and that funds may be requested from HHS.  According to the HHS GPS, "until an awarding office has issued a [NOA] for the initial budget period, any costs incurred by the applicant for the project are incurred at its own risk." (HHS GPS at I-34).  The NOA sets forth relevant information about the award, including "the amount of Federal funds authorized" and "[a]pplicable terms and conditions of award, either by reference or inclusion." Id. at I-34 and 35.  A grant recipient "indicates acceptance of an award and its associated terms and conditions by drawing or requesting funds from the designated HHS payment system or office" and "[i]f a recipient cannot accept the award, including the legal obligation to perform in accordance with award terms and conditions, the

organization" is expected to notify HHS immediately. Id. at I-35.  If the award is accepted, "the

contents of the [NOA] are binding on the recipient unless and until modified by a revised [NOA]

signed by the [Grants Management Officer]." Id.  HHS "may administratively recover funds paid to a

recipient in excess of the amount to which the recipient is . . . entitled under the terms and conditions

of the award, including misspent funds or unallowable costs incurred." Id. at II-96.  "If a recipient

has failed to materially comply with the terms and conditions of award, [HHS] may suspend the

grant, pending corrective action, or may terminate the grant for cause." Id. at II-93; see 45 CFR

§§74.61, 74.62, 92.43.

     38.    Among the standard terms contained in the NOA is a requirement that the award

recipient comply with the requirements of the federal anti-kickback statute:

> Recipients and sub-recipients of Federal funds are subject to the strictures of the
> Medicare and Medicaid anti-kickback statute (42 U.S.C. 1320a-7b(b)) and should
> be cognizant of the risk of criminal and administrative liability under this statute,
> specifically under 42 U.S.C. 1320 7b(b) illegal remunerations which states, in
> part, that whoever knowingly and willfully: (A) Solicits or receives (or offers or
> pays) any remuneration (including kickback, bribe, or rebate) directly or
> indirectly, overtly or covertly, in cash or in kind, in return for referring (or to
> induce such person to refer) an individual to a person for the furnishing or
> arranging for the furnishing of any item or service, OR (B) In return for
> purchasing, leasing, ordering, or recommending purchasing, leasing, or ordering,
> or to purchase, lease, or order, any goods, facility, services, or item .... For which
> payment may be made in whole or in part under subchapter XIII of this chapter or
> a State health care program, shall be guilty of a felony and upon conviction
> thereof, shall be fined not more than $25,000 or imprisoned for not more than five
> years, or both.  (Emphasis added).

     39.    According to the HHS GPS, award recipients also "are required to meet the standards

and requirements for financial management systems set forth or referenced in 45 CFR 74.21 or

92.20, as applicable" and "the adequacy of the financial management system is integral to the ability

of the recipient to account for the expenditure of grant funds."  Id. at II-61.  "These standards are

intended to ensure that Federal funds are handled in a responsible manner that includes adequate

internal controls, cash management consistent with Department of the Treasury requirements." Id.

40.    The HHS GPS states that the financial systems utilized must be sufficient to:

• Provide accurate, current, and complete financial information about Federal awards and, for subawards, reasonable procedures for ensuring that subrecipients provide financial reports in sufficient time to allow preparation of [HHS]-required reports.

• Maintain records that adequately identify the sources of funds for federally assisted activities and the purposes for which the award was used, including authorizations, obligations, unobligated balances, assets, liabilities, outlays or expenditures, and any program income. Accounting records must be supported by source documentation such as canceled checks, paid bills, payrolls, and time and attendance records.

• Maintain effective control over and accountability for all cash, real and personal property, and other assets under the award; adequately safeguard those assets; and ensure that they are used only for authorized purposes.

• Compare actual expenditures or outlays with the approved budget for the award.

• Determine the allowability of costs in accordance with the applicable Federal cost principles, program regulations, and other requirements cited in the [NOA]. This includes the ability to readily identify unobligated balances, accelerated or delayed expenditures, and cost transfers.

• Minimize the time elapsing between any advance payment under [an] award and the disbursement of the funds for direct program costs and the proportionate share of any allowable indirect or facilities and administrative costs, and ensure that the timing and amount of any payments to subrecipients conform to this standard.

Id. at II-61-62; see also 45 CFR §§ 74.21, 92.20.  Further, grant recipients "must notify the [Grants Management Officer] when financial management problems are discovered." Id. at II-62.

41.    The HHS GPS also states that "[a]nyone who becomes aware of the existence (or apparent existence) of fraud, waste, or abuse related to HHS grants or use of grant funds should report this information to HHS."  HHS defines "fraud, waste, or abuse" to include "embezzlement, misuse, or misappropriation of grant funds or property, and false statements, whether by organizations or individuals." Id. at I-7. Specific examples cited in the HHS GPS include theft of grant funds for personal use, using funds for non-grant-related purposes and submitting false financial reports. Id.  The HHS GPS further puts all grant recipients on notice that the "Federal government may pursue administrative, civil, or criminal action under a variety of statutes that relate to fraud and false statements or claims," including the False Claims Act. Id. at I-8.

## V.     FACTS UNDERLYING THE FRAUD SCHEMES

### A.     The Scheme to Induce Patient Referrals Through Illegal Incentive Payments

42.     On information and belief, since at least in or about 2011 in Florida and 2010 in California, AHF engaged in an organization-wide effort to generate consumer demand for its programs by implementing a system of illegal incentive payments that caused self-referrals by patients to utilize AHF services and that rewarded employees for referring patients to AHF's testing, clinical, pharmacy and insurance service centers, all in violation of the federal anti-kickback statute (42 U.S.C. 1320a-7b(b)).

43.     Payments to AHF under HIV testing contracts were either allocated as lump sum amounts paid in equal installments or paid on a per test cost reimbursement basis periodically throughout the year.  Further, many of AHF's HIV testing contracts required, as a condition of the contract, that AHF perform a certain volume of testing and further demonstrate "linkage" between HIV positive test results and clinical care for the individuals who tested positive. Failure to meet these goals resulted in payment reductions under the contracts.  For example, one contract with Florida DOH provided as follows:

> The Provider must link at least 95% of clients with a positive test result to medical care. The provider will have a chart for each positive client that will include: DH1628, DH1628c, consent forms, referral to STD and partner services, proof of medical linkage and adherence program referral to PROACT using Attachment IV of this contract. (Emphasis added).

The contract further provided, in relevant part, that:

> Failure to conduct a minimum of 950 HIV tests quarterly in the target population shall result in a reduction in payment in the amount of $24.86 per HIV test not performed. (Emphasis added).

19

> Failure to screen, test or treat a minimum of 750
> individuals per quarter <u>shall result in a reduction in
> payment in the amount of $52.50 per individual not
> screened, tested or treated.</u> (Emphasis added).

44.     In order to ensure compliance with these and other similar contractual requirements, and avoid losing federal funding under the testing contracts, AHF unlawfully incentivized its employees to increase the volume of HIV test referrals to AHF's testing locations and refer patients with positive test results to AHF clinical service centers.  AHF then sought additional reimbursement under Federal Health Care Programs for rendering services to those patients.

45.     AHF paid its HIV testing personnel under a "commission based" formula that combined a base salary amount and an additional "commission" amount that was predicated on the volume of tests performed.  Additional incentive compensation was paid to testing staff managers, who received financial bonuses if their staff exceeded numerical testing goals.  Moreover, bonus compensation of up to $100 was paid to an employee who "linked" a patient with a positive test result to AHF linkage coordinators for referral to clinical services.   The below description was taken from AHF's internal records:

**Commission Based Testing Formula**

- Set a realistic monthly goal for all testers to meet per department
- Keep everyone at their current salary and anyone testing above the monthly goal will get a monthly commission
- Testers who successfully link a positive client to linkage (client speaks to linkage and provides correct phone number) will get a bonus – ($50 to $100)

**Formula:**

**Regular salary + completed test above testing goal + positives identified**

**Monthly**

|    | $3 | $4 | $5 | $7 |
|----|----|----|----|----|
| 10 | $30 | $40 | $50 | $70 |
| 20 | $60 | $80 | $100 | $140 |
| 30 | $90 | $120 | $150 | $210 |
| 40 | $120 | $160 | $200 | $280 |
| 50 | $150 | $200 | $250 | $350 |

**Scenario #1**

**Monthly goal is 110, test will be paid at $5 and positive will be paid at $100**

**Tester conducted 146 tests in December and identified 1 positive**

**Current Monthly Salary = $1,200**

**Commission/bonus = 36**

**Positive = 1**

**$1,200 + $180 + 100 = $1,480**


46.     AHF encouraged its linkage coordinators to promptly contact any HIV positive patients referred by AHF's testers and link those patients to AHF clinical services.   In furtherance of that effort, linkage coordinators were authorized to pay for patient meals at local fast food restaurants and even pay the transportation costs for those patients to travel to AHF clinical service centers.  Patients were also incentivized to frequent AHF clinical service centers for treatment and testing of sexually transmitted diseases ("STD"), for returning to AHF service centers for ongoing medical care and for remaining STD negative every few months.  More generally, remuneration in the form of gift certificates and cash payments valued at up to $50.00

or more was paid to any AHF Public Health Division employee -- including but not limited to the AHF linkage coordinators who met with referred HIV positive patients -- who was responsible for referring patients to AHF for services, including pharmacy and insurance services.

47.     Through this criminal scheme, AHF generated many millions of additional dollars for: (1) clinical services provided by AHF to illegally referred patients and reimbursed by the Federal Health Care Programs, including Medicare and Medicaid; (2) medications distributed by AHF to illegally referred patients through its pharmacy locations and reimbursed by the Federal Health Care Programs, including Medicare and Medicaid; (3) HIV testing services paid for with federal funds and provided to illegally referred patients; and (4) payments received by AHF through its Positive Healthcare insurance product for illegally referred Medicare and Medicaid patients living with HIV.

### B.     The Scheme to Defraud an HIV Testing Program Funded by the CDC

48.     AHF was part of a national contract between a private firm called ABT Associates and CDC (the "CDC Contract"), the aim of which was to expand HIV testing specifically targeting gay men (referred to in the lexicon used for such testing programs as men who have sex with men or "MSM") in high prevalence areas, including South Florida. Testing reimbursement under the CDC Contract far exceeded reimbursement available under other HIV testing contracts in which AHF participates. For instance, non-targeted HIV testing under another federally–funded contract with the Florida DOH (the "Florida Contract") paid AHF just $10 per test, whereas the CDC Contract paid AHF $150 per test or up to $400 per test for any MSM HIV-positive test results that could be linked to subsequent medical care for the affected individual.

49.     In an effort to increase reimbursements, Whitney Engeran-Cordova, the National Senior Director of Public Health for AHF, directed Relator Carrel to transfer any MSM HIV-positive tests obtained under the Florida Contract -- which did not make positive MSM test results a requirement for reimbursement and had far lower reimbursement rates -- to the CDC Contract.  This included all AHF MSM tests done in mobile units and all MSM tests done at AHF "Out of the Closet" thrift store locations in Broward and Miami-Dade counties.  All costs associated with this testing were charged to the Florida Contract, but reimbursement for the MSM positive tests that AHF obtained came from both the Florida Contract and the CDC Contract.  In or about July 2013, Relator Carrel became aware of comments made by Alexander Goncalvez (AHF Associate Director, Mobile Testing Programs) indicating that AHF was more than 1,000 tests short of maximizing potential reimbursement revenue under the CDC Contract.

50.     In the monthly financial reports that Relator Carrel received, AHF did not allocate any testing-related charges to the CDC Contract because all those costs were being incurred in connection with the Florida Contract, including the cost of the test kits and the staff working in the mobile testing units and at the AHF "Out of the Closet" locations.  In addition, all of the reporting made by AHF under the CDC Contract was fraudulent since it incorporated the MSM positive results diverted from an entirely separate testing program under the Florida Contract, which was not designed according to the testing protocols mandated by the CDC Contract.

51.     Relator Carrel continually expressed his concerns to supervisors that AHF was misrepresenting its testing services under the CDC Contract by using separately reimbursed test results obtained under an entirely different testing program and contract (i.e., the Florida Contract) in order to generate increased reimbursement amounts under the CDC Contract. Relator Carrel sought to suspend the practice of transferring tests over to the CDC Contract and

re-focus AHF's efforts on the stated purpose of that contract while assuming temporary management of contract activities. His request for financial resources to properly execute the CDC Contract, however, was denied and he was fired by AHF about a week later, at which point it is believed that AHF resumed its fraudulent diversion of MSM positive tests.

### C. Fraudulent Reporting to State Agencies Administering HRSA Funds

#### 1. Falsifying Quarterly Financial Statements

52.     In or about May 2013, Julie Chang, the Los Angeles-based internal AHF contract manager for the Broward County Prevention Contract, which was an HIV testing contract funded by CDC, contacted Relator Carrel for a break-down of staff working on the contract. After Relator Carrel supplied the information, Chang replied that there were too many staffing changes and that she was going to leave the staffing description unchanged in the quarterly financial statement. Relator Carrel responded that if she did as she intended, then AHF would be double billing some staff to the contract and billing for other staff that were no longer employed by AHF. Notwithstanding this warning, Chang made no changes to the staffing description and caused the submission of a false financial statement.

53.     This incident was symptomatic of the deficient accounting procedures employed by AHF, which frequently involved erroneous financial allocations to contracts and cost centers. On a monthly basis, Relator Carrel was required to review an extensive financial statement with Terrence Boone, who was Finance Manager for AHF. Every month, Relator Carrel identified problems with allocations and, in some cases, discovered that no charges at all were allocated to contracts, even though invoices were developed and submitted by AHF.

### 2. Falsifying the Spend Rate Under the Florida Contract

54.     The Florida Contract, under which AHF was to provide HIV testing in 12 Florida counties, was paid on a fee for service basis, but funds were drawn down on a quarterly basis and a quarterly financial report also was due.  Ideally, 25% of the funds allocated would be spent in each quarter.  In or about April 2013, however, Relator Loftis learned that the spend rate was lower than the target rate, and was actually closer to 18%.  Since preparation of the quarterly financial reports was part of his responsibilities, Relator Loftis notified Relator Carrel of his discovery and they resolved to increase the spending rate in subsequent quarters so as to compensate for the lower spend rate in the current quarter.

55.     Relator Loftis advised Patricia Bermudez of the underspending problem involving the Florida Contract and of his plan to correct the spend rate moving forward.  Bermudez, however, instructed Relator Loftis to use a 25% spend rate in the current quarterly report, advising that the report must state that AHF spent 25% of the funds allocated during the quarter. Relator Loftis refused to follow Bermudez's direction at that time.  In or about March 2013, during a monthly Grants-Public Health meeting and conference call with Los Angeles-based AHF personnel, Relator Loftis raised the issue with Bermudez again on the phone.  Bermudez replied: "Shawn, we spoke about that several times. I don't know why you can't remember that," referring to the need to misstate the actual spend rate in the quarterly report.  Relator Loftis again refused to follow Bermudez's direction.  The pressure to lie on AHF's behalf caused Relator Loftis to experience physical distress, including severe nausea.  Relator Loftis ultimately submitted an accurate quarterly report reflecting an 18% spend rate.

56.     As a consequence of his refusal to falsify the quarterly report, and his resistance to other efforts by AHF to involve him in fraudulent activities, Relator Loftis was terminated by

AHF on August 16, 2013.  Following his termination, Julie Chang, a grants manager in Los Angeles reporting to Bermudez, submitted a request to the Florida DOH asking that AHF be permitted to revise its quarterly report to reflect a 25% spend rate.

### 3.  Falsifying the Per Test Cost for HIV Testing

57.     In connection with negotiations leading to renewal of the Florida Contract, AHF misrepresented its per test cost for performing HIV testing as leverage to obtain additional funding.  In or about August 2012, Relator Carrel participated in a conference call with Whitney Engeran-Cordova of AHF and a representative from the Florida DOH regarding reimbursement rates under the Florida Contract.  Although Engeran-Cordova agreed to the contract requirements on the phone, Patricia Bermudez of AHF ultimately refused to sign the contract later that year, blaming Relator Carrel for not negotiating a higher rate.

58.     At a subsequent meeting in Tallahassee involving Relator Carrel, Julie Chang and representatives of the Florida DOH, Bermudez joined the meeting by phone and indicated that neither Chang nor Relator Carrel had authority to agree to anything and that AHF was not sure it would sign the contract renewal unless the reimbursement rate was increased.  During this call, Bermudez falsely represented AHF's cost as $40 per test when the true per test cost, as discussed below, was far less.

59.     On or about February 20, 2013, when Relator Carrel was attending a training meeting in the Tampa area, Engeran-Cordova, Chang and Bermudez were supposed to arrive from Los Angeles to join Relator Carrel for a meeting with State representatives to again discuss reimbursement rates under the Florida Contract.  At the last minute, however, these three senior AHF managers chose not to make the trip from Los Angeles and instead directed Relator Carrel

to request increased funding under the Florida Contract based on inflated cost figures. Specifically, Relator Carrel was asked to advocate a position indicating that AHFs cost per test exceeded $40 when, in fact, the true per test cost was less than the proposed contract reimbursement amount of $10. When Relator Carrel asked how the cost figure was calculated, Bermudez refused to elaborate, but merely affirmed the figure as accurate.

60.     Relator Carrel knew, based on financial reports provided by the AHF Finance Division, that the true cost of each test was less than $10. In emails dated on or about January 22, 2013 and February 2, 2013, respectively, Relator Carrel advised Engeran-Cordova regarding the true cost figures. In a subsequent conversation with Bermudez and AHF CFO Jonathan Petrus, Relator Carrel relayed the same findings and expressed his concern about presenting false cost calculations intended to deceive Florida in contract negotiations and induce approval of additional funding. Relator Carrel also spoke with Thomas Twentyman, who worked in AHF's finance department and was involved in calculating the cost figures. Twentyman was unwilling to clarify the basis for his calculations and, when pressed on the matter, replied that he had used certain assumptions that he had devised but would not reveal.

61.     AHF discounted Relator Carrel's concerns, and he was repeatedly directed to present false cost figures to support AHF's position in contract negotiations. Relator Carrel refused to comply, but after Relator Carrel was terminated, AHF presented the false cost figures in support of AHF's negotiating position on the Florida Contract.

**4.  Fraudulently Mischaracterizing Grant-Related Expenses**

62.     Relator Loftis's job responsibilities included packaging and submitting invoices for expense reimbursement to the agencies through which Ryan White and other federal funds were disbursed to AHF.  This included submitting a monthly General Ledger and sometimes also required the submission of actual back-up receipts.  If the back-up for an expense was missing, the expense had to be removed from the associated invoice.

63.     In or about March 2013, Relator Loftis's access to the General Ledger and receipt documentation was interrupted because AHF had started using a new SAP accounting system that was not working properly.  As a consequence, Relator Lofits was forced to submit the March 2013 invoices to various funding agencies with only payroll expenses.  Relator Loftis immediately notified Patricia Bermudez and Julie Chang that, as a result of the malfunctioning SAP accounting system, AHF was losing the opportunity to collect on expenses related to OTPS (Other Than Personnel Services).  In response, Chang and Bermudez directed Relator Loftis to submit budget modifications moving all OTPS expenses into personnel services line items, which had the effect of inflating employee hours to levels that did not reflect the actual amount of time spent by employees on various federally funded projects.

**D.     The Scheme to Defraud the 340B Drug Pricing Program**

64.     AHF currently owns approximately 29 pharmacy locations and also provides mail order pharmaceutical services.  These services are provided, not only to HIV patients, but also to the general public.  According to AHF's website, AHF pharmacies are located in California, New York, Florida, Washington, Georgia and Washington, DC.   AHF's pharmacy operations are a major source of revenue to the organization.

29

65.     AHF participates in the 340B Drug Discount Program ("340B Program"), which is administered by HRSA's Office of Pharmacy Affairs.  Under this program, eligible entities may purchase steeply discounted medications from manufacturers for distribution on an outpatient basis to qualifying patients.  The manufacturers are required to sell the drugs at a discount as a condition of having their products covered by Medicaid.  Eligible entities are permitted to earn a profit on the difference or "spread" between their acquisition cost under the 340B Program and the reimbursement they receive from payers.  According to a HRSA sponsored publication describing the program, "the 340B savings belongs to the entity" and "there is no mandate in the law that requires the entity to pass the 340B savings to patients, although many choose to do so." The Bridge to 340B Comprehensive Pharmacy Services, at 3 (April 2004).

66.     Entities participating in the 340B Program, however, are explicitly prohibited from diverting, reselling or transferring 340B-purchased drugs to non-eligible patients, and are liable to the manufacturers for refunds of any discounts obtained illegally.  Id. at 7.  In order to be an eligible patient:

1. the covered entity has established a relationship with the individual, such that the covered entity maintains records of the individual's health care; and

2. the individual receives health care services from a health care professional who is either employed by the covered entity or provides health care under contractual or other arrangements (i.e., referral for consultation) such that responsibility for the care provided remains with the covered entity; and

3. the individual receives a health care service or range of services from the covered entity which is consistent with the service or range of services for which grant funding or federally qualified health center look-alike status has been provided to the entity. . . .

**An individual will not be considered a "patient" of the entity for purposes of**

> **340B if the only health care service received by the individual from the covered entity is the dispensing of a drug or drugs for subsequent self-administration or administration in the home setting.**

Id. at 4 (emphasis added).

67.    On information and belief, AHF pharmacies commingled their drug inventories and sold drugs acquired from manufacturers at steep discounts under the 340B Program to non-eligible patients, thereby defrauding the 340B Program by profiting from discounts to which AHF was not legally entitled under the law.

68.    In or about June 2012, Relator Ferrer went to a meeting attended by other community-based organizations in Broward County.  At that meeting, Relator Ferrer interacted with other pharmaceutical competitors of AHF who were very upset with AHF and alleged that AHF was abusing the 340B discount program by selling prescription to individuals who were not eligible to receive 340B medications.  Some of the attendees asked Relator Ferrer what he knew about AHF's improper practices. Relator Ferrer responded that he did not know any details because his division did not oversee the pharmacy operations.  When Relator Ferrer returned to the corporate office after the meeting, however, he asked Lydia Gresham, then Deputy of AHF's Southern Bureau, about the concerns raised with Relator Ferrer at the meeting.  Gresham was evasive and tried to skirt the issue, denying any wrongdoing and telling Relator Ferrer that AHF's pharmacy operations were not his concern.   Relator Ferrer was upset and advised Gresham that the situation was tarnishing AHF's reputation.

69.    About a week later, Relator Ferrer learned that the main AHF pharmacy in Jacksonville had been fined because it had no clear inventory records of which drugs were purchased under the 340B program and which drugs had been acquired outside the program. Since the medications that were part of the 340B program were purchased at a steep discount for

31

the benefit of 340B-eligible patients, it was necessary to make sure that those medications were used only for those eligible patients and were not sold to others as to whom AHF was not entitled to benefit from the 340B discount. This included any other Medicaid, Medicare, commercially insured or self-pay patients frequenting AHF's pharmacies to fill prescriptions, but who were not otherwise receiving health services from AHF.

70.     After raising the issue with Gresham, Relator Ferrer's reporting structure was changed. He no longer had access to Gresham, the Bureau Chief, or any additional information regarding the practices of the AHF pharmacy division. Relator Ferrer believes that AHF continues to defraud the 340B Program by selling medications acquired under that program to non-eligible patients and profiting from the difference between its artificially low acquisition cost and the higher amounts it receives as reimbursement from payers.

### E.     The Systematic Failure to Follow Financial Regulations Governing HHS Grants

#### 1.   Commingling of Grant Funds

71.     AHF did not maintain segregated accounts for each grant that would enable the organization to properly track the expenditure of funds in each federally-funded project. Instead, AHF commingled grant funds in one bank account, and depended on what was a completely ineffectual accounting system to record how those funds were being used.

72.     This was an egregious violation of requirements mandating that grantees "maintain effective control over and accountability for all cash, real and personal property, and other assets under the award; adequately safeguard those assets; and ensure that they are used only for authorized purposes" and that they also "maintain records that adequately identify the sources of funds for federally assisted activities and the purposes for which the award was used, including

authorizations, obligations, unobligated balances, assets, liabilities, outlays or expenditures, and any program income." HHS GPS at II-61-62.

73.     "HRSA funds must retain their award-specific identity—they may not be commingled with state funds or other Federal funds. ["Commingling funds" typically means depositing or recording funds in a general account without the ability to identify each specific source of funds for any expenditure.]"  HRSA SF-424 Application Guide at p.3.

74.     The failure to segregate grant funds violated a basic condition of AHF's receipt of HRSA funding, requiring that AHF return all funds that were mishandled in this way.

## 2.  Inability to Track Grant Funds and Assure Use for Authorized Purposes

75.     In or about July 2012, AHF received a Ryan White grant to operate an STD ("Sexually Transmitted Disease") clinic, increase testing in the Jacksonville area and provide medical services to persons living with HIV/AIDS.  A large portion of this grant was intended to reimburse AHF for the cost of lab testing.  After starting at AHF in or about January 2013, Relator Loftis learned that from in or about July 2012 to in or about March, 2013, the AHF grants administrator assigned to this grant had never submitted invoices for reimbursement of lab testing.  When Relator Loftis asked personnel in AHF's Los Angeles headquarters for the lab receipts specific for this grant, they could not provide any.  Relator Loftis further learned that the lab tests related to this grant were being commingled with lab tests related to another grant, and that AHF's accounting department in Los Angeles was unable to identify which lab test was associated with which grant.

76.     Starting in or about April 2013, the City of Jacksonville Ryan White Part A Program ("Program") began refusing payment of lab test invoices after performing its own investigation and discovering that many lab tests had been performed for patients who were not

covered under the STD grant. Those lab test invoices were sent directly from AHF headquarters in Los Angeles to the Program and had not been submitted to Relator Loftis for review. In or about mid-April 2013, the Program performed an audit and confirmed the commingling of lab tests among different Ryan White grants.

77.    Both Relator Loftis and Relator Carrel brought up the issue of comingling with multiple AHF executives, including Whitney Engeran-Cordova, National Director for Public Health; Patricia Bermudez, Director of Grants Administration; Jonathan Petrus, CFO/Performance and Investments; Lyle Honing, CFO/Financial Services and Compliance; and Donna Stidham, Chief of Managed Care. Stidham told Relator Loftis to "stay out of the labs, I will fix the problem." Discussions regarding this matter continued into the time of a HRSA site visit, when Relator Loftis and Relator Carrel were expressly told not to discuss the matter with the HRSA officials onsite, and that Bermudez and Stidham would handle the issue. The problem was never corrected while Relator Loftis and Relator Carrel were employed by AHF.

78.    AHF obtained a sole source contract with Broward County to provide STD health services funded with Ryan White grant proceeds. Relator Carrel was responsible for gathering cost data needed to submit invoices for payment under the contract. In preparing data for the first quarterly invoice, however, Relator Carrel discovered that AHFs financial reporting and billing systems were totally inadequate to provide the necessary data and could not properly trace the costs associated with services rendered by AHF under the Broward County contract. Instead, Relator Carrel found numerous instances where AHF billed clinical medical services associated with other grants to the cost center associated with the Broward County STD contract. AHF also mischaracterized as "outreach" in a Broward County Ryan White Part A contract certain testing services that it rendered under another Broward County Prevention contract.

79.     In or about March 2012, Relator Ferrer alerted supervisors to AHF's ongoing failure to provide financial backup documentation requested by Florida DOH in support of claimed expenses under the Florida Contract (i.e., the 12-County HIV testing contract).  Relator Ferrer was reprimanded for doing so by AHF's Senior Director of Public Health Whitney Engeran-Cordova.  Relator Ferrer had previously raised other compliance problems with AHF supervisors, including AHF's misconduct under the 340B program discussed above and its failure to follow other legal requirements.  AHF responded by firing Relator Ferrer in or about August 2012.

80.     The above examples are only illustrative of what was a pervasive failure of AHF's accounting systems to properly track the use of grant funds to assure that they were used for authorized purposes and to trace the costs for which AHF repeatedly sought reimbursement to the grants with which those costs were actually associated.

### F.     **Retaliatory Employment Actions**

81.     Because Relators complained of compliance violations by AHF that constituted fraud against the government and resulted in AHF's submission of false claims totaling many millions of dollars, Relators were subjected to adverse employment actions, up to and including termination of employment.   AHF had no legitimate, non-retaliatory reason for taking these actions against Relators.   Such actions were malicious and/or or in reckless disregard of Relators' civil rights.  At all times relevant to this action, each Relators performed their jobs in an exemplary fashion and would not have suffered any adverse employment action but for their complaints concerning violations constituting fraud against the government.

## VI.     **CAUSES OF ACTION**

**COUNT ONE**

### Federal False Claims Act
### 31 U.S.C. § 3729(a)(1)(A)

82.     Relators repeat and re-allege each and every allegation contained in paragraphs 1 through 81 above as though fully set forth herein.

83.     This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729, *et seq.*, as amended.

84.     By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to officers, employees or agents of the United States government for payment or approval. 31 U.S.C. § 3729(a)(1)(A).

85.     The United States, unaware of the falsity of the claims made or caused to be made by the Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

86.     By reason of the Defendant's acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

87.     Additionally, the United States is entitled to the maximum penalty of $11,000 for each and every false and fraudulent claim made and caused to be made by Defendant arising from its unlawful conduct as described herein.

## COUNT TWO
## Federal False Claims Act
## 31 U.S.C. § 3729(a)(1)(B)

88.     Relators repeat and re-allege each and every allegation contained in paragraphs 1 through 81 above as though fully set forth herein.

89.     By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false or fraudulent records and statements, and omitted material facts, to get false or fraudulent claims paid or approved by the United States government, within the meaning of 31 U.S.C. § 3729(a)(1)(B).

90.     The United States, unaware of the falsity of the records, statements and material omissions made or caused to be made by the Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

91.     By reason of the Defendant's acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

92.     Additionally, the United States is entitled to the maximum penalty of $11,000 for each and every false and fraudulent claim made and caused to be made by Defendant arising from its unlawful conduct as described herein.

## COUNT THREE
## Federal False Claims Act
## 31 U.S.C. § 3729(a)(1)(G)

93.     Relators repeat and re-allege each and every allegation contained in paragraphs 1 through 81 above as though fully set forth herein.

94.     By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly

avoided or decreased an obligation to pay or transmit money or property to the Government, within the meaning of 31 U.S.C. § 3729(a)(1)(G).

95.     The United States, unaware of the falsity of the records and statements and of the Defendant's concealment and unlawful conduct, was denied an opportunity to claim and demand return of the money and property to which it was legally entitled.

96.     By reason of the Defendant's acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

97.     Additionally, the United States is entitled to the maximum penalty of $11,000 for each and every false and fraudulent claim made and caused to be made by Defendant arising from its unlawful conduct as described herein.

**COUNT FOUR**
**Federal False Claims Act**
**31 U.S.C. § 3729(a)(1)(C)**

98.     Relators repeat and re-allege each and every allegation contained in paragraphs 1 through 81 above as though fully set forth herein.

99.     This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729, et seq., as amended.

100.     By virtue of the acts described above, Defendant conspired with others, known and unknown, to defraud the United States by inducing the United States to pay or approve false and fraudulent claims, and to avoid and conceal an obligation to pay money and property, within the meaning of 31 U.S.C. § 3729(a)(1)(C). Defendant, moreover, took substantial steps in furtherance of the conspiracy, inter alia, by making false and fraudulent statements and representations, by preparing false and fraudulent records, and/or by failing to disclose material facts.

101. By reason of the Defendant's acts, the United States has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

102. Additionally, the United States is entitled to the maximum penalty of $11,000 for each and every violation of 31 U.S.C. § 3729(a)(3) as described herein.

## COUNT FIVE
### (Federal False Claims Act – Retaliation Violation)
### 31 U.S.C. § 3730(h)

103. Relators repeat and re-allege each and every allegation contained in paragraphs 1 through 81 above as though fully set forth herein.

104. Defendant had a duty under the False Claims Act, 31 U.S.C. § 3730(h), to refrain from taking discriminatory or retaliatory actions against employees who take lawful actions in furtherance of a False Claims Act action, or who make lawful efforts to stop others from violating the False Claims Act. Such discriminatory and retaliatory action includes, but is not limited to, discharging, demoting, suspending threatening or harassing an employee for engaging in such protected conduct.

105. As set forth above, Relators engaged in numerous activities that are protected under the False Claims Act. This included investigation and inquiries to AHF managers regarding various fraudulent activities to enhance AHF's receipt of federal grant and health insurance proceeds; bringing this fraudulent and illegal activity to the attention of AHF senior management personnel; refusing to participate in, assist, or ignore a scheme to defraud the government; and other similar actions to stem the FCA violations described above.

106. Defendant – including senior management personnel working at the various Defendant locations -- were well aware that Relators had engaged in these protected activities,

and they discriminated and retaliated against Relators for engaging in such protected conduct by taking adverse employment actions against Relators.

107. Defendant's actions damaged and continue to damage Relators in violation of 31 U.S.C. § 3730(h). As a direct and proximate result of the foregoing, Relators have lost the benefits and privileges of employment and have suffered additional economic and non-economic damages, including severe emotional anguish and irreparable, continuing to harm their careers. In connection with this claim, Relators seek all damages and other appropriate relief authorized by the False Claims Act, as well as litigation costs and reasonable attorneys' fees.

### COUNT SIX
### (Florida False Claims Act)
### § 68.082(2)(a), Fla. Stat.

65. Relators repeat and reallege each and every allegation contained in paragraphs 1 through 81 above as though fully set forth herein.

66. This is a claim for treble damages and penalties under the Florida False Claims Act, §§ 68.081 *et seq.*, Fla. Stat., as amended.

67. By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to Florida for payment or approval, within the meaning of § 68.082(2)(a), Fla. Stat.

68. Florida, unaware of the falsity of the claims made or caused to be made by the Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

69. By reason of the Defendant's acts, Florida been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

70.     Additionally, Florida is entitled to the maximum penalty of $11,000 for each and every false and fraudulent claim made and caused to be made by Defendant arising from their unlawful conduct as described herein.

### COUNT SEVEN
### (Florida False Claims Act)
### § 68.082(2)(b), Fla. Stat.

71.     Relators repeat and reallege each and every allegation contained in paragraphs 1 through 81 above as though fully set forth herein.

72.     This is a claim for treble damages and penalties under the Florida False Claims Act, §§ 68.081 *et seq.*, Fla. Stat., as amended.

73.     By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false or fraudulent records and statements, and omitted facts, material to false or fraudulent claims, within the meaning of § 68.082(2)(b).

74.     Florida, unaware of the falsity of the records, statements and material omissions made or caused to be made by the Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

75.     By reason of the Defendant's acts, Florida has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

76.     Additionally, Florida is entitled to the maximum penalty of $11,000 for each and every false and fraudulent claim made and caused to be made by Defendant arising from their unlawful conduct as described herein.

## COUNT EIGHT
### (Florida False Claims Act)
### § 68.082(2)(c), Fla. Stat.

77.     Relators repeat and reallege each and every allegation contained in paragraphs 1 through 81 above as though fully set forth herein.

78.     This is a claim for treble damages and penalties under the Florida False Claims Act, §§ 68.081 *et seq.*, Fla. Stat., as amended.

79.     By virtue of the acts described above, Defendant conspired with others known and unknown to defraud Florida by inducing Florida to pay or approve false and fraudulent claims, and to avoid and conceal an obligation to pay money and property, within the meaning of § 68.082(2)(c). Defendant, moreover, took substantial steps in furtherance of the conspiracy, inter alia, by making false and fraudulent statements and representations, by preparing false and fraudulent records, and/or by failing to disclose material facts.

80.     By reason of the Defendant's acts, Florida has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

81.     Additionally, Florida is entitled to the maximum penalty of $11,000 for each and every false and fraudulent claim made and caused to be made by Defendant arising from their unlawful conduct as described herein.

## COUNT NINE
### (Florida False Claims Act)
### § 68.082(2)(g), Fla. Stat.

82.     Relators repeat and reallege each and every allegation contained in paragraphs 1 through 80 above as though fully set forth herein.

83.     This is a claim for treble damages and penalties under the Florida False Claims Act, §§ 68.081 *et seq.*, Fla. Stat., as amended.

84.     By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government, within the meaning of § 68.082(2)(g), Fla. Stat.

85.     Florida, unaware of the falsity of the records and statements and of the Defendant's concealment and unlawful conduct, was denied an opportunity to claim and demand return of the money and property to which it was legally entitled.

86.     By reason of the Defendant's acts, Florida has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

87.     Additionally, Florida is entitled to the maximum penalty of $11,000 for each and every false and fraudulent claim made and caused to be made by Defendant arising from their unlawful conduct as described herein.

**COUNT TEN**
**(Florida False Claims Act – Whistleblower Act)**
**§ 68.088, Fla. Stat and § 112.3187, Fla. Stat.**

88.     Relators repeat and reallege each and every allegation contained in paragraphs 1 through 81 above as though fully set forth herein.

89.     Defendant had a duty under the Florida False Claims Act, § 68.088 and the Florida Whistleblower Act, § 112.3187, Fla. Stat., to refrain from taking discriminatory or retaliatory actions against employees who take lawful actions in furtherance of a False Claims Act action, or who make lawful efforts to stop others from violating the False Claims Act. Such discriminatory and retaliatory action includes, but is not limited to, discharging, demoting, suspending threatening or harassing an employee for engaging in such protected conduct.

90.     As set forth above, Relators engaged in numerous activities that are protected under the False Claims Act. This included investigation and inquiries to supervisory personnel regarding various fraudulent activities to enhance federal and state reimbursement; bringing this fraudulent and illegal activity to the attention of supervisory personnel; refusing to participate in, assist, or ignore a scheme to defraud the government; and other similar actions to stem the FCA violations described above.

91.     Defendant was well aware that Relators had engaged in these protected activities, and they discriminated and retaliated against Relators for engaging in such protected conduct by commencing proceedings to terminate her employment.

92.     Defendant's actions damaged and continue to damage Relators in violation of the Florida False Claims Act, § 68.088 and the Florida Whistleblower Act, § 112.3187, Fla. Stat. As a direct and proximate result of the foregoing, Relators have lost the benefits and privileges of employment and has suffered additional economic and non-economic damages, including severe

emotional anguish and irreparable, continuing to harm their careers. In connection with this claim, Relators seek all damages and other appropriate relief authorized by the False Claims Act and Whistleblower Act, as well as litigation costs and reasonable attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, Relators, acting on behalf and in the name of the United States of America and the State of Florida, demand and pray that judgment be entered against Defendant under the Federal False Claims Act and Florida False Claims Act as follows:

(1)     That Defendant cease and desist from violating 31 U.S.C. §§ 3729 *et seq.* and §§ 68.081 *et seq.*, Fla. Stat., as set forth above;

(2)     That this Court enter judgment against Defendant in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of not less than $5,000 and not more than $11,000 for each violation of 31 U.S.C. § 3729;

(3)     That this Court enter judgment against Defendant in an amount equal to three times the amount of damages the State of Florida has sustained because of Defendant's actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of § 68.082(2), Fla. Stat.;

(4)     That Relators be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) and § 68.085, Fla. Stat.;

(5)     That by reason of Defendant's retaliatory and discriminatory actions against Relators in violation of 31 U.S.C. § 3730(h), and §§ 68.088, 112.3187, Fla. Stat., judgment be entered in favor of Relators and against Defendant, and that Relators be awarded double their

back-pay losses, plus front pay, interest, costs, attorneys' fees and special damages for emotional distress and harm to their reputations; and

(6)     That Relators be awarded all costs of this action, including attorneys' fees and expenses; and

(7)     That Relators recover such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands a trial by jury.

Dated: June 4, 2014

By:  _____
James P. Gitkin

SALPETER GITKIN, LLP
James P. Gitkin (FL Bar No. 570001)
One East Broward Boulevard – Suite 1500
Fort Lauderdale, FL 33301
Tel. (954) 467-8622
Fax (954) 467-8623

KAISER LAW FIRM, PLLC
Geoffrey R. Kaiser, Esq. *(Pro Hac Vice To Be Filed)*
926 RXR Plaza
Uniondale, New York 11556-0926
Tel. (516) 570-3071
Fax (516) 570-3071

Attorneys for Relators