**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 0:14-cv-61301-KMW**

UNITED STATES OF AMERICA and
THE STATE OF FLORIDA *ex rel.*
JACK CARREL, MAURICIO  FERRER
and SHAWN LOFTIS,

                  Plaintiffs-Relators,

      vs.

AIDS HEALTHCARE FOUNDATION, INC.,

                Defendant.

_____//

**FIRST AMENDED COMPLAINT FOR VIOLATIONS OF**
**THE FEDERAL FALSE CLAIMS ACT [31 U.S.C. §§ 3729 *et. seq.*]**
**AND FLORIDA FALSE CLAIMS ACT [§§ 68.081 *et. seq.*, Fla. Stat.]**

Plaintiffs-Relators Jack Carrel, Mauricio Ferrer and Shawn Loftis (collectively, "Relators"), through their attorneys of record, on behalf of the United States of America and the State of Florida, file their First Amended Complaint against Defendant AIDS Healthcare Foundation, Inc. ("AHF"), and allege based upon personal knowledge, relevant documents, and information and belief, as follows:

I.      <ins>**NATURE OF THE ACTION**</ins>

1.    This is an action to recover damages and civil penalties on behalf of the United States of America and the State of Florida arising from false and/or fraudulent statements, records, and claims made and caused to be made by AHF and/or its agents, employees and co-conspirators in violation of the Federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.* and Florida False Claims Act, §§ 68.081 *et seq.*, Fla. Stat.

2.     As set forth in detail below, AHF knowingly engaged in a  multi-state kickback scheme designed to defraud Federal health care programs, including Medicare, Medicaid and HIV/AIDS grant programs sponsored by the Health Resources and Services Administration ("HRSA") and the Centers for Disease Control and Prevention ("CDC"), two agencies located within the U.S. Department of Health & Human Services ("HHS").   AHF's fraudulent conduct is made even worse by the fact that these funds were entrusted to AHF for the purpose of assisting a vulnerable patient population consisting of individuals living with HIV/AIDS, of whom there are more than 1.1 million residing in the United States.

3.     AHF conducted an organization-wide criminal effort across at least twelve states to enhance funding from federal health care programs in violation of the anti-kickback statute (42 U.S.C. § 1320a-7b(b)) by paying unlawful financial inducements to employees and patients in order to generate referrals to AHF's various service centers, including clinical services, insurance services, pharmacy services and testing services.   The resulting illegal referrals produced thousands of "false and fraudulent" claims under the Federal Civil False Claims Act ("FCA"), 31 U.S.C. §§ 3729, *et seq*. and Florida False Claims Act, §§ 68.081 *et seq*., Fla. Stat., and caused at least tens of millions of dollars in fraudulent payments by federal health care programs, including Medicare and Medicaid, as well as HIV/AIDS assistance programs funded by HRSA and CDC.   Such claims cheated the government and unlawfully enriched AHF.   Therefore, Relators Jack Carrel, Mauricio Ferrer and Shawn Loftis seek to recover all available damages, civil penalties, and other relief for violations alleged herein.

2

II.     **PARTIES**

4.     Relator Jack Carrel resides in Louisiana and was the Director of Public Health, Southern Bureau forU AHF, from August 9, 2012 to August 1, 2013.   In that position, Relator Carrel was responsible for program implementation, coordination, and evaluation of the prevention division, as well as for providing guidance to program staff on budget management, supervision of personnel and volunteers, patient/client relations, community relations and the oversight and management of prevention program administration in the Southern Bureau. Relator Mauricio Ferrer resides in Florida and was a Senior Program Manager in the Southern Bureau of AHF from May 17, 2011 to in or about August 2012.  In that position, Relator Ferrer was responsible for supervising the daily functions and administrative operations of prevention and testing programs in Florida, including launching and growing Prevention Program Services throughout the Bureau and supervising Program Managers for the Out of the Closet Thrift Store-based HIV test site programs, and two Mobile Testing Units (MTUs).  Relator Shawn Loftis resides in New York and was the Grants Manager, Southern Bureau for AHF, from January 2, 2013 to August 16, 2013.  In that position, Relator Loftis was responsible for day-to-day fiscal management of sponsored projects.

5.     AHF is a California corporation headquartered in Los Angeles, California.  AHF conducts business operations within the State of Florida from offices, care centers and pharmacy outlets located throughout the state, including Ft. Lauderdale, Miami, Pensacola, Ft. Myers, Orlando, Tampa, Delray Beach, and Jacksonville.  In addition to Florida and California, AHF conducts operations in at least ten other states, including Georgia, Louisiana, Maryland, Mississippi, New York, Ohio, South Carolina, Texas, Nevada, and Washington, D.C. AHF

describes itself as a global organization providing cutting-edge medicine and advocacy to more than 200,000 patients in 28 countries.  AHF states that it is the largest provider of HIV/AIDS medical care in the United States.

### III.    JURISDICTION AND VENUE

6.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1367, and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.  Under 31 U.S.C. § 3730(e), there has been no statutorily relevant public disclosure of the "allegations or transactions" in this Complaint.  Relators are the original sources of the facts and information alleged in this Complaint.

7.    This Court has personal jurisdiction over the Defendant pursuant to 31 U.S.C. § 3732(a) because that section authorizes nationwide service of process and because the Defendant has minimum contacts with the United States.  Moreover, the Defendant can be found in this District and transacts business in this District.

8.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and 1395(a) and 31 U.S.C. § 3732(a) because the Defendant can be found in and transacts business in this District. At all times relevant to this Complaint, Defendant regularly conducted substantial business within this District, maintained employees in this District, and/or made significant sales within this District. In addition, statutory violations, as alleged herein, occurred in this District.

## IV.   APPLICABLE LAW

### A.   Federal and State False Claims Acts

9.   The FCA was originally enacted during the Civil War and was substantially amended in 1986. Congress enacted the 1986 amendments to enhance and modernize the government's tools for recovering losses sustained by frauds against it. The amendments were intended to create incentives for individuals with knowledge of fraud against the government to disclose the information without fear of reprisals or government inaction, and to encourage the private bar to commit resources to prosecuting fraud on the government's behalf.

10.   The FCA prohibits knowingly presenting or causing to be presented to the federal government a false or fraudulent claim for payment or approval. 31 U.S.C. § 3729(a)(1)(A).[1] Additionally, it prohibits knowingly making or using a false or fraudulent record or statement "material to a false or fraudulent claim" paid or approved by the federal government, or "material to an obligation to pay" money to the government and further prohibits knowingly concealing and improperly avoiding or decreasing "an obligation to pay" money to the government. 31 U.S.C. § 3729(a)(1)(B) and (G).  The FCA also prohibits two or more parties from conspiring to defraud the government by getting a false or fraudulent claim allowed or paid. 31 U.S.C. § 3729(a)(1)(C).  Any person who violates the FCA is liable for a civil penalty of up to $11,000 for each violation, plus three times the amount of the damages sustained by the United States. 31 U.S.C. § 3729(a).

11.   The FCA does not require direct contact between a defendant and the government. By its terms, the FCA imposes liability on any person who presents or *causes* to be presented a

---

[1] Citations are to the renumbered liability provisions of the FCA, as effected by the Fraud Enforcement and Recovery Act of 2009 (Publ. L. No. 111-21, May 20, 2009).

false or fraudulent claim to the government (or false statement in support of a false or fraudulent claim). *See* 31 U.S.C. § 3729(a).

12.     To "cause" an FCA violation, it is not necessary that a defendant's fraudulent conduct be the last in the series of events that results in financial loss to the government. As applied by the courts, the standard for "causation" under the FCA is whether the submission of a false or fraudulent claim was "reasonably foreseeable" from a defendant's actions. Under this standard, a defendant's fraudulent conduct can occur anywhere in the chain of events leading to financial loss by the government, and can be an indirect, as well as direct, cause of the loss. Moreover, the defendant need not be the recipient or beneficiary of the false claim. All that is required is that the defendant, by its fraudulent conduct, set in motion a series of events which results in a reasonably foreseeable loss to the government.

13.     The FCA, 31 U.S.C. § 3729(a)(1)(C), makes any person, who conspires to defraud the United States by getting a false or fraudulent claim allowed or paid, liable for three times the amount of the damages the government sustains and a civil monetary penalty of up to $11,000 per claim for claims made on or after September 29, 1999.

14.     The FCA defines a "claim" to include any request or demand, whether under contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States government provides any portion of the money or property which is requested or demanded, or if the government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested.

15.     A "false claim" is defined by statute to include any claim that incorporates items or services resulting from a violation of the federal anti-kickback statute (42 U.S.C. § 1320a-7b(b)):

6

(g) In addition to the penalties provided for in this section [i.e., 42 U.S.C. § 1320a-7b] . . . a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of [31 U.S.C. §§ 3729 et seq.]

The anti-kickback statute, in turn, is violated whenever one knowingly and willfully offers, receives, solicits or pays anything of value, whether directly or indirectly, overtly or covertly, in cash or in kind, in return for the referral of an individual for services reimbursable by a Federal health care program or for the purchase or ordering of items or services reimbursable by a Federal health care program.  The statute, violation of which is a felony offense, defines "Federal health care program" to include Medicare, Medicaid and any other "plan or program that provides health benefits, whether directly, through insurance, or otherwise, which is funded directly, in whole or in part, by the United States Government." 42 U.S.C. § 1320a-7b(f).

16.     The FCA allows any person having information about an FCA violation to bring an action on behalf of the United States, and to share in any recovery. The FCA requires that the complaint be filed under seal for a minimum of 60 days (without service on the defendants during that time) to allow the government time to conduct its own investigation and to determine whether to join the suit.

17.     The Florida False Claims Act, §§ 68.081 et seq., Fla. Stat., is modeled after the FCA, and its liability provisions are virtually identical.  Similarly to the FCA, any person who violates, or conspires to violate, the Florida False Claims Act is liable for three times the amount of the damages sustained by the State of Florida.  In addition, a violator faces a civil penalty of up to $11,000 per claim.

B.    **The Federal Health Care Programs**

18.    The health care programs described in the paragraphs below, and any other government-funded healthcare programs, shall be referred to as "Federal Health Care Programs."

19.    The Medicare Program, Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, *et seq.*, is a health insurance program administered by the United States that is funded by taxpayer revenue.  Entitlement to Medicare is based on age, disability or affliction with certain diseases.  The program is overseen by HHS through the Centers for Medicare and Medicaid Services ("CMS").   Medicare provides for payment of hospital services, medical services, durable medical equipment and prescription drugs on behalf of Medicare-eligible beneficiaries.

20.    Claims submitted to Medicare for payment, whether submitted on a paper CMS-1500 Claim Form, or electronically, carry certifications of truth and accuracy.  The paper Claim Form carries a certification that the billing information on the form is true, accurate and complete, and that the provider submitting the form did not knowingly or recklessly disregard or misrepresent or conceal material facts. UBS-04 CMS-1450 Form.  The Claim Form further states that the person or entity submitting the form "understands that misrepresentation or falsification of essential information as requested" by the form "may serve as the basis for civil monetary penalties and assessments and may upon conviction include fines and/or imprisonment . . . ." Id.  Those who submit claims electronically are likewise required to certify that the claims are "accurate, complete and truthful" and to "acknowledge that all claims will be paid from Federal funds, that the submission of such claims is a claim for payment under the Medicare program and that anyone who misrepresents or falsifies or causes to be misrepresented or falsified any record or other information relating to that claim . . . may, upon conviction, be subject to a fine

and/or imprisonment under applicable Federal law." Medicare Claims Processing Manual, Chapter 24, 30.2.

21.   When providers enroll in the Medicare Program, they further agree as follows:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to this supplier. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. <u>I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the supplier's compliance with all applicable conditions of participation in Medicare.</u>

Medicare Enrollment Application, at p. 31 (emphasis added).

22.   The Medicaid Program, Title XIX of the Social Security Act, 42 U.S.C. §§ 1396-1396v is a health insurance program administered by the United States and individual states and is funded by federal, state and local taxpayer revenue.  The Medicaid Program is overseen by HHS through CMS.  Medicaid was designed to assist participating states in providing medical services, durable medical equipment and prescription drugs to financially needy individuals that qualify for Medicaid.  The Medicaid program pays for services pursuant to plans developed by the States and approved by HHS through CMS.  42 U.S.C. §§ 1396a(a)-(b).  States pay doctors, hospitals, pharmacies, and other providers and suppliers of medical items and services according to established rates. 42 U.S.C. §§1396b(a)(1), 1903(a)(1). The federal government then pays each state a statutorily established share of "the total amount expended ... as medical assistance under the State plan." See 42 U.S.C. §1396b(a)(1). This federal-to-state payment is known as Federal Financial Participation.

23.   Florida maintains a federally-approved Medicaid program to reimburse health care charges made by physicians and other health care providers for the treatment of many low-

income Florida citizens not covered by Medicare or private insurance.  Claims submitted to the Florida Medicaid Program cause payments to be made by both the United States and Florida. The United States and Florida contribute approximately half the cost of each claim submitted to the Florida Medicaid Program.  Providers apply to participate in the Florida Medicaid Program and agree as a condition of both participation and payment to comply with all the policies and procedures of the Florida Agency for Health Care Administration ("AHCA"), which administers the Medicaid Program in Florida.  Medicaid providers must sign a provider agreement promising that the provider will comply with all laws and rules governing the delivery and reimbursement of services or goods to Medicaid recipients.  Florida Medicaid, Provider General Handbook, at 2-12.  Each claim submitted to the Medicaid Program, whether electronically or on a paper claim form, carries a certification that the claim complies with all federal and state laws and regulations; that the services for which reimbursement is claimed "were medically indicated and necessary to the health" of the patient; that the information contained in the claim "is true, accurate and complete," and that the provider understands "that payment and satisfaction of [the] claim will be from Federal and State funds and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal or State laws." Florida Medicaid, Provider Reimbursement Handbook, CMS-1500.

24.    AHCA policies and procedures bar Medicaid payments resulting from fraud or abuse.  "Abuse" includes practices that result in unnecessary cost to the Medicaid program and may include "a violation of state or federal law, rule or regulation."  Florida Medicaid, Provider General Handbook, at 5-3.  "Fraud" is defined as "an intentional deception or misrepresentation made by a person with the knowledge that the deception results in unauthorized benefit to herself or himself or another person" and also includes "any act that constitutes fraud under federal or

state law." Id.  "Overpayment" is defined as "any amount that is not authorized to be paid by the Medicaid program whether paid as a result of inaccurate or improper cost reporting, improper claims, unacceptable practices, fraud, abuse or mistake." Id.

25.    AHCA requires "repayment for inappropriate, medically unnecessary, or excessive goods or services from the person furnishing them, the person under whose supervision they were furnished, or the person causing them to be furnished." Id.

26.    To participate in Medicare and Medicaid, providers must be duly licensed and authorized by the States in which they practice to render professional services.  See Medicare General Information, Eligibility and Entitlement, Chapter 5, 70.3; Florida Medicaid, Provider General Handbook, at 2-3.

27.    HRSA and CDC provide federal funding to community-based organizations like AHF, either directly or indirectly through State agencies, for programs designed to expand medical care for people living with HIV/AIDS and to increase awareness of HIV status.

28.    HRSA provides much of its funding through the Ryan White HIV/AIDS Program ("Ryan White"), which is the largest Federal program focused exclusively on HIV/AIDS care. According to the HRSA website, Ryan White is for individuals living with HIV/AIDS who have no health insurance, have insufficient health care coverage, or lack financial resources to get the care they need. The majority of Ryan White funds support primary medical care and essential support services, and a smaller portion also supports technical assistance, clinical training, and research on innovative models of care.

29.    The legislation that created Ryan White specifies a number of Parts to meet the needs of different communities and populations.  **Part A** provides emergency assistance to certain metropolitan and other areas that are most severely affected by the HIV/AIDS epidemic.

**Part B** provides grants to the States, the District of Columbia and certain U.S. territories.  **Part C** provides comprehensive primary health care in an outpatient setting for people living with HIV disease.  **Part D** provides family-centered care involving outpatient or ambulatory care for women, infants, children, and youth with HIV/AIDS.  **Part F** provides funding for other programs, including training programs for providers treating people with HIV/AIDS.

30.    Ryan White works with cities, states, and local community-based organizations to provide HIV-related services to more than half a million people each year.  AHF received a portion of its Ryan White funding in direct HRSA grants and another portion through various Florida state and county agencies, including the Florida Department of Health HIV/AIDS Program.  On information and belief, AHF was a recipient of Ryan White grant funds over a period of years totaling millions of dollars.

31.    Of the more than 1.1 million people living with HIV/AIDS, an estimated 240,000 are unaware of their HIV-positive status.  According to the CDC, increasing the number of people who are aware of their HIV status is a key strategy in preventing infections.  In order to achieve this goal, the CDC provides funding for expanded HIV testing programs aimed, in part, at significantly increasing the number of persons who are tested in jurisdictions having a high rate of HIV among disproportionately affected populations.  AHF participated in some of these CDC-funded HIV testing programs and, on information and belief, it received CDC grant funds over a period of years totaling millions of dollars.

32.    AHF's entitlement to HRSA and CDC grant funds was contingent upon its compliance with standard terms and conditions that attached to all HHS grants.  In applying for and accepting HHS grant funds, AHF certified its compliance with these terms and conditions. In general, the requirements that apply to the recipient of grant funds, including public policy

requirements, also apply to sub-recipients and contractors under grants.  As will be explained

further below, AHF knowingly and repeatedly violated  an essential grant term and condition –

compliance with the federal anti-kickback statute -- which rendered its acceptance and use of

grant proceeds fraudulent and a violation of the False Claims Act.

33.    Standard terms and conditions of HHS grants are set forth in federal regulations and

further explained by the HHS Grants Policy Statement, which states, at I-6:

> HHS grant awards generally are made to organizations. The organization is legally
> accountable for the performance of the award and the expenditure of funds. . . In
> signing a grant application, [the organization's authorized representative] agrees that
> the organization will assume the obligations imposed by applicable Federal statutes
> and regulations and other terms and conditions of the award, including any
> assurances, if a grant is awarded. These responsibilities include accountability both
> for the appropriate use of funds awarded and the performance of the grant-supported
> project or activities as specified in the approved application.

34.    The Notice of Award is the legal document indicating an award has been made and

that funds may be requested from HHS.  According to the HHS Grant Policy Statement, "until an

awarding office has issued a [Notice of Award] for the initial budget period, any costs incurred by

the applicant for the project are incurred at its own risk." (HHS Grant Policy Statement at I-34).  The

Notice of Award sets forth relevant information about the award, including "the amount of Federal

funds authorized" and "[a]pplicable terms and conditions of award, either by reference or inclusion."

Id. at I-34 and 35.  A grant recipient "indicates acceptance of an award and its associated terms and

conditions by drawing or requesting funds from the designated HHS payment system or office" and

"[i]f a recipient cannot accept the award, including the legal obligation to perform in accordance with

award terms and conditions, the organization" is expected to notify HHS immediately. Id. at I-35.  If

the award is accepted, "the contents of the [Notice of Award] are binding on the recipient unless and

until modified by a revised [Notice of Award] signed by the [Grants Management Officer]." Id.

HHS "may administratively recover funds paid to a recipient in excess of the amount to which the

recipient is . . . entitled under the terms and conditions of the award, including misspent funds or unallowable costs incurred." <u>Id</u>. at II-96.  "If a recipient has failed to materially comply with the terms and conditions of award, [HHS] may suspend the grant, pending corrective action, or may terminate the grant for cause." <u>Id</u>. at II-93; <u>see</u> 45 CFR §§74.61, 74.62, 92.43.

35.    Among the standard terms contained in the Notice of Award is a requirement that the award recipient comply with the requirements of the federal anti-kickback statute:

> <u>Recipients and sub-recipients of Federal funds are subject to the strictures of the Medicare and Medicaid anti-kickback statute (42 U.S.C. 1320a-7b(b))</u> and should be cognizant of the risk of criminal and administrative liability under this statute, specifically under 42 U.S.C. 1320 7b(b) illegal remunerations which states, in part, that whoever knowingly and willfully: (A) Solicits or receives (or offers or pays) any remuneration (including kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind, in return for referring (or to induce such person to refer) an individual to a person for the furnishing or arranging for the furnishing of any item or service, OR (B) In return for purchasing, leasing, ordering, or recommending purchasing, leasing, or ordering, or to purchase, lease, or order, any goods, facility, services, or item .... For which payment may be made in whole or in part under subchapter XIII of this chapter or a State health care program, shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.  (Emphasis added).

36.    The HHS Grant Policy Statement also states that "[a]nyone who becomes aware of the existence (or apparent existence) of fraud, waste, or abuse related to HHS grants or use of grant funds should report this information to HHS." [<u>Id.</u> at I-7]  HHS defines "fraud, waste, or abuse" to include "embezzlement, misuse, or misappropriation of grant funds or property, and false statements, whether by organizations or individuals."  <u>Id</u>. at I-7.   The HHS Grant Policy Statement further puts all grant recipients on notice that the "Federal government may pursue administrative, civil, or criminal action under a variety of statutes that relate to fraud and false statements or claims," including the False Claims Act. <u>Id</u>. at I-8.

## V.     FACTS UNDERLYING THE FRAUD SCHEMES

### A.     The Scheme to Induce Patient Referrals Through Illegal Incentive Payments

37.    On information and belief, starting no later than in or about 2010 , AHF instituted a fraudulent scheme to generate consumer demand for its programs by implementing a system of illegal incentive payments that caused self-referrals by patients to utilize AHF services and that rewarded employees for referring patients to AHF's testing, clinical, pharmacy and insurance service centers, all in violation of the federal anti-kickback statute (42 U.S.C. 1320a-7b(b)).  The kickback scheme began in California and spread eastward across the country through standardized and illegal financial incentive policies governing the entire organization.

38.    Payments to AHF under HIV testing contracts were either allocated as lump sum amounts paid in equal installments or paid on a per test cost reimbursement basis periodically throughout the year.  Further, many of AHF's HIV testing contracts required, as a condition of the contract, that AHF perform a certain volume of testing and further demonstrate "linkage" between HIV positive test results and clinical care for the individuals who tested positive. Failure to meet these goals resulted in payment reductions under the contracts.  For example, one contract with Florida Department of Health provided as follows:

> The Provider must link at least 95% of clients with a positive test result to medical care. The provider will have a chart for each positive client that will include: DH1628, DH1628c, consent forms, referral to STD and partner services, proof of medical linkage and adherence program referral to PROACT using Attachment IV of this contract. (Emphasis added).

The contract further provided, in relevant part, that:

> Failure to conduct a minimum of 950 HIV tests quarterly in the target population shall result in a reduction in payment in the amount of $24.86 per HIV test not performed. (Emphasis added).

15

Failure to screen, test or treat a minimum of 750 individuals per quarter <u>shall result in a reduction in payment in the amount of $52.50 per individual not screened, tested or treated.</u> (Emphasis added).

39.    In order to ensure compliance with these and other similar contractual requirements, and avoid losing federal funding under the testing contracts, AHF unlawfully incentivized its employees to increase the volume of HIV test referrals to AHF's testing locations and refer patients with positive test results to AHF clinical service centers.  AHF then sought additional reimbursement under Federal Health Care Programs for rendering services to those patients.

40.    AHF paid its HIV testing personnel under a "commission based" formula that combined a base salary amount and an additional "commission" amount that was predicated on the volume of tests performed.  Additional incentive compensation was paid to testing staff managers, who received financial bonuses if their staff exceeded numerical testing goals, as reflected in the AHF commission-based testing cost analysis attached as <u>Exhibit 1</u>.  Moreover, bonus compensation of up to $100 was paid to an employee who "linked" a patient with a positive test result to AHF linkage coordinators for referral to clinical services.  The below description was taken from AHF's internal records (attached as <u>Exhibit 2</u>):

**Commission Based Testing Formula**
- **Set a realistic monthly goal for all testers to meet per department**
- **Keep everyone at their current salary and anyone testing above the monthly goal will get a monthly commission**
- <u>**Testers who successfully link a positive client to linkage (client speaks to linkage and provides correct phone number) will get a bonus – ($50 to $100)**</u>

**Formula:**
**Regular salary + completed test above testing goal + positives identified**
**Monthly**

|    | $3 | $4 | $5 | $7 |
|----|-----|------|------|------|
| 10 | $30 | $40 | $50 | $70 |
| 20 | $60 | $80 | $100 | $140 |
| 30 | $90 | $120 | $150 | $210 |
| 40 | $120 | $160 | $200 | $280 |
| 50 | $150 | $200 | $250 | $350 |

**Scenario #1**
**Monthly goal is 110, test will be paid at $5 and positive will be paid at $100**
**Tester conducted 146 tests in December and identified 1 positive**
**Current Monthly Salary = $1,200**
**Commission/bonus = 36**
**Positive = 1**
**$1,200 + $180 + 100 = $1,480**

(Emphasis added)

41. AHF encouraged its linkage coordinators to promptly contact any HIV positive

patients referred by AHF's testers and link those patients to AHF clinical services. In

furtherance of that effort, linkage coordinators were authorized to pay for patient meals at local

fast food restaurants and even pay the transportation costs for those patients to travel to AHF

clinical service centers. Patients were also incentivized to frequent AHF clinical service centers

for treatment and testing of sexually transmitted diseases ("STD"), for returning to AHF service

centers for ongoing medical care and for remaining STD negative every few months. More

generally, remuneration in the form of gift certificates and cash payments valued at up to $50 or

more was paid to any AHF Public Health Division ("PHD") employee -- including but not

limited to the AHF linkage coordinators who met with referred HIV positive patients -- who was

responsible for referring patients to AHF for services, including pharmacy and insurance

services. Patients, moreover, were plied with valuable gifts for frequenting AHF pharmacies,

including a monthly allotment of multivitamins and nutrition shakes worth more than $50.

17

42.   Although formed as a non-profit entity, AHF exhibited a for-profit corporate mindset and a voracious appetite for any and all revenues associated with HIV-patient referrals. The illegal incentive schemes that AHF implemented were designed to channel patient referrals to all corners of AHF's operations, from testing services to clinical services to pharmacy services to insurance services (AHF marketed a managed care insurance product for Medicaid patients known as "Positive Healthcare").   The below chart (attached as <u>Exhibit 3</u>), excerpted from an internal AHF financial presentation, well illustrates this aggressive mentality:



## All AHF

| | | | Full Year 2011 | | | Full Year 2012 | |
|---|---|---|---|---|---|---|---|
| | | Number of Tests | 72,982 | | | 98,283 | |
| | | Positives | 890 | 1.20% | | 1,113 | 1.13% |
| | | Referrals | 633 | | | 823 | |
| | | Number of Positives from tests and referrals | 1,523 | | | 1,936 | |
| | | | | % of Positives | | | % of Positives |
| L i n k a g e | HCC | Become an AHF HCC Patient | 814 | 53% | | 1,123 | 58% |
| | MC | Enroll in one of our Managed Care Plans | 39 | 3% | 37 also HCC Patients | 38 | 2% | 33 also HCC Patients |
| | Rx | Fill your Rx at an AHF Pharmacy | 672 | 44% | 615 (76%) from HCC 57 Pharmacy Only | 822 | 42% | 780 (69%) from HCC 42 Pharmacy Only |

43.   "Linkage" – or the referral of HIV-positive patients into AHF's constellation of services -- was AHF's "holy grail" and the key to its business model.  As reflected above, AHF's internal records are replete with references to the importance of linking HIV-positive patients into AHF's care and the financial rewards that would flow not only to employees who were responsible for "linkage" but also to patients who self-referred to AHF for clinical services.

44.   AHF employed "Care Coordinators" in its Linkage Program for the purpose of

ensuring that HIV-positive patients were connected to the full menu of AHF healthcare services, including testing, clinical, pharmacy and benefit services.   An "AHF Linkage to Care Training Manual" (attached as Exhibit 4) emphasized the role of the Care Coordinator to "cooperate with PHD-SB Management and HIV Testing Counselors to ensure the referral of 100% of preliminary positive clients into AHF Healthcare Centers . . . and AHF Pharmacies or other remote healthcare referral locations within 72 hours."   The training manual provides step-by-step instructions on how to link patients into AHF care and specifies that HIV-positive patients will be connected on both their first and second visits at an AHF Healthcare Center with a "benefits counselor," a "phlebotomist," a "medical doctor," and the "pharmacy."

45.   The importance and financial rewards associated with linking patients into AHF's care are referenced throughout the business records of the organization.   At a May 2013 Leadership Summit ("Leadership Summit") AHF defined "success" for the PHD in 2013 as the ability to "link 60% of those we identify as [HIV] positive into our care."   Financial incentives were paid to AHF testers, testing managers and linkage personnel (i.e., Care Coordinators) for linking patients into AHF services and products.   The chart below (attached as Exhibit 5), taken from AHF's records, describes financial incentives paid to AHF's HIV testers if they were able to successfully "link" such patients "to AHF medical care":

PG 1

Commission Based Testing Flow Chart



46.   AHF's President, Michael Weinstein, attended the Leadership Summit and personally advocated for: (1) increased testing to raise HIV "positivity" rates; (2) improved "linkage" of patients to and retention in AHF medical care; and (3) the payment of financial incentives to patients for the purpose of inducing self-referrals to AHF medical care.  Weinstein specifically directed staff to raise the patient financial incentive to $50 immediately and to implement the incentive program nationally throughout the AHF organization.  Weinstein also directed a patient financial incentive of $50 to those falling out of care to induce them to return to AHF medical care and also a financial incentive of up to $50 every few months to remain in AHF care, as well as an additional financial "bonus" at the end of one year of such care.  Explicit

discussions were held concerning the importance of "find[ing] more positives" and "gain[ing] more referrals." Also discussed was the relationship between referrals of HIV-positive patients into AHF medical care and the start of medication regimens through AHF Pharmacy outlets. The Public Health Division budget even included a line item for patient incentive expense.

47. To AHF, "linkage into care" for HIV-positive patients meant "linkage into AHF care," and the illegal financial incentive scheme that AHF instituted was intended to ensure such a result. AHF, moreover, measured the financial success and "return on investment" in its PHD in terms of how effectively the PHD was able to link patients into other AHF services so that AHF could generate sufficient revenue to recoup the costs being incurred in rendering care to HIV-positive patients. That strategy is well-illustrated by the AHF record below (attached as Exhibit 6), excerpted from an internal PHD financial presentation, which describes how AHF sought to recover the costs of care incurred by the PHD through revenues earned in its Pharmacy Division:



**PUBLIC HEALTH**
Overview

> **PHD KSFs**

> Tests

> Positivity Rate

> Linkage (into AHF services)

> **PHD ROI**
> The time it takes for the Rx gross margin to recover the PHD service costs

48.   AHF's strategy is further reflected in its business records, which carefully track numbers and percentages of HIV-positive patients who were linked into AHF Healthcare Centers and AHF Pharmacies, and their associated revenue streams.  AHF maintained weekly "Linkage to Care" reports that tracked HIV-positive patients who were linked to AHF care (attached as Exhibit 7).  AHF financial records tracked the numbers of patient referrals into AHF Healthcare Centers and Pharmacies and their associated revenue impact (attached as Exhibit 8). Those records also disclose that AHF's Pharmacy Division was an enormous revenue generator, being responsible in 2012 alone for more than $300 million in total revenue.

49.   Through  the criminal scheme described above, AHF generated many millions of additional dollars for: (1) clinical services provided by AHF to illegally referred patients and reimbursed  by  the  Federal  Health  Care  Programs,  including  Medicare  and  Medicaid;  (2)

medications distributed by AHF to illegally referred patients through its pharmacy locations and reimbursed by the Federal Health Care Programs, including Medicare and Medicaid; (3) HIV testing services paid for with federal funds and provided to illegally referred patients; and (4) payments received by AHF through its Positive Healthcare managed care insurance product for illegally referred Medicaid patients living with HIV.

50.    The precise number of illegally referred HIV-positive patients cannot be known with certainty at this time, but a spreadsheet generated by AHF and attached as <u>Exhibit 9</u> lists more than 840 "linked" (and de-identified) patients who, on information and belief, represent at least a portion of the illegal referrals generated by AHF and who received services paid for by Federal Health Care Programs, as described above.   Using an average annual cost of HIV care of approximately $23,000 (which is the estimated 2010 average annual cost according to the CDC government website) would mean that for this group of patients alone, AHF's fraudulent kickback scheme may have caused Federal Health Care Programs to pay in the range of $20 million in HIV care costs in just a single year.   The total losses to the government over the entire life of the illegal scheme, of course, will be much higher.

### B.    <u>Retaliatory Employment Actions</u>

51.    Because Relators complained of compliance violations by AHF that constituted fraud against the government and resulted in AHF's submission of false claims totaling many millions of dollars, Relators were subjected to adverse employment actions, up to and including termination of employment.   AHF had no legitimate, non-retaliatory reason for taking these actions against Relators.   Such actions were malicious and/or or in reckless disregard of Relators' civil rights.   At all times relevant to this action, the Relators performed their jobs in an

exemplary fashion and would not have suffered any adverse employment action but for their complaints concerning violations constituting fraud against the government.

**VI.**   **CAUSES OF ACTION**

**COUNT ONE**
**Federal False Claims Act**
**31 U.S.C. § 3729(a)(1)(A)**

52.    Relators repeat and re-allege each and every allegation contained in paragraphs 1 through 51 above as though fully set forth herein.

53.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729, *et seq*., as amended.

54.    By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to officers, employees or agents of the United States government for payment or approval. 31 U.S.C. § 3729(a)(1)(A).

55.    The United States, unaware of the falsity of the claims made or caused to be made by the Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

56.    By reason of the Defendant's acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

57.    Additionally, the United States is entitled to the maximum penalty of $11,000 for each and every false and fraudulent claim made and caused to be made by Defendant arising from its unlawful conduct as described herein.

## COUNT TWO
## Federal False Claims Act
## 31 U.S.C. § 3729(a)(1)(B)

58.     Relators repeat and re-allege each and every allegation contained in paragraphs 1 through 51 above as though fully set forth herein.

59.     By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false or fraudulent records and statements, and omitted material facts, to get false or fraudulent claims paid or approved by the United States government, within the meaning of 31 U.S.C. § 3729(a)(1)(B).

60.     The United States, unaware of the falsity of the records, statements and material omissions made or caused to be made by the Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

61.     By reason of the Defendant's acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

62.     Additionally, the United States is entitled to the maximum penalty of $11,000 for each and every false and fraudulent claim made and caused to be made by Defendant arising from its unlawful conduct as described herein.

## COUNT THREE
## Federal False Claims Act
## 31 U.S.C. § 3729(a)(1)(G)

63.     Relators repeat and re-allege each and every allegation contained in paragraphs 1 through 51 above as though fully set forth herein.

64.     By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money

or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government, within the meaning of 31 U.S.C. § 3729(a)(1)(G).

65.     The United States, unaware of the falsity of the records and statements and of the Defendant's concealment and unlawful conduct, was denied an opportunity to claim and demand return of the money and property to which it was legally entitled.

66.     By reason of the Defendant's acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

67.     Additionally, the United States is entitled to the maximum penalty of $11,000 for each and every false and fraudulent claim made and caused to be made by Defendant arising from its unlawful conduct as described herein.

### COUNT FOUR
### Federal False Claims Act
### 31 U.S.C. § 3729(a)(1)(C)

68.     Relators repeat and re-allege each and every allegation contained in paragraphs 1 through 51 above as though fully set forth herein.

69.     This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729, et seq., as amended.

70.     By virtue of the acts described above, Defendant conspired with others, known and unknown, to defraud the United States by inducing the United States to pay or approve false and fraudulent claims, and to avoid and conceal an obligation to pay money and property, within the meaning of 31 U.S.C. § 3729(a)(1)(C). Defendant, moreover, took substantial steps in furtherance of the conspiracy, inter alia, by making false and fraudulent statements and

representations, by preparing false and fraudulent records, and/or by failing to disclose material facts.

71.    By reason of the Defendant's acts, the United States has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

72.    Additionally, the United States is entitled to the maximum penalty of $11,000 for each and every violation of 31 U.S.C. § 3729(a)(3) as described herein.

## COUNT FIVE
### (Federal False Claims Act – Retaliation Violation)
### 31 U.S.C. § 3730(h)

73.    Relators repeat and re-allege each and every allegation contained in paragraphs 1 through 51 above as though fully set forth herein.

74.    Defendant had a duty under the False Claims Act, 31 U.S.C. § 3730(h), to refrain from taking discriminatory or retaliatory actions against employees who take lawful actions in furtherance of a False Claims Act action, or who make lawful efforts to stop others from violating the False Claims Act.   Such discriminatory and retaliatory action includes, but is not limited to, discharging, demoting, suspending threatening or harassing an employee for engaging in such protected conduct.

75.    As set forth above, Relators engaged in numerous activities that are protected under the False Claims Act. This included investigation and inquiries to AHF managers regarding various fraudulent activities to enhance AHF's receipt of federal grant and health insurance proceeds; bringing this fraudulent and illegal activity to the attention of AHF senior management personnel; refusing to participate in, assist, or ignore a scheme to defraud the government; and other similar actions to stem the FCA violations described above.

27

76.     Defendant – including senior management personnel working at the various Defendant locations -- were well aware that Relators had engaged in these protected activities, and they discriminated and retaliated against Relators for engaging in such protected conduct by taking adverse employment actions against Relators.

77.     Defendant's actions damaged and continue to damage Relators in violation of 31 U.S.C. § 3730(h).   As a direct and proximate result of the foregoing, Relators have lost the benefits and privileges of employment and have suffered additional economic and non-economic damages, including severe emotional anguish and irreparable, continuing harm to their careers. In connection with this claim, Relators seek all damages and other appropriate relief authorized by the False Claims Act, as well as litigation costs and reasonable attorneys' fees.

**COUNT SIX**
**(Florida False Claims Act)**
**§ 68.082(2)(a), Fla. Stat.**

65.     Relators repeat and reallege each and every allegation contained in paragraphs 1 through 51 above as though fully set forth herein.

66.     This is a claim for treble damages and penalties under the Florida False Claims Act, §§ 68.081 *et seq*., Fla. Stat., as amended.

67.     By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to Florida for payment or approval, within the meaning of § 68.082(2)(a), Fla. Stat.

68.     Florida, unaware of the falsity of the claims made or caused to be made by the Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

69.     By reason of the Defendant's acts, Florida been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

70.     Additionally, Florida is entitled to the maximum penalty of $11,000 for each and every false and fraudulent claim made and caused to be made by Defendant arising from their unlawful conduct as described herein.

## COUNT SEVEN
### (Florida False Claims Act)
### § 68.082(2)(b), Fla. Stat.

71.     Relators repeat and reallege each and every allegation contained in paragraphs 1 through 51 above as though fully set forth herein.

72.     This is a claim for treble damages and penalties under the Florida False Claims Act, §§ 68.081 *et seq.*, Fla. Stat., as amended.

73.     By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false or fraudulent records and statements, and omitted facts, material to false or fraudulent claims, within the meaning of § 68.082(2)(b).

74.     Florida, unaware of the falsity of the records, statements and material omissions made or caused to be made by the Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

75.     By reason of the Defendant's acts, Florida has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

76.     Additionally, Florida is entitled to the maximum penalty of $11,000 for each and every false and fraudulent claim made and caused to be made by Defendant arising from their unlawful conduct as described herein.

## COUNT EIGHT
### (Florida False Claims Act)
### § 68.082(2)(c), Fla. Stat.

77.     Relators repeat and reallege each and every allegation contained in paragraphs 1 through 51 above as though fully set forth herein.

78.     This is a claim for treble damages and penalties under the Florida False Claims Act, §§ 68.081 *et seq.*, Fla. Stat., as amended.

79.     By virtue of the acts described above, Defendant conspired with others known and unknown to defraud Florida by inducing Florida to pay or approve false and fraudulent claims, and to avoid and conceal an obligation to pay money and property, within the meaning of § 68.082(2)(c). Defendant, moreover, took substantial steps in furtherance of the conspiracy, inter alia, by making false and fraudulent statements and representations, by preparing false and fraudulent records, and/or by failing to disclose material facts.

80.     By reason of the Defendant's acts, Florida has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

81.     Additionally, Florida is entitled to the maximum penalty of $11,000 for each and every false and fraudulent claim made and caused to be made by Defendant arising from their unlawful conduct as described herein.

## COUNT NINE
### (Florida False Claims Act)
### § 68.082(2)(g), Fla. Stat.

82.     Relators repeat and reallege each and every allegation contained in paragraphs 1 through 51 above as though fully set forth herein.

83.     This is a claim for treble damages and penalties under the Florida False Claims Act, §§ 68.081 *et seq.*, Fla. Stat., as amended.

84.   By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government, within the meaning of § 68.082(2)(g), Fla. Stat.

85.   Florida, unaware of the falsity of the records and statements and of the Defendant's concealment and unlawful conduct, was denied an opportunity to claim and demand return of the money and property to which it was legally entitled.

86.   By reason of the Defendant's acts, Florida has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

87.   Additionally, Florida is entitled to the maximum penalty of $11,000 for each and every false and fraudulent claim made and caused to be made by Defendant arising from their unlawful conduct as described herein.

## COUNT TEN
### (Florida False Claims Act – Whistleblower Act)
### § 68.088, Fla. Stat and § 112.3187, Fla. Stat.

88.   Relators repeat and reallege each and every allegation contained in paragraphs 1 through 51 above as though fully set forth herein.

89.   Defendant had a duty under the Florida False Claims Act, § 68.088 and the Florida Whistleblower Act, § 112.3187, Fla. Stat., to refrain from taking discriminatory or retaliatory actions against employees who take lawful actions in furtherance of a False Claims Act action, or who make lawful efforts to stop others from violating the False Claims Act.   Such

discriminatory and retaliatory action includes, but is not limited to, discharging, demoting, suspending threatening or harassing an employee for engaging in such protected conduct.

90.     As set forth above, Relators engaged in numerous activities that are protected under the False Claims Act. This included investigation and inquiries to supervisory personnel regarding various fraudulent activities to enhance federal and state reimbursement; bringing this fraudulent and illegal activity to the attention of supervisory personnel; refusing to participate in, assist, or ignore a scheme to defraud the government; and other similar actions to stem the FCA violations described above.

91.     Defendant was well aware that Relators had engaged in these protected activities, and they discriminated and retaliated against Relators for engaging in such protected conduct by commencing proceedings to terminate her employment.

92.     Defendant's actions damaged and continue to damage Relators in violation of the Florida False Claims Act, § 68.088 and the Florida Whistleblower Act, § 112.3187, Fla. Stat.  As a direct and proximate result of the foregoing, Relators have lost the benefits and privileges of employment and has suffered additional economic and non-economic damages, including severe emotional anguish and irreparable, continuing to harm their careers. In connection with this claim, Relators seek all damages and other appropriate relief authorized by the False Claims Act and Whistleblower Act, as well as litigation costs and reasonable attorneys' fees.

## **PRAYER FOR RELIEF**

WHEREFORE, Relators, acting on behalf and in the name of the United States of America and the State of Florida, demand and pray that judgment be entered against Defendant under the Federal False Claims Act and Florida False Claims Act as follows:

(1)     That Defendant cease and desist from violating 31 U.S.C. §§ 3729 *et seq*. and §§ 68.081 *et seq*., Fla. Stat., as set forth above;

(2)     That this Court enter judgment against Defendant in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of not less than $5,000 and not more than $11,000 for each violation of 31 U.S.C. § 3729;

(3)     That this Court enter judgment against Defendant in an amount equal to three times the amount of damages the State of Florida has sustained because of Defendant's actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of § 68.082(2), Fla. Stat.;

(4)     That Relators be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) and § 68.085, Fla. Stat.;

(5)     That by reason of Defendant's retaliatory and discriminatory actions against Relators in violation of 31 U.S.C. § 3730(h), and §§ 68.088, 112.3187, Fla. Stat., judgment be entered in favor of Relators and against Defendant, and that Relators be awarded double their back-pay losses, plus front pay, interest, costs, attorneys' fees and special damages for emotional distress and harm to their reputations; and

(6)     That Relators be awarded all costs of this action, including attorneys' fees and expenses; and

(7)     That Relators recover such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relators hereby demand a

trial by jury.

Dated: April 3, 2015

By:   /s/Theodore J. Leopold
        Theodore J. Leopold (FL Bar No. 705608)
        Diana L. Martin (FL Bar No. 624489)
        Leslie M. Kroeger (FL Bar No. 989762)
        COHEN MILSTEIN SELLERS & TOLL PLLC
        2925 PGA Boulevard, Suite 200
        Palm Beach Gardens, FL 33410
        Tel.  (877) 515-7955
        Fax  (561) 515-1401

        James P. Gitkin (FL Bar No. 570001)
        SALPETER GITKIN, LLP One East
        Broward Boulevard, Suite 1500
        Fort Lauderdale, FL 33301
        Tel. (954) 467-8622
        Fax (954) 467-8623

        Geoffrey R. Kaiser, Esq. *(Pro Hac Vice To Be Filed)*
        KAISER LAW FIRM, PLLC
        926 RXR Plaza
        Uniondale, New York 11556-0926
        Tel. (516) 570-3071
        Fax (516) 570-3071

        *Attorneys for Relators*