**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 0:14-cv-61301-KMW**

UNITED STATES OF AMERICA and
THE STATE OF FLORIDA *ex rel.*
JACK CARREL, MAURICIO FERRER
and SHAWN LOFTIS,

Plaintiffs,

vs.

AIDS HEALTHCARE FOUNDATION, INC.,

Defendant.
____________________________________________//

**THIRD AMENDED COMPLAINT FOR VIOLATIONS OF**
**THE FEDERAL FALSE CLAIMS ACT [31 U.S.C. §§ 3729 *et. seq.*]**
**AND FLORIDA FALSE CLAIMS ACT [§§ 68.081 *et. seq.*, Fla. Stat.]**

Plaintiff-Relators Jack Carrel, Mauricio Ferrer, and Shawn Loftis (collectively "Relators"), through their attorneys of record, on behalf of the United States of America and the State of Florida, file their Third Amended Complaint against Defendant AIDS Healthcare Foundation, Inc. ("AHF"), and allege as follows:

## I. NATURE OF THE ACTION

1. This False Claims Act lawsuit arises from a multi-state kickback scheme engineered by AHF to enhance its revenues derived from Federal health care programs, including Medicare, Medicaid, and HIV/AIDS grant programs sponsored by the Health Resources and Services Administration ("HRSA") and the Centers for Disease Control and Prevention ("CDC"), two agencies located within the U.S. Department of Health & Human Services ("HHS"). AHF's kickback scheme, in direct violation of the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), involves funds entrusted to AHF for the purpose of assisting a

vulnerable patient population consisting of individuals living with HIV/AIDS, more than 1.1 million of whom reside in the United States.

2. Specifically, AHF enhances funding from federal health care programs in violation of the Anti-Kickback Statute by paying unlawful financial inducements to employees and patients in order to generate referrals to AHF's various service centers, including clinical services, insurance services, pharmacy services, and testing services. The resulting illegal referrals have led and continue to lead to the provision of medical services, treatment, and medications to thousands of patients, for which AHF has submitted and continues to submit "false and fraudulent" claims under the Federal Civil False Claims Act ("FCA"), 31 U.S.C. §§ 3729, *et seq*., and Florida False Claims Act, §§ 68.081, *et seq.*, Fla. Stat., resulting in its recovery of at least tens of millions of dollars in fraudulent payments by federal health care programs, including Medicare and Medicaid, as well as HIV/AIDS assistance programs funded by HRSA and CDC. Therefore, Relators Jack Carrel, Mauricio Ferrer, and Shawn Loftis seek to recover all available damages, civil penalties, and other relief for violations alleged herein.

## II. PARTIES

3. Relator Jack Carrel resides in Louisiana and was the Director of Public Health, Southern Bureau for AHF, from August 9, 2012 to August 1, 2013. In that position, Relator Carrel was responsible for program implementation, coordination, and evaluation of the prevention division, as well as for providing guidance to program staff on budget management, supervision of personnel and volunteers, patient/client relations, community relations and the oversight and management of prevention program administration in the Southern Bureau.

4. Relator Mauricio Ferrer resides in Florida and was a Senior Program Manager in the Southern Bureau of AHF from May 17, 2011 to in or about August 2012. In that position,

Relator Ferrer was responsible for supervising the daily functions and administrative operations of prevention and testing programs in Florida, including launching and growing Prevention Program Services throughout the Bureau and supervising Program Managers for the Out of the Closet Thrift Store-based HIV test site programs, and two Mobile Testing Units (MTUs).

5. Relator Shawn Loftis resides in New York and was the Grants Manager, Southern Bureau for AHF, from January 2, 2013 to August 16, 2013. In that position, Relator Loftis was responsible for day-to-day fiscal management of sponsored projects.

6. AHF is a California corporation headquartered in Los Angeles, California. AHF conducts business operations within the State of Florida from offices, care centers, and pharmacy outlets located throughout the state, including Ft. Lauderdale, Miami, Pensacola, Ft. Myers, Orlando, Tampa, Delray Beach, and Jacksonville. In addition to Florida and California, AHF conducts operations in at least ten other states, including Georgia, Louisiana, Maryland, Mississippi, New York, Ohio, South Carolina, Texas, Nevada, and Washington, D.C. AHF describes itself as a global organization providing cutting-edge medicine and advocacy to more than 200,000 patients in 28 countries. AHF boasts that it is the largest provider of HIV/AIDS medical care in the United States.

## III. <u>JURISDICTION AND VENUE</u>

7. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1367, and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730. Under 31 U.S.C. § 3730(e), there has been no statutorily relevant public disclosure of the "allegations or transactions" in this Complaint.

8. This Court has personal jurisdiction over the Defendant pursuant to 31 U.S.C. § 3732(a) because that section authorizes nationwide service of process and because the Defendant has minimum contacts with the United States. Moreover, the Defendant can be found in this District and transacts business in this District.

9. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and 1395(a) and 31 U.S.C. § 3732(a) because the Defendant can be found in and transacts business in this District. At all times relevant to this Complaint, Defendant regularly conducted substantial business within this District, maintained employees in this District, and/or made significant sales within this District. In addition, statutory violations, as alleged herein, occurred in this District.

## IV. FACTS

### A. The Scheme to Induce Patient Referrals Through Illegal Incentive Payments

10. Starting no later than in or about 2010 and continuing through the present, AHF instituted a fraudulent scheme to generate consumer demand and increase revenue for its programs by implementing a system of illegal payments that incentivized patients to utilize AHF services and that rewarded employees, via payments wholly distinct from compensation for the provision of services, solely for referring patients to AHF's testing, clinical, pharmacy, and insurance service centers. These payments were made in violation of the federal anti-kickback statute, 42 U.S.C. § 1320a-7b(b), which prohibits knowingly and willfully offering, receiving, soliciting or paying anything of value, whether directly or indirectly, overtly or covertly, in cash or in kind, in return for the referral of an individual for services reimbursable by a Federal health care program or for the purchase or ordering of items or services reimbursable by a Federal health care program. A "Federal health care program" includes Medicare, Medicaid and any other "plan or program that provides health benefits, whether directly, through insurance, or

otherwise, which is funded directly, in whole or in part, by the United States Government." 42 U.S.C. § 1320a-7b(f). AHF's kickback scheme began in California and spread eastward across the country through standardized financial incentive policies governing the entire organization.

11. Once AHF provided medical services, treatment, or medications to the patients referred illegally, AHF submitted "false and fraudulent" claims for payment with government funds. The FCA prohibits knowingly presenting or causing to be presented to the federal government a false or fraudulent claim for payment or approval. 31 U.S.C. § 3729(a)(1)(A).[1] Additionally, it prohibits knowingly making or using a false or fraudulent record or statement "material to a false or fraudulent claim", 31 U.S.C. § 3729(a)(1)(B), or "material to an obligation to pay" money to the government and further prohibits knowingly concealing and improperly avoiding or decreasing "an obligation to pay" money to the government. 31 U.S.C. § 3729(a)(1)(G). The FCA defines a "claim" to include any request or demand, whether under contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States government provides any portion of the money or property which is requested or demanded, or if the government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested. A "false claim" is defined by statute to include any claim that incorporates items or services resulting from a violation of the federal anti-kickback statute:

> In addition to the penalties provided for in this section [i.e., 42 U.S.C. § 1320a-7b] . . . a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of [31 U.S.C. §§ 3729 et seq.]

42 U.S.C. § 1320a-7b(g).

[1] Citations are to the renumbered liability provisions of the FCA, as effected by the Fraud Enforcement and Recovery Act of 2009 (Publ. L. No. 111-21, May 20, 2009).

12. Although formed as a non-profit entity, AHF exhibited a for-profit corporate mindset and a voracious appetite for any and all revenues associated with HIV-patient referrals. AHF's scheme involving illegal incentives for referrals was designed to channel employee and patient referrals to all corners of AHF's operations, from testing services to clinical services to pharmacy services to insurance services.

**Testing Services**

13. AHF was contracted by various government agencies, including the State of Florida, to conduct HIV testing. Payments to AHF under these testing contracts were either allocated as lump sum amounts paid in equal installments or paid on a per test cost reimbursement basis periodically throughout the year. Many of AHF's HIV testing contracts required, as a condition of the contract, that AHF perform a certain volume of testing and further demonstrate "linkage" between HIV positive test results and clinical care for the individuals who tested positive. Failure to meet these goals resulted in payment reductions under the contracts. For example, one contract with Florida Department of Health provided as follows:

> The Provider must *link* at least 95% of clients with a positive test result to medical care. The provider will have a chart for each positive client that will include . . . proof of medical linkage. . . . (Emphasis added).

The contract further provided, in relevant part, that:

> Failure to conduct a minimum of 950 HIV tests quarterly in the target population shall result in a reduction in payment in the amount of $24.86 per HIV test not performed. (Emphasis added).
>
> Failure to screen, test or treat a minimum of 750 individuals per quarter shall result in a reduction in payment in the amount of $52.50 per individual not screened, tested or treated. (Emphasis added).

14. To avoid losing funding under the testing contracts, AHF unlawfully incentivized its employees to increase the volume of HIV test referrals to AHF's testing locations and interfered with patients' choice of medical providers by incentivizing its employees to direct

patients exclusively to AHF's own clinical service centers and pharmacies and not to any other providers.

15. AHF paid its HIV testing personnel under a "commission based" formula that combined a base salary amount and an additional "commission" amount solely predicated on the volume of tests performed. Additional incentive compensation was paid to testing staff managers, who received financial bonuses if their staff exceeded numerical testing goals, as reflected in the AHF commission-based testing cost analysis chart attached as Exhibit 1 and incorporated below. Such incentive compensation paid to the testing managers was not based on any services furnished or provided by the managers themselves, but rather was paid to encourage the managers to increase the volume of testing performed by the testing staff under their supervision, in direct violation of the anti-kickback statute. This chart was taken from AHF's internal records and is shown below with emphasis added:

PG 2

**Commission Based Testing - Cost Analysis**

| LOCATIONS | Monthly Base Goal | 15% Increase | CBT $ | 30% increase | CBT $ | 45% Increase | CBT $ |
|---|---|---|---|---|---|---|---|
| LA - MTU | 1400 | 1610 | $ 2,100.00 | 1820 | $ 4,200.00 | 2030 | $ 6,300.00 |
| LA - OTC | 990 | 1139 | $ 1,485.00 | 1287 | $ 2,970.00 | 1436 | $ 4,455.00 |
| FL - MTU | 1027 | 1181 | $ 1,540.50 | 1335 | $ 3,081.00 | 1489 | $ 4,621.50 |
| FL - OTC | 1202 | 1382 | $ 1,803.00 | 1563 | $ 3,606.00 | 1743 | $ 5,409.00 |
| Total | 4619 | 5312 | $ 6,928.50 | 6005 | $ 13,857.00 | 6698 | $ 20,785.50 |
| | | increase in tests | 693 | increase in tests | 1386 | increase in tests | 2079 |

| LOCATIONS | Jan-13 | JAN Vs Base goals | % of tests Jan vs Base Goal |
|---|---|---|---|
| LA - MTU | 1660 | 260 | 12% |
| LA - OTC | 1201 | 211 | 12% |
| FL - MTU | 1099 | 72 | 11% |
| FL - OTC | 1641 | 439 | 14% |
| Total | 5601 | 982 | |

| Program Manager CBT | |
|---|---|
| 0 to 15% | $ - |
| 16% to 20% | $ 300.00 |
| 21% to 30% | $ 400.00 |
| 31% to 40% | $ 500.00 |
| 41% to 50% | $ 650.00 |
| 51% to 60% | $ 800.00 |
| 61% to 75% | $ 950.00 |
| 76% to 85% | $ 1,000.00 |
| 86% to 95% | $ 1,200.00 |
| 95% and up | $ 1,400.00 |

## Clinical Services

16. The referral of HIV-positive patients into AHF's constellation of services, known as "linkage," was key to AHF's business model. As reflected below, AHF's internal records are replete with references to the importance of linking HIV-positive patients into AHF's care and the financial rewards that would flow not only to employees who were responsible for "linkage" but also to patients who were induced through remuneration to refer themselves ("self-referred") to AHF for clinical services.

17. At all times relevant to this action, AHF has employed people with the title "Care Coordinators" or "Linkage Coordinators" whose job it is to ensure that HIV-positive patients are directed exclusively to the full menu of AHF healthcare services, including testing, clinical, pharmacy, and insurance services. An "AHF Linkage to Care Training Manual" (attached as Exhibit 2) emphasizes the role of the Care Coordinator to "cooperate with PHD-SB Management and HIV Testing Counselors to ensure the referral of 100% of preliminary positive clients into AHF Healthcare Centers . . . and AHF Pharmacies or other remote healthcare referral locations within 72 hours." The training manual provides step-by-step instructions on how to link patients into AHF care and specifies that HIV-positive patients will be connected on both their first and second visits at an AHF Healthcare Center with a "benefits counselor," a "phlebotomist," a "medical doctor," and the "pharmacy."

18. AHF's linkage system has been under the direction of the "Linkage Director" in AHF's California headquarters, a position held by Mena Gorre for part of the time period relevant to this action. "Linkage Managers" at each local AHF Bureau throughout the country have overseen and supervised the Linkage Coordinators working in that Bureau. Under AHF policy, whenever a patient tests positive for HIV at an AHF testing center, an AHF employee

places the patient on the phone with a linkage coordinator whose job it is to get the patient to: 1) visit an AHF clinic within 72 hours to undergo a confirmatory HIV test; and 2) return to the clinic a second time for the test results. Once the patient makes this second visit to an AHF clinic and it is confirmed the patient is HIV positive, AHF considers the patient "linked." Under AHF's illegal kickback scheme involving compensation not for services rendered but for referrals, this linkage entitles the Linkage Coordinator to a $100 commission. Furthermore, bonus compensation of up to $100 is paid to the employee who linked the patient with a positive test result to the AHF Linkage Coordinator for referral to the clinical services. This compensation is not predicated on any services furnished or provided by the AHF employee who linked the patient, but rather is paid in return for the employee's referral of the patient for items and services furnished by others at AHF. The below description was taken from AHF's internal records (attached as Exhibit 3):

> Commission Based Testing Formula
> - Set a realistic monthly goal for all testers to meet per department
> - Keep everyone at their current salary and anyone testing above the monthly goal will get a monthly commission
> - Testers who successfully link a positive client to linkage (client speaks to linkage and provides correct phone number) will get a bonus – ($50 to $100)

(Emphasis added).

19. AHF has paid its employees these commissions on a monthly basis in checks issued at the same time as, but separate from, their regular payroll checks. Attached as composite Exhibit 4 are copies of check stubs for both payroll and commission payments made to a single linkage coordinator. To initiate payment to Linkage Coordinators, the Coordinator or the Coordinator's Linkage Manager inputs in a national AHF database the dates for each qualifying patient's first and second clinic visit. This information is verified by, or at the direction of, the Linkage Director at AHF's California headquarters before the payroll department, also at the

California headquarters, issues payment for the linkage commissions. Exhibit 5, which is a redacted, printed hard copy of this national database as it existed in or about May 2013, shows which patients were "linked," identifies the Linkage Coordinator responsible for their linkage, and further identifies when AHF acknowledged and processed each Coordinator's commission payment for the linkage. Exhibit 5 identifies in the "fldEIPCoordinato" column the Linkage Coordinators for hundreds of patients; notes whether each patient attended his or her initial and follow-up clinic visits in the "fldInitialVisit" and "fldFollowUp" columns; states the specific date that the Linkage Coordinator's commission was sent to accounts payable for processing in the "fldSentAP" column; and identifies the individuals that created and modified the database with regard to each patient, and when they did so, in the "fldCreated," "fldCreatedBy," "fldModified," and "fldModifiedBy" columns. In many instances, the database also identifies, for claims reimbursement purposes, what type of insurance each patient has in the "fldInsurance" and "fldNotes" fields, and, for numerous illegally referred patients, reflects federal sources of funding for medical care, including Medicare, Medicaid, and Ryan White funding. This database further demonstrates that while it was often the local Linkage Manager that created and modified the database, the individual Linkage Coordinators and the Linkage Director at AHF's California headquarters did so as well. For instance, on page 1 of Exhibit 5, the name Jason Handy, who was the Linkage to Care Program Manager in the Southern Bureau of AHF, appears dozens of times. But, as shown below, the names Elveth Bentley and Shireathia, both Linkage Coordinators, appear as creating or modifying information for their assigned patients. (Ex. 5, p. 1 at rows 13, 57-80). And, as also shown below and in the attached Exhibit 5, Mena Gorre, the AHF Linkage Director, is shown to have created or modified information with regard to numerous patients. (Ex. 5, p. 1 at rows 63, 65, 81-88).

| | fldEIPCoordinato | fldIntake | fldInitialVisit | fldFollowUp | fldPayrollCounte | fldSentAP | fldInsurance | fldCreated | fldCreatedBy | fldModified | fldModifiedBy |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 13 | Elveth | 013 8:30:00 AM | 013 9:00:00 AM | 013 8:30:00 AM | 3995 | 3/15/2013 | | 013 5:23:22 PM | jason.handy | 13 11:49:00 AM | elveth.bentley |
| 57 | Shireathia | 013 9:00:00 AM | 013 9:00:00 AM | | 3910 | | Ryan White | 013 3:11:54 PM | shireathiar | 013 4:20:03 PM | shireathiar |
| 58 | Shireathia | 013 9:00:00 AM | 013 3:30:00 PM | 013 4:00:00 PM | 3911 | 4/26/2013 | Medical | 013 3:34:18 PM | shireathiar | 013 4:18:07 PM | shireathiar |
| 59 | Shireathia | 013 8:45:00 AM | 013 9:00:00 AM | 13 11:00:00 AM | 3912 | 3/1/2013 | Medical | 013 4:21:31 PM | shireathiar | 013 4:28:22 PM | shireathiar |
| 60 | Shireathia | 013 9:00:00 AM | 013 2:30:00 PM | | 3913 | | Military | 013 4:31:42 PM | shireathiar | 013 4:44:45 PM | shireathiar |
| 61 | | | | | | | | 13 11:24:47 AM | shireathiar | | |
| 62 | Shireathia | 013 2:00:00 PM | 013 3:00:00 PM | 013 1:15:00 PM | 4060 | 3/15/2013 | Ryan White | 013 9:53:03 AM | shireathiar | 013 1:11:56 PM | shireathiar |
| 63 | Shireathia | 013 9:00:00 AM | 013 9:00:00 AM | 013 9:45:00 AM | 4061 | 4/26/2013 | Medical | 13 12:53:01 PM | shireathiar | 013 8:50:09 AM | mena.gorre |
| 64 | Shireathia | 013 8:45:00 AM | 13 10:00:00 AM | 013 9:45:00 AM | 4062 | 3/29/2013 | | 13 12:58:31 PM | shireathiar | 013 1:04:38 PM | shireathiar |
| 65 | Shireathia | 13 10:30:00 AM | 013 2:30:00 PM | 013 1:45:00 PM | 4063 | 3/29/2013 | Ryan White | 013 1:16:09 PM | shireathiar | 013 8:49:26 AM | mena.gorre |

(Excerpt from Ex. 5).

20. To ensure they satisfied AHF's expectations with regard to patient linkage, Linkage Coordinators were required to attend two weekly meetings. The first was a local meeting with the Linkage Manager and the other local Linkage Coordinators. The second meeting was a national conference call run by AHF's Linkage Director and attended by the Linkage Managers and Linkage Coordinators from each AHF location.

21. In order to induce patients to attend their appointments at the AHF clinics as scheduled by the Linkage Coordinators, the Coordinators were authorized to pay for patient meals at local fast food restaurants and even pay the transportation costs for those patients to travel to AHF clinical service centers. Patients received gift cards for an AHF Thrift Store called "Out of the Closet" after attending two clinic visits, and they were also incentivized to frequent AHF clinical service centers for treatment and testing of sexually transmitted diseases ("STD"), for returning to AHF service centers every few months for ongoing medical care, and for remaining STD negative.

**Pharmaceutical & Insurance Services**

22. AHF owns and operates pharmacies near, and sometimes connected to, the locations where it has clinics, and it markets its own managed care insurance products for Medicare and Medicaid patients known as "Positive Healthcare."

23. Just as AHF seeks to link each HIV positive patient to services at an AHF Clinic, it seeks to link each HIV positive patient to services at an AHF Pharmacy and enrollment in an AHF insurance plan.

24. To induce this linkage, AHF pays remuneration in the form of gift certificates and cash payments valued at up to $50 or more to any AHF Public Health Division ("PHD") employee -- including but not limited to the AHF Linkage Coordinators -- responsible for referring a patient to an AHF Pharmacy or to Positive Healthcare. And, just as with linkage to clinical services, AHF pays bonus compensation of up to $100 to the employee who links the patient with a positive test result to the AHF Linkage Coordinator for referral to the pharmaceutical services. This compensation was not predicated on any services furnished or provided by the AHF employee who linked the patient, but rather is paid in return for the employee's referral of the patient for items and services furnished by others at AHF.

25. AHF gives GNC gift cards to patients who enroll in a Positive Healthcare plan. And it gives Ensure to patients who use its pharmacies.

26. Additionally, AHF provides remuneration directly to patients who both enroll in a Positive Healthcare plan and use an AHF Pharmacy, including a monthly allotment of multivitamins and nutrition shakes worth more than $50, which AHF has shipped directly to such patients.

27. AHF directs its PHD physicians to get patients enrolled in Positive Healthcare and linked with an AHF Pharmacy. To induce its physicians to comply, AHF ties their annual bonuses to the number of Positive Healthcare patients being treated. Thus, PHD physicians are paid bonus compensation based, not on services furnished or provided to patients, but rather on the number of patient referrals made to AHF's Positive Healthcare insurance program. Similarly,

AHF pays nurses working in the Positive Healthcare division a commission for referring patients covered by Positive Healthcare to AHF clinics and pharmacies.

28. In addition to AHF's conduct set forth above, the chart below (attached as <u>Exhibit 6</u>), excerpted from an internal AHF financial presentation given on or about March 28, 2013, evidences AHF's intense interest in tracking its success in channeling patient referrals to all corners of AHF's operations:

## All AHF




| | | Full Year2011 | | | Full Year2012 | | |
|---|---|---|---|---|---|---|---|
| | Number of Tests | 72,982 | | | 98,283 | | |
| | Positives | 890 | 1.20% | | 1,113 | 1.13% | |
| | Referrals | 633 | | | 823 | | |
| | Number of Positives from tests and referrals | 1,523 | | | 1,936 | | |
| | | | % of Positives | | | % of Positives | |
| Linkage: HCC | Become an AHF HCC Patient | 814 | 53% | | 1,123 | 58% | |
| Linkage: MC | Enroll in one of our Managed Care Plans | 39 | 3% | 37 also HCC Patients | 38 | 2% | 33 also HCC Patients |
| Linkage: Rx | Fill your Rx at an AHF Pharmacy | 672 | 44% | 615 (76%) from HCC 57 Pharmacy Only | 822 | 42% | 780 (69%) from HCC 42 Pharmacy Only |

29. The importance and financial rewards associated with linking patients into AHF's care are referenced throughout the business records of the organization. At a May 2013 Leadership Summit ("Leadership Summit") held in Cleveland, Ohio, AHF defined "success" for the PHD in 2013 as the ability to "link 60% of those we identify as [HIV] positive into our care." Financial incentives were paid to AHF testers, testing managers, and linkage personnel (i.e., Care Coordinators) for linking patients into AHF services and products. The chart below (attached as

Exhibit 7), taken from AHF's records, describes financial incentives paid to AHF's HIV testers if they were able to successfully "link" such patients "to AHF medical care":




30. AHF's President, Michael Weinstein, attended the May 2013 Leadership Summit and personally advocated for: (1) increased testing to raise HIV "positivity" rates; (2) improved "linkage" of patients to and retention in AHF medical care; and (3) the payment of financial incentives to patients for the purpose of inducing self-referrals to AHF medical care. Weinstein specifically directed staff to raise the patient financial incentive to $50 immediately and to implement the incentive program nationally throughout the AHF organization. Weinstein also directed a patient financial incentive of $50 to those falling out of care to induce them to return to AHF medical care and also a financial incentive of up to $50 every few months to remain in AHF care, as well as an additional financial "bonus" at the end of one year of such care. Explicit

discussions were held concerning the importance of "find[ing] more positives" and "gain[ing] more referrals." Also discussed was the relationship between referrals of HIV-positive patients into AHF medical care and the start of medication regimens through AHF Pharmacy outlets. AHF allocated substantial and increasing financial resources to its patient self-referral incentive program. Specifically, AHF spent the following amounts for "Patient Incentives Program Service Expenses" between 2011 and 2013 according to tax returns filed by the organization:

| 2011 | 2012 | 2013 |
|---|---|---|
| $141,921 | $222,585 | $242,230 |

31. The financial rewards AHF paid to patients and employees were paid only for referrals to AHF, not for care rendered by any other providers. AHF, moreover, measured the financial success and "return on investment" in its PHD in terms of how effectively the PHD was able to link patients into other AHF services so that AHF could generate sufficient revenue to recoup the costs incurred in rendering care to HIV-positive patients. That strategy is well-illustrated by the AHF record below (attached as Exhibit 8), excerpted from an internal PHD financial presentation given on or about March 28, 2013, which describes how AHF sought to recover the costs of care incurred by the PHD through revenues earned in its Pharmacy Division:

AHF

**PUBLIC HEALTH**
**Overview**

➢ **PHD KSFs**

- ➢ Tests
- ➢ Positivity Rate
- ➢ Linkage (into AHF services)

➢ **PHD ROI**

- ➢ The time it takes for the Rx gross margin to recover the PHD service costs

32. AHF's strategy is further reflected in its business records, which carefully track numbers and percentages of HIV-positive patients who were linked into AHF Healthcare Centers and AHF Pharmacies and their associated revenue streams. AHF maintained weekly "Linkage to Care" reports that tracked HIV-positive patients who were linked to AHF care (an example of which is attached as Exhibit 9). AHF financial records tracked the numbers of patient referrals into AHF Healthcare Centers and Pharmacies and their associated revenue impact (an example of which is attached as Exhibit 10). Those records also disclose that AHF's Pharmacy Division was an enormous revenue generator, being responsible in 2012 alone for more than $300 million in total revenue.

**B. AHF's Admissions Concerning Its Payment For Referrals**

33. Since the initial filing of this lawsuit, AHF, through its President Michael Weinstein, has made numerous admissions acknowledging that AHF pays incentives to patients and employees for the purpose of linking such patients to AHF services.

34. In a message to "Partners and Friends" issued on April 13, 2015, AHF President Michael Weinstein defended the practice of paying financial incentives to patients, stating: "The provision of small incentives to patients in order to help link them to care is appropriate, legal and necessary [to] keep them in care and healthy." In fact, the practice described, which involved payment of cash and in-kind remuneration worth a minimum of $50 and was implemented by AHF for the express purpose of generating referrals to AHF's various health services, is patently unlawful and a direct violation of the Anti-Kickback Statute.

35. In an interview with Frontiers Media published the same day, Weinstein defended AHF's practice of "giving incentives up to the level of $50 per patient in order to make sure that they come in for their first two appointments." Karen Ocamb, *AHF's Weinstein on Florida*

*Lawsuit: 'We Did Nothing Wrong' (Special Report),* Frontiers Media, Apr. 13, 2015, available at https://www.frontiersmedia.com/frontiers-blog/2015/04/13/ahfs-weinstein-on-florida-lawsuit-we-did-nothing-wrong-special-report/. Weinstein continued:

> We employee (sic) linkage coordinators to ensure that people get into care. That's their job. Do we pay incentives to employees whose job it is to get people into care when they successfully link? Yes. Do we pay commissions to testers based on doing more tests that (sic) what the quota is? Yes. And do we give small incentives to make sure patients come in? Yes….

*Id*.

36. The admissions referenced above, when combined with all of the other evidence already discussed, leave no room for doubt that AHF has implemented an organization-wide kickback scheme utilizing financial incentives to induce patient referrals to AHF health services. AHF and Weinstein freely acknowledge doing so and attempt to justify the practice with an "ends justifies the means" rationale of ensuring that HIV-positive individuals receive needed care for their medical conditions. The public policies animating the Anti-Kickback Statute, however, do not permit such a cavalier approach.

37. As expressly recognized by the Office of Inspector General, Department of Health and Human Services, on its website, those public policies do not depend on whether services were rendered, or even on whether services were medically necessary, but rather on the corrupting effect of kickbacks in healthcare and the resulting risks of "overutilization, increased program costs, corruption of medical decisionmaking, patient steering and unfair competition." *See* http://oig.hhs.gov/compliance/physician-education/01laws.asp. The prohibition against kickbacks, moreover, "applies to all sources of referrals, even patients." *Id.* AHF was not entitled to game the healthcare system by implementing a system of financial incentives designed to

manipulate the HIV patient referral stream to AHF's singular advantage, thereby offending all of the public policy imperatives underlying the Anti-Kickback Statute.

**C. <u>AHF Submitted Claims To And Received Reimbursement From Federal Health Care Programs Based On Illegal Patient Referrals</u>**

38. Through the scheme described above, AHF generated many millions of additional dollars for: (1) clinical services provided by AHF to illegally referred patients and reimbursed by the Federal Health Care Programs, including Medicare and Medicaid; (2) medications distributed by AHF to illegally referred patients through its pharmacy locations and reimbursed by the Federal Health Care Programs, including Medicare and Medicaid; (3) HIV testing services paid for with federal or state funds and provided to illegally referred patients; and (4) payments received by AHF through its Positive Healthcare managed care insurance product for illegally referred Medicare and Medicaid patients living with HIV.

39. AHF derives a major source of its revenues from Federal Health Care Programs. In its 2005 Annual Report, AHF stated:

> AHF has many contracts, subcontracts, and grants with government agencies. AHF's business development staff bid for these contracts and they are managed by our Contracts Department. Government contracts account for almost 50 percent of AHF's revenues. Sources of funds include the RyanWhite CARE Act, Centers for Disease Control and Prevention, Medicare, and state Medicaid.

More recently, AHF's Consolidated Financial Statements for 2013 disclosed that Medicare and Medicaid dollars comprised approximately 45% of its patient service revenue. Medicare revenues were listed at approximately $46 million on AHF's 2013 tax return; revenues from government grants were listed at approximately $18 million.

40. AHF submitted claims for clinical services rendered to illegally referred patients under the general authority and direction of Whitney Engeran-Cordova, AHF's National Senior

Director of Public Health, and it submitted claims for pharmacy services under the general authority and direction of Kenneth Scott Carruthers, AHF's Chief of Pharmacy. The clinical services themselves were rendered by AHF physicians, whose actual or electronic signatures appeared on AHF's claims for reimbursement from Federal Health Care Programs. Physicians employed by AHF who rendered care to patients illegally incentivized by AHF, and whose signatures accompanied AHF's claims for reimbursement, included at least the following individuals between 2010 and 2013: Lisha Wilson; Gerald Hamwi; Rebecca L. Colon; Susan G. Sanchez; Catherine Chien; Robert J. Catalla; Joseph Piperato; Deborah Holmes; Esther Schumann; and Clifford Kinder.

41. The precise number of illegally referred HIV-positive patients cannot be known with certainty at this time, but a spreadsheet generated by AHF and attached as Exhibit 5 lists more than 840 "linked" (and de-identified) patients who represent at least a portion of the illegal referrals generated by AHF and who received services paid for by Federal Health Care Programs, as described above. Using an average annual cost of HIV care of approximately $23,000 (which is the estimated 2010 average annual cost according to the CDC government website) would mean that for this group of patients alone, AHF's fraudulent kickback scheme caused Federal Health Care Programs to pay AHF in the range of $20 million in HIV care costs in just a single year. The total amount that AHF improperly received from the government over the entire life of the illegal scheme, of course, will be much higher.

42. Relator Carrel, as Director of Public Health for the Southern Bureau, covering from Washington, D.C. to Florida to the Louisiana/Texas border, and a member of AHF's National Leadership Team, had broad program-related responsibilities over HIV testing, linkage to care, and mobile clinic services that required intimate knowledge of the Public Health

Division's operations within his region and within AHF as a whole. This knowledge included a continually updated understanding of the numbers of patients being linked to AHF health services as well as the significance and meaning of the data entries contained in the spreadsheet attached as Exhibit 5, which was likewise being continually updated. Based on Relator Carrel's experience as Director of Public Health while at AHF, which entailed not only his own hands-on involvement in program operations but also high-level interactions with other Public Health Division employees, he knows that it was a matter of standard operating procedure at AHF that the patients listed in Exhibit 5 were referred to and received health services from AHF, which included services paid for by Federal Health Care Programs, including Medicare, Medicaid and Ryan White. Relator Carrel further knows that the information contained in the "fldInsurance" and "fldNotes" fields of the spreadsheet which indicate "Medicare," "Medicaid," or "Ryan White" was included in the spreadsheet for claim reimbursement purposes and that those programs received AHF's claims for health services, including testing, clinical, and pharmacy services, rendered to patients on the list. Additionally, Relator Carrel knows that the Linkage Coordinators who referred the patients on the list would, in fact, receive commission payments for those referrals and that, in the regular course of business at AHF, those commission payments would be sent to Accounts Payable for processing on the dates indicated in the field on the spreadsheet marked "fldSentAP." Relator Carrel came by this knowledge through the normal course of his employment, including the following:

a. Weekly meetings with Southern Bureau Public Health managers and coordinators, including Michael McKany (Associate Director of Wellness Centers), Eric Boyd (Program Manager - Mobile Testing Units), Jason Handy and Michelle Morgan (Linkage to Care Program Managers), Gregory Jacques (Program Manager - Miami),

Michael Urbain (Program Manager - Wellness Centers), Keplar Verduga (Program Coordinator - ABT), Horace Watson and David Martinez (Operations Managers), Gerritt Rogalski (Senior Program Manager), Robert Parisi (Program Manager Broward STD), and Nilber Ramon (Administrative Assistant), at which issues regarding linkage to care were discussed, among other matters such as protocol and procedure reviews, personnel issues, monthly performance reports of each program, and debriefing on past events;

b. Periodic meetings with the Southern Bureau Linkage staff including Jason Handy and Michelle Morgan (Linkage to Care Program Managers), Mena Gorre (AHF Associate Director of Linkage to Care), and Linkage/Outreach Coordinators Catheline Lamour, Jeffery Doe, Jasaline Perez, Eric Dunn, Shireathia Robinson (Jacksonville), Michelle Morgan (Washington, DC), and Julio Rodriguez, at which issues such as the following were discussed: individual coordinators' numbers, cases, performance, and achievement of objectives; strategies to increase number of individuals linked to AHF services; commissions paid for linkage of patients to AHF services; linkage coordinator protocols; and grant/contract reporting;

c. Regular National Public Health Division Leadership meetings with Whitney Engeran Cordova (Senior Director of Public Health), Michael Weinstein (President of AHF), Michael McKany (Southern Bureau Associate Director of Wellness Centers), Terrence Boone (Public Health Division Program Finance Manager), Ses Soltani (National Associate Director of Programs), Lori Mizuno (National Director of Public Health & Domestic Advocacy), Albert Ruiz (National Director of Public Health, Wellness Service), Jessie Gruttadauria (Associate Director of Advocacy), Raul

Ramirez (Associate Director of Testing Programs), Alexander Goncalvez (National Associate Director of Mobile Testing Programs) and Mena Gorre (National Associate Director of Linkage to Care), at which discussions regarding national objectives and performance for testing and linkage to care, and strategies for increasing number of positive test results and number of positive patients linked to AHF care and pharmacies took place;

d. Regular (usually weekly) meetings with Michael Kahane (AHF Southern Bureau Chief) and Lydia Gresham (Deputy Bureau Chief, AHF Southern Bureau) at which overall policy and program issues were discussed;

e. Monthly financial review meetings with Terrence Boone (Public Health Division Program Finance Manager) at which the Southern Bureau Public Health Division's financial reports were analyzed and discussed;

f. Bi-weekly meetings with site specific staff including Fort Myers, Florida; Jacksonville, Florida; Washington, D.C.; Atlanta, Georgia; and Pensacola, Florida that included Barbara Chinn (Senior Program Manager – D.C.), Anthony Thomas (Prevention and Outreach Manager), Roberto Polanco (Program Manager - Jacksonville), Dawn Averill, RN, BS (Associate Director of Growth & Development - Pensacola), Daniel Mitton (Program Manager- Fort Myers), and Reggie Batiste (Program Manager-Atlanta), at which monthly performance, grant issues, and plans for referral sources were discussed;

g. Periodic Ryan White and Prevention contract meetings with Broward County including, at various times, Mena Gorre (National Associate Director of Linkage to Care), Julie Chang (AHF National senior grants manager), Patricia Bermudez (AHF

National Director of Grants Administration), and Whitney Engeran Cordova (Senior Director of Public Health), at which protocols and procedures established by the funder were discussed;

h. Periodic Ryan White and Prevention contract meetings with Miami-Dade County including, at various times, Mena Gorre (National Associate Director of Linkage to Care), Julie Chang (AHF National senior grants manager), Patricia Bermudez (AHF National Director of Grants Administration), Whitney Engeran Cordova (Senior Director of Public Health), Shawn Loftis (Southern Bureau, grants manager) Fred Villari (Miami-Dade County contract manager), and Elizabeth 'Liza' Nash (AHF Southern Bureau Senior Director, Care Management Programs), at which protocols and procedures established by the funder were discussed;

i. Periodic higher level finance meetings with Whitney Engeran Cordova (Senior Director of Public Health), Lyle Honig (AHF Chief Financial Officer/Financial Services & Compliance), Thomas Twentyman (AHF Finance Department, Manager), and Jonathan Petrus (AHF Chief Financial Officer for Performance & Investment), at which strategies to increase linkage of patients to AHF services was discussed;

j. Periodic Ryan White Part C contract meetings with Wanda Chestnut (HRSA Public Health Analyst), Shawn Loftis (Southern Bureau, grants manager), Patricia Bermudez (AHF National Director of Grants Administration), Elizabeth ‘Liza’ Nash (AHF Southern Bureau Senior Director, Care Management Programs), Gregory Todd Reese (AHF Southern Bureau Associate Director of Healthcare Center Operations), Robert (Bob) Catalla (Medical Director Jacksonville AHF clinic), Rona Revels (Jacksonville clinic Program Coordinator), Sharon Reilly (Jacksonville clinic Nurse Manager), and

Donna Stidham (Chief of Managed Care, AHF), at which protocols and procedures established by the funder were discussed;

k. Periodic State of Florida prevention contract meetings with Shawn Loftis (Southern Bureau, grants manager), Patricia Bermudez (AHF National Director of Grants Administration), Whitney Engeran Cordova (Senior Director of Public Health), Tom Bendle (Florida Department of Health, HIV Counseling and Testing Coordinator), and Marlene LaLota (Florida Department of Health HIV Prevention Manager, HIV/AIDS and Hepatitis Program), at which protocols and procedures established by the funder were discussed;

l. Periodic AHF clinic area meetings including, at various times, Jeremy Zellers (Southern Bureau Assistant Director of Pharmacy Operations), Michael Kahane (AHF Southern Bureau Chief), Lydia Gresham (Deputy Bureau Chief, AHF Southern Bureau), Michael Wohlfeiler (Southern Bureau Medical Director), clinic physicians, and Positive Healthcare staff from each site, at which patient numbers, the increase or decrease in patients linked to AHF pharmacies and Positive Healthcare were reviewed and discussed; and

m. Periodic Duval County prevention contract meetings with Max Wilson (Florida Department of Health) and Shawn Loftis (Southern Bureau, grants manager), at which protocols and procedures established by the funder were discussed.

Furthermore, a former Southern Bureau Senior Director in AHF's Public Health Division advised Relator Carrell that AHF paid Positive Healthcare nurses a commission for every patient they linked to an AHF clinic or AHF pharmacy.

43. Relator Ferrer, by virtue of his position as Senior Program Manager in the Southern Bureau of AHF, likewise had knowledge of how AHF conducted its healthcare operations in Florida. Relator Ferrer, under the supervision of the Associate Director of the Public Health Division-Southern Bureau (James Vellequette), was responsible for supervising the daily functions and administrative operations of prevention and testing programs in the State of Florida, including launching and growing Prevention Program Services throughout the Bureau. Relator Ferrer knows that it was a standard business practice of AHF to pay linkage coordinators for patient referrals to AHF services and to track those referrals for the purpose of making such payments—one of his weekly responsibilities was leading a meeting to discuss such referrals and linkages. At those meetings, AHF analyzed the number of patients with reactive HIV test results that were successfully linked to clinical, pharmaceutical, and insurance services with AHF, and discussed any failures to link patients with services at AHF. Michael Weinstein took part in these meetings, during which he gave directives to the Southern Bureau. Ferrer also led monthly staff meetings at which the Linkage Manager (Jason Handy) discussed linkage results and ways to increase the number of patients with reactive HIV test results that were successfully linked to clinical, pharmaceutical, and insurance services with AHF. In these meetings, representatives from the AHF Pharmacy (Peter Povolli) and Positive Healthcare (Sonia Diaz) divisions offered gift cards to AHF employees who secured and referred clients to enroll in the programs. Peter Povolli also provided wall displays for the AHF testing sites and the AHF mobile units with free Ensure milkshakes and vitamins for those patients who obtained their medications from an AHF Pharmacy. The free milkshakes and vitamins were a tool for AHF's HIV testers to engage with potential patients, and the testers were awarded with commission in the form of a $50 gift card for every linked patient. AHF Pharmacy and Positive Healthcare also

sought to link patients into AHF care by sponsoring local events at which they paid for refreshments and dinner. Additionally, Relator Ferrer knows that the patients who were illegally referred to AHF under the methods described above would, as a matter of course, receive various health services from AHF, including testing, clinical, and pharmacy services, and that AHF would, in turn, seek reimbursement for those services from Federal Health Care Programs, including the Medicare, Medicaid and Ryan White programs. Ferrer developed this knowledge not only by working at AHF, but also by serving as a member of the Broward Regional Planning Council (the entity AHF applied to for Ryan White funds in Broward County) while employed at AHF.

44. Similarly, Relator Loftis, in his position as Grants Manager for the Southern Bureau, was responsible for fiscal management of sponsored projects and his job required that he understand the sources of AHF grant funding, including Ryan White program funding, for all health-related services rendered by AHF to patients, as well as the manner in which such funding was obligated by AHF in the course of its operations. Relator Loftis knows that it was a standard business practice of AHF to pay linkage coordinators for patient referrals to AHF services, and he was in attendance at a March 2013 meeting with the AHF grants and public health divisions at which this referral payment scheme was openly discussed. Relator Loftis knows that AHF's compliance with the Anti-Kickback Statute was a condition of AHF receiving any Ryan White funds and that AHF certified to this condition when applying for Ryan White funds. Relator Loftis further knows that AHF regularly sought payment from the Ryan White program for health services, including testing, clinical, and pharmacy services, rendered to AHF patients. Based on Relator Loftis's experience as Grants Manager while at AHF, he knows that, in the ordinary course of business at AHF, the patients who are listed on Exhibit 5 and for whom "Ryan

White" is listed as a funding source in the "fldInsurance" and "fldNotes" fields, would have received health services from AHF for which AHF sought reimbursement from Ryan White grant funds.

45. Claims for health services were submitted by AHF to Federal Health Care Programs on a regular basis, pursuant to standard HIV treatment protocols. Standard medical protocols for treatment of HIV requires patient visits at least once every 3-4 months, and renewal of HIV-related medications at least as frequently. *See, e.g.*, Guide for HIV/AIDS Clinical Care, Health Resources and Services Administration, HIV/AIDS Bureau, April 2014, at p. 92 (describing suggested frequency and follow-up intervals of the history and physical examination for monitoring HIV-infected patients; defining "every visit" as "at least every 3-4 months"). Based on his experience as Director of Public Health at AHF, Relator Carrel knows that patients illegally referred to AHF pursuant to the kickback scheme described above, after submitting to AHF testing and receiving a positive HIV diagnosis, visited AHF clinics and pharmacies pursuant to these standard protocols, which generated reimbursement claims for items and services reimbursable under Federal Health Care Programs. Many of those patients also enrolled in AHF's Positive Healthcare insurance product, which resulted in the payment of Medicare or Medicaid dollars to AHF for services rendered.

**Ryan White Funding**

46. HRSA and CDC provide federal funding to community-based organizations like AHF, either directly or indirectly through State or local agencies, for programs designed to expand medical care for people living with HIV/AIDS and to increase awareness of HIV status.

47. HRSA provides much of its funding through the Ryan White HIV/AIDS Program ("Ryan White"), which is the largest Federal program focused exclusively on HIV/AIDS care.

According to the HRSA website, Ryan White is for individuals living with HIV/AIDS who have no health insurance, have insufficient health care coverage, or lack financial resources to get the care they need. The majority of Ryan White funds support primary medical care and essential support services, and a smaller portion also supports technical assistance, clinical training, and research on innovative models of care.

48. The legislation that created Ryan White specifies a number of Parts to meet the needs of different communities and populations. Part A provides emergency assistance to certain metropolitan and other areas that are most severely affected by the HIV/AIDS epidemic. Part B provides grants to the States, the District of Columbia and certain U.S. territories. Part C provides comprehensive primary health care in an outpatient setting for people living with HIV disease. Part D provides family-centered care involving outpatient or ambulatory care for women, infants, children, and youth with HIV/AIDS. Part F provides funding for other programs, including training programs for providers treating people with HIV/AIDS.

49. Ryan White works with cities, states, and local community-based organizations to provide HIV-related services to more than half a million people each year. AHF receives a portion of its Ryan White funding in direct HRSA grants and another portion through various Florida state and county agencies, including the Florida Department of Health HIV/AIDS Program. AHF was a recipient of Ryan White grant funds over a period of years. AHF also receives payments from private insurers on behalf of patients whose insurance premiums were paid by the federal or state governments with Ryan White funds.

50. Of the more than 1.1 million people living with HIV/AIDS, an estimated 240,000 are unaware of their HIV-positive status. According to the CDC, increasing the number of people who are aware of their HIV status is a key strategy in preventing infections. In order to

achieve this goal, the CDC provides funding for expanded HIV testing programs aimed, in part, at significantly increasing the number of persons who are tested in jurisdictions having a high rate of HIV among disproportionately affected populations. AHF participated in some of these CDC-funded HIV testing programs and received CDC grant funds over a period of years.

51. AHF's entitlement to HRSA and CDC grant funds, including Ryan White funds, was contingent upon its compliance with standard terms and conditions that attached to all HHS grants. In applying for and accepting HHS grant funds, AHF certified its compliance with these terms and conditions. In general, the requirements that apply to the recipient of grant funds, including public policy requirements, also apply to sub-recipients and contractors under grants. As will be explained further below, AHF knowingly and repeatedly violated an essential grant term and condition – compliance with the federal Anti-Kickback Statute – which rendered its acceptance and use of grant proceeds fraudulent and a violation of the False Claims Act.

52. Standard terms and conditions of HHS grants are set forth in federal regulations and are further explained by the HHS Grants Policy Statement, *available at* http://www.hhs.gov/asfr/ogapa/aboutog/hhsgps107.pdf, which states, at I-6:

> HHS grant awards generally are made to organizations. The organization is legally accountable for the performance of the award and the expenditure of funds. . . In signing a grant application, [the organization's authorized representative] agrees that the organization will assume the obligations imposed by applicable Federal statutes and regulations and other terms and conditions of the award, including any assurances, if a grant is awarded. These responsibilities include accountability both for the appropriate use of funds awarded and the performance of the grant-supported project or activities as specified in the approved application.

53. The Notice of Award is the legal document indicating an award has been made and that funds may be requested from HHS. According to the HHS Grant Policy Statement, "until an awarding office has issued a [Notice of Award] for the initial budget period, any costs

incurred by the applicant for the project are incurred at its own risk." (HHS Grant Policy Statement at I-34). The Notice of Award sets forth relevant information about the award, including "the amount of Federal funds authorized" and "[a]pplicable terms and conditions of award, either by reference or inclusion." *Id.* at I-34 and 35. A grant recipient "indicates acceptance of an award and its associated terms and conditions by drawing or requesting funds from the designated HHS payment system or office" and "[i]f a recipient cannot accept the award, including the legal obligation to perform in accordance with award terms and conditions, the organization" is expected to notify HHS immediately. *Id.* at I-35. If the award is accepted, "the contents of the [Notice of Award] are binding on the recipient unless and until modified by a revised [Notice of Award] signed by the [Grants Management Officer]." *Id.* HHS "may administratively recover funds paid to a recipient in excess of the amount to which the recipient is . . . entitled under the terms and conditions of the award, including misspent funds or unallowable costs incurred." *Id.* at II-96. "If a recipient has failed to materially comply with the terms and conditions of award, [HHS] may suspend the grant, pending corrective action, or may terminate the grant for cause." *Id.* at II-93; see 45 CFR §§74.61, 74.62, 92.43.

54. Among the standard terms contained in the Notice of Award is a requirement that the award recipient comply with the requirements of the federal Anti-Kickback Statute:

> Recipients and sub-recipients of Federal funds are subject to the strictures of the Medicare and Medicaid anti-kickback statute (42 U.S.C. 1320a-7b(b)) and should be cognizant of the risk of criminal and administrative liability under this statute, specifically under 42 U.S.C. 1320 7b(b) illegal remunerations which states, in part, that whoever knowingly and willfully: (A) Solicits or receives (or offers or pays) any remuneration (including kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind, in return for referring (or to induce such person to refer) an individual to a person for the furnishing or arranging for the furnishing of any item or service, OR (B) In return for purchasing, leasing, ordering, or recommending purchasing, leasing, or ordering, or to purchase, lease, or order, any goods, facility, services, or item .... For which payment may be made in whole or in part under subchapter XIII of this chapter or

> a State health care program, shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both. (Emphasis added).

See Exhibit 11, Sample Notice of Award at p. 3, ¶ 3.

55. The HHS Grant Policy Statement also states that "[a]nyone who becomes aware of the existence (or apparent existence) of fraud, waste, or abuse related to HHS grants or use of grant funds should report this information to HHS." [Grants Policy Statement at I-7.] HHS defines "fraud, waste, or abuse" to include "embezzlement, misuse, or misappropriation of grant funds or property, and false statements, whether by organizations or individuals." *Id.* at I-7. The HHS Grant Policy Statement further puts all grant recipients on notice that the "Federal government may pursue administrative, civil, or criminal action under a variety of statutes that relate to fraud and false statements or claims," including the False Claims Act. *Id.* at I-8.

56. AHF submitted claims for all Ryan White-eligible patients, including those who received AHF services as a result of AHF's illegal kickback scheme described above. AHF submitted those claims for services rendered as a result of illegal referrals despite knowing that those claims were ineligible for payment.

57. The manner in which AHF submitted such claims depended on the rules and regulations established by each county authorized to distribute Ryan White funds. For patients residing in Miami-Dade County, AHF electronically logged services rendered to Ryan White-eligible patients in a computer program/system called SDIS. At the end of each month, an AHF Grants Manager printed the billing information for the electronic entries for that month, certified they were a true and accurate accounting of services rendered and the payments AHF was entitled to, and mailed the documents to the Ryan White Grants Coordination Office for Miami-Dade County. Relator Shawn Loftis, as part of the duties of his employment with AHF, pulled,

certified, and submitted these requests for payment to Miami-Dade County each month from January through July 2013. The payment requests he submitted included requests for payment for services rendered to patients as a result of AHF's illegal kickback scheme. The County then paid AHF for reimbursable services by electronically depositing the funds into a bank account controlled by AHF's California headquarters.

58. By contrast, Broward County has delegated the distribution of Ryan White funds to the Broward County Health Services Planning Council. Pursuant to AHF's agreement with Broward County for Ryan White funding, in force during all times relevant to this action, the County will pay AHF only for services actually delivered, invoiced, and documented. (See, e.g., First Amendment to Agreement between Broward County and Aids Healthcare Foundation, Inc. for Ryan White Part A Funding FY 2011, attached as Exhibit 12, at ¶ 4.5). AHF is required to provide the invoices in paper format only with supporting documentation by the 15th of each month, (Ex. 12 at ¶ 4.5.4.1 & p. 31 ¶ 2), on "the forms prescribed by the County in the Provider Handbook," (Ex. 12 at ¶ 4.5.4.3; prescribed invoice form attached as Exhibit 13), and within 30 days the County will pay AHF the invoiced amount from Ryan White funds. (Ex. 12 at ¶ 4.5.4.3).

59. Regardless of how a particular county decides to accept claims for or distribute its Ryan White funds, each county, as required by the Ryan White program, makes compliance with federal health care laws, including the Anti-Kickback Statute, a condition of payment. This is demonstrated by AHF's Agreement with Broward County, which contains the following provision:

> 15.9 COMPLIANCE WITH LAWS. AHF shall comply with all applicable federal, state, and local laws, codes, ordinances, rules, and regulations in performing its duties, responsibilities, and obligations pursuant to this Agreement.

(Ex. 12 at ¶ 15.9). It is further demonstrated by the County's incorporation of its Provider Handbook into the terms of its agreement with AHF. (Ex. 12 at ¶ 14.1.H ("AHF acknowledges receipt of the Provider Handbook and understands that each document contained therein is made a part of this Agreement.)). The Provider Handbook requires that "[d]irect services must be delivered in accordance with the National Monitoring Standards" established by HRSA, including "[a] set of uniform monitoring standards established for Part A and B Grantees and Funded Providers" called "Universal Monitoring Standards." (Handbook, *available online at* http://www.broward.org/HumanServices/CommunityPartnerships/Documents/ProviderHandbook031715.pdf, at pp. 31-32). The Universal Monitoring Standards require compliance with the Anti-Kickback Statute. (See Universal Monitoring Standards, attached as Exhibit 14, at pp. 6-7, § C). The Standards prohibit "employees (as individuals or entities), from soliciting or receiving payment in kind or cash for the purchase, lease, ordering, or recommending the purchase, lease, or ordering, of any goods, facility services, or items" and required providers and subgrantees, such as AHF, to have "adequate policies and procedures to discourage soliciting cash or in-kind payments for . . . referring clients. . . ." (Ex. 14 at p. 7 ¶ 2).

60. Not only has AHF failed to adopt any such policy or procedure that discourages payments for client referrals, it has adopted policies and procedures that award kickbacks to its employees and to patients for client referrals. AHF then treated these illegally referred patients and submitted claims for payment for such treatment from Ryan White funds.

61. As a result of submitting ineligible claims for payment with Ryan White funds, AHF obtained federal funds for treatment and services performed as a result of referrals made in violation of the Anti-Kickback Statute that, upon information and belief, amount to millions of dollars.

**Medicare Reimbursements**

62. The Medicare Program, Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, *et seq.*, is a health insurance program administered by the United States that is funded by taxpayer revenue. Entitlement to Medicare is based on age, disability or affliction with certain diseases. The program is overseen by HHS through the Centers for Medicare and Medicaid Services ("CMS"). Medicare provides for payment of hospital services, medical services, durable medical equipment and prescription drugs on behalf of Medicare-eligible beneficiaries.

63. Compliance with federal health care laws, including the Anti-Kickback Statute, is a condition of payment by the Medicare program. Violators of the Anti-Kickback Statute are prohibited from receiving payment as part of the Medicare program. When providers enroll in the Medicare Program, they must acknowledge "that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal Anti-Kickback Statute and the Stark law), and on the supplier's compliance with all applicable conditions of participation in Medicare. *Medicare Enrollment Application*, at p. 31.

64. In order to receive payment from Medicare, a claim must be submitted electronically or on paper, and every claim contains a certification by the provider that the claim complies with all applicable laws, regulations and program instructions required for payment, including but not limited to the federal Anti-Kickback Statute. It was AHF's corporate practice to have billing personnel in its testing centers, clinics, and pharmacies submit claims to Medicare electronically for each Medicare-eligible patient, regardless of the type of services rendered, soon after treatment or services were provided to that patient. Medicare paid the claims electronically to an account controlled by AHF's corporate headquarters in California.

65. AHF submitted such claims for all Medicare-eligible patients, including those who received AHF services as a result of AHF's illegal referral scheme described above. Upon information and belief, AHF submitted those claims for services rendered after illegal referrals to Medicare despite knowing that those claims were ineligible for payment.

66. As a result of submitting these ineligible claims to Medicare, AHF obtained federal funds for treatment and services performed as a result of referrals made in violation of the Anti-Kickback Statute that, upon information and belief, amount to millions of dollars.

67. AHF was required by law or Medicare rules or regulations to repay to the federal government the payments it received for the ineligible claims, but it did not do so.

## Medicaid Reimbursements

68. The Medicaid Program, Title XIX of the Social Security Act, 42 U.S.C. §§ 1396-1396v, is a health insurance program administered by the United States and individual states and is funded by federal, state and local taxpayer revenue. The Medicaid Program is overseen by HHS through CMS. Medicaid was designed to assist participating states in providing medical services, durable medical equipment and prescription drugs to financially needy individuals that qualify for Medicaid. The Medicaid program pays for services pursuant to plans developed by the States and approved by HHS through CMS. 42 U.S.C. §§ 1396a(a)-(b). States pay doctors, hospitals, pharmacies, and other providers and suppliers of medical items and services according to established rates. 42 U.S.C. §§1396b(a)(1), 1903(a)(1). The federal government then pays each state a statutorily established share of "the total amount expended ... as medical assistance under the State plan." See 42 U.S.C. §1396b(a)(1). This federal-to-state payment is known as Federal Financial Participation.

69. Florida maintains a federally-approved Medicaid program to reimburse health care charges made by physicians and other health care providers for the treatment of many low-income Florida citizens not covered by Medicare or private insurance. Claims submitted to the Florida Medicaid Program cause payments to be made by both the United States and Florida. The United States and Florida each contribute approximately half the cost of each claim submitted to the Florida Medicaid Program. Providers apply to participate in the Florida Medicaid Program and agree as a condition of both participation and payment to comply with all the policies and procedures of the Florida Agency for Health Care Administration ("AHCA"), which administers the Medicaid Program in Florida. Medicaid providers must sign a provider agreement promising that the provider will comply with all laws and rules governing the delivery and reimbursement of services or goods to Medicaid recipients. *Florida Medicaid, Provider General Handbook*, at 2-12. Each claim submitted to the Medicaid Program, whether electronically or on a paper claim form, carries a certification that the claim complies with all federal and state laws and regulations; that the services for which reimbursement is claimed "were medically indicated and necessary to the health" of the patient; that the information contained in the claim "is true, accurate and complete," and that the provider understands "that payment and satisfaction of [the] claim will be from Federal and State funds and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal or State laws." *Florida Medicaid, Provider Reimbursement Handbook*, CMS-1500.

70. AHCA policies and procedures bar Medicaid payments for services resulting from fraud or abuse. "Abuse" includes practices that result in unnecessary cost to the Medicaid program and may include "a violation of state or federal law, rule or regulation." *Florida*

*Medicaid, Provider General Handbook*, at 5-3. "Fraud" is defined as "an intentional deception or misrepresentation made by a person with the knowledge that the deception results in unauthorized benefit to herself or himself or another person" and also includes "any act that constitutes fraud under federal or state law." *Id.* "Overpayment" is defined as "any amount that is not authorized to be paid by the Medicaid program whether paid as a result of inaccurate or improper cost reporting, improper claims, unacceptable practices, fraud, abuse or mistake." *Id.*

71. AHF submitted claims for all Medicaid-eligible patients, including those who received AHF services as a result of AHF's illegal kickback scheme described above. AHF submitted those claims for services rendered after illegal referrals to Medicaid despite knowing that those claims were ineligible for payment.

72. As a result of submitting these ineligible claims to Medicaid, AHF obtained federal and state funds for treatment and services performed as a result of referrals made in violation of the Anti-Kickback Statute.

73. AHCA requires "repayment for inappropriate, medically unnecessary, or excessive goods or services from the person furnishing them, the person under whose supervision they were furnished, or the person causing them to be furnished." *Id.* AHF was, therefore, required to repay to the federal government the payments it received for the ineligible claims.

**D. <u>Representative False Claims</u>**

74. Patient John Doe #1 tested positive for HIV at an AHF facility in [redacted]. He was assigned to an AHF Linkage Coordinator named [redacted] who referred him to AHF for clinical services. The same month, patient John Doe #1 completed his first and second visits at an AHF clinic. On [redacted], AHF directed its accounts payable department to

pay [redacted] a commission for successfully linking patient John Doe #1 to treatment with AHF.

75. Patient John Doe #1 qualified for and was approved for coverage of his medical care and treatment under Ryan White.

76. Patient John Doe #1 visited the AHF facility referred to as [redacted] on [redacted] and had his blood drawn.

77. Patient John Doe #1 returned to the AHF facility referred to as [redacted] on [redacted] for an office visit with [redacted], M.D.

78. Patient John Doe #1 was not billed for either the [redacted] or [redacted] visit. He was advised by AHF it was billing Ryan White for his treatment and he was advised by the Broward County Health Services Planning Council that it was paying AHF for his treatment with Ryan White funds. The following excerpt from John Doe #1's AHF patient ledger shows that AHF was paid with Ryan White funds for John Doe #1's clinical services rendered by AHF on [redacted] and [redacted]:

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| [redacted] | AHF | [redacted] MD, | [redacted] | [redacted] | | | | | |
| Current Insurance Carrier: | RYAN WHITE [redacted] | PART A | | | | | | | |
| [redacted] | [redacted] | [redacted] | 1.00 | $10.00 | | | $0.00 | $0.00 |
| [redacted] | RYAN WHITE [redacted] | Ryan White | | | $0.00 | ($10.00) | | |
| | | Visit Total/Balance Due | | $10.00 | $0.00 | ($10.00) | $0.00 | $0.00 |
| [redacted] | AHF | [redacted] MD, | [redacted] | [redacted] | | | | | |
| Current Insurance Carrier: | RYAN WHITE [redacted] | PART A | | | | | | | |
| [redacted] | [redacted] | [redacted] | 1.00 | $134.00 | | | $0.00 | $0.00 |
| [redacted] | RYAN WHITE [redacted] | PAR [redacted] | | | $0.00 | ($134.00) | | |

79. Patient John Doe #2 tested positive for HIV at an AHF facility in [redacted]. He was assigned to an AHF Linkage Coordinator named [redacted] who referred him to AHF for clinical services. The same month, patient John Doe #2 completed his first and second visits at an AHF clinic. On information and belief, AHF directed its accounts payable department to pay [redacted] a commission for successfully linking patient John Doe #2 to treatment with AHF.

Information regarding this commission payment to [redacted], who is currently employed by AHF, is peculiarly within AHF's knowledge or control.

80. The linkage coordinator, [redacted], also arranged for Patient John Doe #2 to apply and qualify for coverage of his medical care and treatment under Ryan White.

81. Patient John Doe #2 was treated by [redacted], M.D., at an AHF clinic on [redacted].

82. Patient John Doe #2 was not billed for the treatment he received at the AHF clinic. He was advised by both AHF and by the Broward County Health Services Planning Council that AHF was being paid for his treatment with Ryan White funds.

83. On [redacted], patient John Doe #2 visited an AHF Clinic for blood work. While at the clinic, he was given an application to requalify for coverage under the Ryan White program. Patient John Doe #2's application was approved and the Broward County Health Services Planning Council decided to provide him with a health insurance policy through Blue Cross/Blue Shield, with the premiums paid for with Ryan White funds. AHF billed Blue Cross for John Doe #2's treatment at the [redacted] visit, and Blue Cross paid the claim to AHF.

## V. <u>CAUSES OF ACTION</u>

### COUNT ONE
### Federal False Claims Act
### <u>31 U.S.C. § 3729(a)(1)(A)</u>

84. Relators repeat and re-allege each and every allegation contained in paragraphs 1 through 83 above as though fully set forth herein.

85. This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729, *et seq*., as amended.

86. As set forth above, by paying remuneration to its employees and to patients themselves in order to induce the referral of patients to AHF's clinics and pharmacies for the furnishing of medical services and medications that would ultimately be paid for, in whole or in part, by a federal health care program, Defendant violated the Anti-Kickback Statute.

87. Defendant was legally prohibited from seeking any reimbursement from a federal health care program for medical services or medications provided to patients referred to Defendant in violation of the Anti-Kickback Statute.

88. As set forth above, however, Defendant did seek reimbursement from federal health care programs for medical services and medications provided to illegally referred patients. Such reimbursement requests constituted "false claims" by operation of the Anti-Kickback Statute, which defines any claim arising from a violation of the statute to be a "false claim" under the FCA. Furthermore, in seeking reimbursement from federal health care programs, Defendant either directly or impliedly certified falsely that its reimbursement requests were being made in compliance with the Anti-Kickback Statute, adherence to which was a condition of payment. Defendant's false certifications transformed its reimbursement requests into "false claims" under the FCA.

89. By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to officers, employees or agents of the United States government for payment or approval. 31 U.S.C. § 3729(a)(1)(A).

90. The United States, unaware of the falsity of the claims made or caused to be made by the Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

91. By reason of the Defendant's acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

92. Additionally, the United States is entitled to the maximum penalty of $11,000 for each and every false and fraudulent claim made and caused to be made by Defendant arising from its unlawful conduct as described herein.

**COUNT TWO**
**Federal False Claims Act**
**31 U.S.C. § 3729(a)(1)(B)**

93. Relators repeat and re-allege each and every allegation contained in paragraphs 1 through 83 above as though fully set forth herein.

94. By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim. 31 U.S.C. § 3729(a)(1)(B) (2009).

95. As set forth above, by paying remuneration to its employees and to patients themselves in order to induce the referral of patients to AHF's clinics and pharmacies for the furnishing of medical services and medications that would ultimately be paid for, in whole or in part, by a federal health care program, Defendant violated the Anti-Kickback Statute.

96. Defendant was legally prohibited from knowingly making, using, or causing to be made or used, false records or statements material to a false or fraudulent claim.

97. As set forth above, however, Defendant violated this prohibition by making or using, or causing to be made or used, false records or statements, such as invoices and claim forms, material to the false or fraudulent claims in which it sought reimbursement from federal health care programs for medical services and medications provided to illegally referred patients.

Such reimbursement requests constituted "false claims" by operation of the Anti-Kickback Statute, which defines any claim arising from a violation of the statute to be a "false claim" under the FCA.

98. By reason of the Defendant's acts, the falsity of which the United States was unaware, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

99. Additionally, the United States is entitled to the maximum penalty of $11,000 for each and every false and fraudulent claim made and caused to be made by Defendant arising from its unlawful conduct as described herein.

**COUNT THREE**
**Federal False Claims Act**
**<u>31 U.S.C. § 3729(a)(1)(G)</u>**

100. Relators repeat and re-allege each and every allegation contained in paragraphs 1 through 83 above as though fully set forth herein.

101. By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government, within the meaning of 31 U.S.C. § 3729(a)(1)(G).

102. As set forth above, by paying remuneration to its employees and to patients themselves in order to induce the referral of patients to AHF's clinics and pharmacies for the furnishing of medical services and medications that would ultimately be paid for, in whole or in part, by a federal health care program, Defendant violated the Anti-Kickback Statute.

103. Defendant was legally prohibited from seeking any reimbursement from a federal health care program for medical services or medications provided to patients referred to Defendant in violation of the Anti-Kickback Statute.

104. As set forth above, however, Defendant did seek and receive reimbursement from federal health care programs for medical services and medications provided to illegally referred patients.

105. As a grantee or subgrantee of Ryan White funds, Defendant was permitted to obtain or use Ryan White funds only in compliance with the Anti-Kickback Statute. Even though Defendant obtained or used funds in violation of this condition, it certified its compliance with the Anti-Kickback Statute, thereby avoiding and concealing its obligation to repay those funds to the government.

106. Additionally, all the funds Defendant received from Medicare and Medicaid for services rendered to patients in violation of the Anti-Kickback Statute were overpayments that Defendant knew were required by law to be repaid, but it knowingly failed to make such repayments while concealing its obligation to do so from the government.

107. The United States, unaware of the falsity of the records and statements and of the Defendant's concealment and unlawful conduct, was denied an opportunity to claim and demand return of the money and property to which it was legally entitled.

108. By reason of the Defendant's acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

109. Additionally, the United States is entitled to the maximum penalty of $11,000 for each and every false and fraudulent claim made and caused to be made by Defendant arising from its unlawful conduct as described herein.

**COUNT FOUR**
**(Florida False Claims Act)**
**§ 68.082(2)(a), Fla. Stat.**

110. Relators repeat and reallege each and every allegation contained in paragraphs 1 through 83 above as though fully set forth herein.

111. This is a claim for treble damages and penalties under the Florida False Claims Act, §§ 68.081 *et seq*., Fla. Stat., as amended.

112. By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to Florida for payment or approval, within the meaning of § 68.082(2)(a), Fla. Stat.

113. As set forth above, by paying remuneration to its employees and to patients themselves in order to induce the referral of patients to AHF's clinics and pharmacies for the furnishing of medical services and medications that would ultimately be paid for, in whole or in part, by a federal health care program, Defendant violated the Anti-Kickback Statute.

114. Defendant was legally prohibited from seeking any reimbursement from Florida for medical services or medications provided to patients referred to Defendant in violation of the Anti-Kickback Statute.

115. As set forth above, however, Defendant did seek reimbursement from Florida for medical services and medications provided to illegally referred patients. Such reimbursement requests constituted "false claims" by operation of the Anti-Kickback Statute, which defines any claim arising from a violation of the statute to be a "false claim" under the FCA. Furthermore, in seeking reimbursement from Florida, Defendant either directly or impliedly certified falsely that its reimbursement requests were being made in compliance with the Anti-Kickback Statute,

adherence to which was a condition of payment. Defendant's false certifications transformed its reimbursement requests into "false claims" under the FCA.

116. Florida, unaware of the falsity of the claims made or caused to be made by the Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

117. By reason of the Defendant's acts, Florida been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

118. Additionally, Florida is entitled to the maximum penalty of $11,000 for each and every false and fraudulent claim made and caused to be made by Defendant arising from their unlawful conduct as described herein.

**COUNT FIVE**
**(Florida False Claims Act)**
**§ 68.082(2)(b), Fla. Stat.**

119. Relators repeat and reallege each and every allegation contained in paragraphs 1 through 83 above as though fully set forth herein.

120. This is a claim for treble damages and penalties under the Florida False Claims Act, §§ 68.081 *et seq*., Fla. Stat., as amended.

121. By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false or fraudulent records and statements, and omitted facts, material to false or fraudulent claims, within the meaning of § 68.082(2)(b).

122. As set forth above, by paying remuneration to its employees and to patients themselves in order to induce the referral of patients to AHF's clinics and pharmacies for the furnishing of medical services and medications that would ultimately be paid for, in whole or in part, by a federal health care program, Defendant violated the Anti-Kickback Statute.

123. Defendant was legally prohibited from knowingly making, using, or causing to be made or used, false records or statements material to a false or fraudulent claim.

124. As set forth above, however, Defendant violated this prohibition by making or using, or causing to be made or used, false records or statements, such as invoices and claim forms, material to the false or fraudulent claims in which it sought reimbursement from federal health care programs for medical services and medications provided to illegally referred patients. Such reimbursement requests made to the State of Florida constituted "false claims" under Florida law.

125. Florida, unaware of the falsity of the records, statements and material omissions made or caused to be made by the Defendant, paid and continues to pay the claims that would not be paid but for Defendant's unlawful conduct.

126. By reason of the Defendant's acts, Florida has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

127. Additionally, Florida is entitled to the maximum penalty of $11,000 for each and every false and fraudulent claim made and caused to be made by Defendant arising from their unlawful conduct as described herein.

**COUNT SIX**
**(Florida False Claims Act)**
**<u>§ 68.082(2)(g), Fla. Stat.</u>**

128. Relators repeat and reallege each and every allegation contained in paragraphs 1 through 83 above as though fully set forth herein.

129. This is a claim for treble damages and penalties under the Florida False Claims Act, §§ 68.081 *et seq*., Fla. Stat., as amended.

130. By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government, within the meaning of § 68.082(2)(g), Fla. Stat.

131. As set forth above, by paying remuneration to its employees and to patients themselves in order to induce the referral of patients to AHF's clinics and pharmacies for the furnishing of medical services and medications that would ultimately be paid for, in whole or in part, by a federal health care program, Defendant violated the Anti-Kickback Statute.

132. Defendant was legally prohibited from seeking any reimbursement from Florida for medical services or medications provided to patients referred to Defendant in violation of the Anti-Kickback Statute.

133. As set forth above, however, Defendant did seek and receive reimbursement from Florida for medical services and medications provided to illegally referred patients.

134. As a grantee or subgrantee of Ryan White funds, Defendant was permitted to obtain or use Ryan White funds only in compliance with the Anti-Kickback Statute. Even though Defendant obtained or used funds in violation of this condition, it certified its compliance with the Anti-Kickback Statute, thereby avoiding and concealing its obligation to repay those funds to the government.

135. Additionally, all the Florida state funds Defendant received from Medicaid for services rendered to patients in violation of the Anti-Kickback Statute were overpayments that Defendant knew were required by law to be repaid to Florida, but it knowingly failed to make such repayments while concealing its obligation to do so from the government.

136. Florida, unaware of the falsity of the records and statements and of the Defendant's concealment and unlawful conduct, was denied an opportunity to claim and demand return of the money and property to which it was legally entitled.

137. By reason of the Defendant's acts, Florida has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

138. Additionally, Florida is entitled to the maximum penalty of $11,000 for each and every false and fraudulent claim made and caused to be made by Defendant arising from their unlawful conduct as described herein.

**PRAYER FOR RELIEF**

WHEREFORE, Relators, acting on behalf and in the name of the United States of America and the State of Florida, demand and pray that judgment be entered against Defendant under the Federal False Claims Act and Florida False Claims Act as follows:

(1) That Defendant cease and desist from violating 31 U.S.C. §§ 3729 *et seq*. and §§ 68.081 *et seq*., Fla. Stat., as set forth above;

(2) That this Court enter judgment against Defendant in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of not less than $5,000 and not more than $11,000 for each violation of 31 U.S.C. § 3729;

(3) That this Court enter judgment against Defendant in an amount equal to three times the amount of damages the State of Florida has sustained because of Defendant's actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of § 68.082(2), Fla. Stat.;

(4) That Relators be awarded the maximum amount allowed pursuant to 31 U.S.C.

§ 3730(d) and § 68.085, Fla. Stat.;

(5) That Relators be awarded all costs of this action, including attorneys' fees and expenses; and

(6) That Relators recover such other relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relators hereby demand a trial by jury.

Dated: July 10, 2015

By: */s/Theodore J. Leopold*
Theodore J. Leopold (FL Bar No. 705608)
Diana L. Martin (FL Bar No. 624489)
Leslie M. Kroeger (FL Bar No. 989762)
COHEN MILSTEIN SELLERS & TOLL PLLC
2925 PGA Boulevard, Suite 200
Palm Beach Gardens, FL 33410
Tel. (877) 515-7955
Fax (561) 515-1401

Gary L. Azorsky (admitted *Pro Hac Vice*)
Casey M. Preston (admited *Pro Hac Vice*)
Raymond M. Sarola (admitted *Pro Hac Vice*)
COHEN MILSTEIN SELLERS & TOLL PLLC
3 Logan Square, 1717 Arch Street
Suite 3610
Philadelphia, PA 19103
Tel. (267) 479-5703
Fax (267) 479-5701

James P. Gitkin (FL Bar No. 570001)
SALPETER GITKIN, LLP One East
Broward Boulevard, Suite 1500
Fort Lauderdale, FL 33301
Tel. (954) 467-8622
Fax (954) 467-8623

Geoffrey R. Kaiser (admitted *Pro Hac Vice*)
KAISER LAW FIRM, PLLC
926 RXR Plaza
Uniondale, New York 11556-0926
Tel. (516) 570-3071
Fax (516) 570-3071

*Attorneys for Relators*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 10, 2015, I electronically filed the foregoing document in redacted form with the Clerk of the Court using CM/ECF, and that the unredacted document is being filed under seal in the conventional manner. I also certify that the redacted version of the foregoing document is being served this day on all counsel of record identified on the attached Service List via transmission of Notices of Electronic Filing generated by CM/ECF, and the unredacted version is being served via electronic mail.

By: */s/Theodore J. Leopold*
Theodore J. Leopold (FL Bar No. 705608)
COHEN MILSTEIN SELLERS & TOLL PLLC

**Service List**

James P. Gitkin, Esq.
jim@salpetergitkin.com
SALPETER GITKIN, LLP
One East Broward Boulevard
Suite 1500
Fort Lauderdale, FL 33301
(954) 467-8622
*Co-Counsel for Relators*

Geoffrey R. Kaiser, Esq.
gkaiser@kaiserfirm.com
KAISER LAW FIRM, PLLC
926 RXR Plaza
Uniondale, NY 11556
(516) 570-3071
*Co-Counsel for Relators*

Mitchell A. Kamin, Esq.
mak@birdmarella.com; lak@birdmarella.com
Marc E. Masters, Esq.
mem@birdmarella.com; cmd@birdmarella.com
Paul S, Chan, Esq.
psc@birdmarella.com; em@birdmarella.com
Bird Marella
1875 Century Park West, Suite 2300
Los Angeles, CA 90067
Phone: (310) 201-2100
Fax: (310) 201-2110
*Attorneys for Aids Healthcare Foundation*

Stephen H. Thomas, Jr.
Stephen.thomas@myfloridalegal.com
Office of the Attorney General
Medicaid Fraud Control Unit
PL-01, The Capitol
Tallahassee, FL 32339
(850) 414-3883

Elisa Castrolugo, Esq.
Elisa.castrolugo@usdoj.gov
Susan Torres
Susan.Torres@usdoj.gov
United States Attorney's Office
99 N.E. 4th Street, 3rd Floor
Miami, FL 33132