**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO. 14-cv-61301-KMW**

UNITED STATES OF AMERICA and THE STATE OF FLORIDA ex rel., JACK CARREL, MAURICIO FERRER, and SHAWN LOFTIS,

Plaintiffs,

vs.

AIDS HEALTHCARE FOUNDATION, INC.,

Defendant.
_________________________________/

# ORDER

**THIS MATTER** is before the Court on Defendant AIDS Healthcare Foundation, Inc.'s ("AHF") motion to dismiss the Third Amended Complaint ("TAC") for failure to state a claim. (DE 70, 72). AHF is a California nonprofit corporation which provides diagnostic, clinical, insurance, and pharmacy services to patients with HIV/AIDS. Relator Jack Carrel was AHF's Director of Public Health, Southern Bureau, from August 9, 2012, to August 1, 2013. Relator Mauricio Ferrer was AHF's Senior Program Manager, Southern Bureau from May 17, 2011, to August 2012. Relator Shawn Loftis was AHF's Grants Manager, Southern Bureau, from January 2, 2013, to August 16, 2013.

Relators brought this case against AHF on June 4, 2014 under the False Claims Act ("FCA") and Florida False Claims Act ("FFCA"), two statutes that allow private actors—whistleblowers—to bring cases in the name of the government against those who defraud the government. 31 U.S.C. § 3730(b); Fla. Stat. § 68.083(2). After

Relators filed the TAC (DE 59, 62), AHF moved to dismiss (DE 70, 72), Relators responded (DE 79, 82), and AHF replied (DE 85, 87). For the reasons set forth below, the Court grants in part and denies in part the motion to dismiss.

## I. BACKGROUND[1]

Relators allege that AHF pays its employees to purposefully steer patients who have tested positive for HIV at an AHF facility to AHF's other HIV/AIDS-related services. Relators also claim that AHF pays such patients directly to accomplish the same referral. The TAC characterizes these payments to employees and patients as "kickbacks" prohibited by the federal Anti-Kickback statute ("AKS"), 42 U.S.C. § 1320(a)-7b(b).[2] And because reimbursement claims for services provided to patients referred through kickbacks are deemed "false or fraudulent" under the AKS, 42 U.S.C. § 132)(a)-7b(g), Relators argue that the claims AHF allegedly submitted to three federal healthcare programs premised on referrals from kickbacks violates the FCA and FFCA.

Relators sue to recover treble damages and to obtain injunctive relief. Counts I and IV of the TAC allege that every claim AHF submitted for services rendered to illegally referred patients was an illegal "false claim" under the FCA and FFCA, respectively. Counts II and V of the TAC allege that AHF used false statements and

---

[1] The non-conclusory factual allegations contained in the Third Amended Complaint ("TAC") are taken as true for purposes of AHF's motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) and are construed in the light most favorable to Relators. *See Speaker v. U.S. Dep't of Health & Human Servs. Ctrs. For Disease Control & Prevention*, 623 F.3d 1371, 1379 (11th Cir. 2010).

[2] The Anti-Kickback Statute ("AKS") provides that "[w]hoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind . . . in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program . . . shall be guilty of a felony . . . ." 42 U.S.C. § 1320(a)-7b(b).

records in support of each false claim in violation of the FCA and FFCA, respectively. Counts III and VI allege that AHF was obligated to pay the government a refund on any reimbursements received through false claims but failed to do so in violation of the FCA and FFCA, respectively.

**A. Kickbacks**

AHF's kickback schemes allegedly stemmed from government contracts that mandate HIV diagnostic test providers to demonstrate that positive-testing patients are receiving follow-up care. (DE 62 ¶ 13). According to the TAC, these contractual pressures, combined with AHF's "voracious appetite for any and all revenues associated with HIV-patient referrals," (DE 62 ¶ 12), led AHF to set two goals: test more patients and steer the positive-testing patients from AHF's diagnostic services "exclusively" to AHF's other healthcare services.[3] (DE 62 ¶ 14). AHF then devised four schemes to pay employees and patients to achieve these goals[4] (DE 62 ¶¶ 14, 17-27), which Relators contend all violate the AKS.

The main "Linkage Coordinator" scheme begins each time a patient tests positive for HIV at an AHF testing facility. (DE 62 ¶ 18). The TAC is silent as to whether AHF administers these tests to patients free of charge, although it does state that various

---

[3] The TAC does not clearly define the various services that AHF provides to individuals with HIV/AIDS, nor the type of facility in which each of these services are provided. From what the Court can discern, AHF provides diagnostic testing at AHF testing centers (DE 62 ¶ 18); medical treatment at AHF healthcare centers, clinical service centers, and clinics (DE 62 ¶¶ 17, 18, 21); pharmacy services at AHF pharmacies (DE 62 ¶ 22); and managed care medical insurance plans under the "Positive Healthcare" brand (DE 62 ¶ 22).

[4] Although none of the three Relators worked at AHF before May 2011 or after August 2013, the TAC alleges AHF's implemented its incentive compensation scheme in 2010 and continues to maintain the scheme through today. (DE 62 ¶ 10).

government entities pay AHF to conduct these diagnostic tests. (DE 62 ¶ 13). Following the positive test, the employee who conducted the test introduces the patient to AHF "'Linkage Coordinators' whose job it is" to persuade the patient to make two follow-up visits to an AHF clinic: one visit within 72 hours of the initial positive test for a confirmatory test, and another to receive the confirmatory test results. (DE 62 ¶ 18). After the patient completes these two visits,[5] AHF directs its accounts payable department to cut bonus checks of up to $100 to both the employee who conducted the test and the "linkage coordinator" for a successful patient "linkage." (DE 62 ¶ 18). AHF pays these bonus checks on a monthly basis through checks separate from regular payroll checks and supervises bonus disbursal through a database approvals system administered by "linkage managers" in each region and the "linkage director" at AHF's headquarters in California. (DE 62 ¶¶ 17-21).

The TAC also alleges three other kickback schemes. First, AHF gives cash or gift certificates valued at up to $50 or more to "any AHF Public Health Division ('PHD') employee" who refers an HIV-positive patient to AHF's pharmacies or insurance plans (DE 62 ¶ 24) and bases bonus compensation for its physicians on the number of patients that the physician treats who are covered by AHF's insurance plans (DE 62 ¶ 27) (the "PHD Employee Scheme"). Second, AHF pays employees conducting HIV tests commissions for increasing the volume of tests that they administer (the "Test Scheme").[6] (DE 62 ¶¶ 15, 18). Third, AHF gives gift certificates to patients who enroll

---

[5] There is no allegation that AHF bills any government-operated insurance program for reimbursement for these initial two visits.

[6] Relators do not allege that AHF billed the government for any services that HIV-positive patients did not need or for services that were never provided. Instead, they

in AHF's insurance plans, nutritional shakes to patients who use AHF's pharmacies, and a monthly allotment of multivitamins and nutritional shakes to patients who use both (the "Patient Scheme"). (DE 62 ¶¶ 25-26).

In support of these allegations, Relators rely broadly on their personal knowledge of AHF's operations. (DE 62 ¶¶ 42-45). Additionally, Relators attach and rely on dozens of pages of AHF documents that allude generally to "linkage" and "positivity rates" (DE 59-5, 59-8, DE 59-10), "positives" and "referrals" (DE 59-6), and "commissions based testing" through which testing staff were paid to increase testing volume (DE 59-1, 59-3, 59-7).[7] Relators also attach a "Linkage to Care Training Manual" (DE 59-2), check stubs paid to a single unidentified linkage coordinator that they allege illustrate linkage bonuses (DE 59-4), and an AHF "Linkage to Care Report" specifying the numbers of patients referred for one week in October 2012 (DE 59-9). Finally, Relators cite public statements made by AHF's President, Michael Weinstein, confirming that AHF pays incentives to patients and to employees to "link" patients to AHF services. (DE 62 ¶¶ 30, 34, 35).

**B. Submission of False Claims**

Relators next contend that AHF submitted claims to various government entities for services rendered to patients "referred illegally" through all four of AHF's kickback schemes. (DE 62 ¶ 11). Relators argue that any claims AHF made to government

---

argue that the exclusivity of AHF's referrals is harmful because it amplifies the "corrupting effect of kickbacks in healthcare and the resulting risks" of overutilization, increased program costs, corruption of medical decisionmaking, patient steering, and unfair competition. (DE 62 ¶ 37; *see also* DE 82 at 12).

[7] AHF filed a countersuit regarding Relators' possession and publication of AHF proprietary materials. *See AIDS Healthcare Foundation, Inc. v. Carrel, et al.*, Case No. 15-cv-21546-KMW.

programs based on illegal patient referrals were "false" and violated the FCA and FFCA because the AKS renders claims based on services provided to illegally referred patients "false," 42 U.S.C. § 1320-7b(g), and because AHF had to certify compliance with the AKS before receiving reimbursements. Relators explain that they cannot know the precise number of illegal claims AHF submitted because that information is uniquely within AHF's control. (DE 62 ¶ 41).

To show that AHF actually submitted claims based on illegal referrals, Relators primarily extrapolate from certain AHF documents. First, they point to AHF's 2005 annual report and its 2013 consolidated financial statement, which show that AHF derives a sizeable percentage of its funds from three "Federal Healthcare Programs": the Ryan White Comprehensive AIDS Resources Emergency Act ("Ryan White"),[8] Medicare,[9] and Medicaid[10] (DE 62 ¶ 39). Second, they attach several documents which

---

[8] The Ryan White CARE Act, 42 U.S.C. § 300ff *et seq.*, as amended, establishes a grant program administered by two divisions of the Department of Health and Human Resources ("HHS"): the Health Resources and Services Administration ("HRSA") and the Centers for Disease Control and Prevention ("CDC"). HRSA and CDC provide federal funds to community-based organizations, either directly or indirectly, through State or local agencies, for programs designed to expand medical care for people living with HIV/AIDS and to increase awareness of HIV status. (DE 62 ¶¶ 46-61). For the alleged Ryan White claims, Relators proceed on an express certification theory. They allege that Broward County disburses Ryan White funds to AHF via a contract which requires AHF to document, invoice, and deliver services before the County disburses the funds. (DE 62 ¶¶ 58-61). The contract's terms also incorporate a "Provider Handbook" that explicitly references the AKS. (DE 62 ¶ 59). Relators separately allege, based on the personal knowledge of Relator Loftis, that the Ryan White funds are paid to AHF monthly by Miami-Dade County. (DE 62 ¶ 57).

[9] Medicare is a health insurance program that covers certain classes of Americans, including those above a certain age or those afflicted with certain diseases or disabilities. Medicare is administered by federal government and is overseen by the Department of Health and Human Services ("HHS") through the Center for Medicare and Medicaid Services ("CMS"). (DE 62 ¶¶ 62-67). For the alleged Medicare claims, Relators assert that AHF both expressly certified compliance with the AKS in an

purport to establish that AHF is a Ryan White grantee but that do not reflect any Ryan White payments to AHF for services provided to illegally referred patients.[11] Additionally, they point to a Patient Spreadsheet, which they assert "lists more than 840 'linked' . . . patients who represent at least a portion of the illegal referrals generated by AHF" and several AHF linkage personnel who received kickbacks in return for referring those patients. (DE 62 ¶ 41; *see also* DE 59-5). The Patient Spreadsheet contains columns labelled "fldInsurance" and "fldNotes." (DE 62 ¶ 19; DE 59-5). Relator Carrel claims that these columns list the insurance program for each patient and identify sources of claim reimbursement for such patients. (DE 62 ¶¶ 19, 42). And even though the Patient Spreadsheet is neither a billing form nor a record of actual reimbursements issued to AHF, Relators assert that they know AHF submitted claims to the government based on services provided to illegally referred patients because some entries in the "fldInsurance" and "fldNotes" column contain notations that read Medicare, Medicaid, or Ryan White. (DE 62 ¶¶ 19, 42).

---

acknowledgment it had to sign before becoming a Medicare provider and also impliedly certifies compliance each time it submits an individual Medicare claim. (DE 62 ¶¶ 63-64).

[10] Medicaid is a health insurance program designed to assist participating states in providing medical care to the indigent. It is administered by federal and state governments and is overseen by HHS and CMS. (DE 62 ¶¶ 68-73). For the Medicaid claims, Relators proceed on an implied certification theory and assert that AHF agreed, as a condition of participation and payment through Medicaid, to comply with "all the policies and procedures of" the agency that administered Florida's Medicaid program, which include a general provision requiring that AHF comply with federal and state law. (DE 62 ¶ 69).

[11] Relators attach an unspecified grant award (DE 59-11), a contract for Ryan White funding between AHF and Broward County (DE 59-12), what appears to be a sample claim form under that Broward County contract (DE 59-13), and National Monitoring Standards for Ryan White grantees (DE 59-14).

Beyond these general allegations, the TAC advances two "Representative False Claims" that contend that AHF submitted actual false claims for services rendered to patients referred through the Linkage Coordinator Scheme. (DE 62 ¶¶ 74-83). John Doe #1[12] tested positive for HIV at an AHF facility in [redacted]. (DE 62 ¶ 74). He was assigned an AHF linkage coordinator named [redacted] who referred him to "AHF for clinical services." (DE 62 ¶ 74). John Doe #1 completed his first and second visits to AHF in [redacted]. (DE 62 ¶ 74). On [redacted], after the second visit, AHF "directed Accounts Payable" to pay [redacted] a bonus of an unspecified amount. (DE 62 ¶ 74). John Doe #1 returned to AHF facilities for a blood drawing ten months later on [redacted] (DE 62 ¶ 76) and a doctor's visit on [redacted] (DE 62 ¶ 77). At an unspecified time, he "was advised by AHF it was billing Ryan White" and "was advised by the Broward County Health Services Planning Council" that it was paying AHF with Ryan White funds for the [redacted] and [redacted] visits. (DE 62 ¶ 78). The TAC references an excerpt of a document that shows John Doe #1 had Ryan White coverage for the [redacted] visits. (DE 62 ¶ 78).

Similarly, John Doe #2 tested positive for HIV at an AHF facility in [redacted] and was assigned an AHF linkage coordinator named [redacted]. (DE 62 ¶ 79). [redacted] referred John Doe #2 to "AHF for clinical services." (DE 62 ¶ 79). John Doe #2 completed his first and second visits to AHF in [redacted]. (DE 62 ¶ 79). The TAC alleges that after these two visits, on "information and belief, AHF directed its accounts payable department to pay" [redacted] an unspecified bonus. (DE 62 ¶ 79). [redacted] also

[12] It should be noted that John Doe #1 is [redacted]. The Parties and the Court have found no case authority where a [redacted].

arranged, at an unspecified time, for John Doe #2 to "apply and qualify for coverage of his medical care and treatment under Ryan White." (DE 62 ¶ 80). John Doe #2 returned to an AHF clinic for a doctor's visit on [redacted]. (DE 62 ¶ 81). As to that visit, John Doe #2 "was advised by both AHF and the Broward County Health Services Planning Council that AHF was being paid for his treatment with Ryan White funds." (DE 62 ¶ 82). On [redacted], John Doe #2 visited an AHF facility for blood work. (DE 62 ¶ 83). During that visit, he was given an application to requalify for Ryan White coverage. (DE 62 ¶ 83). That application was approved and the Broward County Health Services Planning Counsel provided John Doe #2 with a health insurance policy through Blue Cross Blue Shield with premiums paid by Ryan White. (DE 62 ¶ 83). AHF submitted a claim to Blue Cross Blue Shield for the [redacted], visit. (DE 62 ¶ 83).

**C. Procedural History**

On June 4, 2014, Plaintiffs filed the Complaint (DE 1) in this case under seal pursuant to the requirements of the FCA and FFCA, which allow the United States and Florida the opportunity to review the matter and decide whether to intervene. On February 9, 2015, the United States entered a notice of election to decline intervention. (DE 9). On February 10, 2015, Florida did the same. (DE 10). The Court entered Orders granting these elections to decline intervention on February 12, 2015 (DE 11, 12) and the Clerk unsealed the case that day (DE 13).

On April 3, 2015, Relators filed their First Amended Complaint ("FAC") (DE 14). On May 8, 2015, AHF responded by filing a motion to dismiss the FAC (DE 33), which argued that the FAC was implausible under Rules 8(a)(2) and 9(b) and failed to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure. On May 11, 2015,

the Court set a status conference in this matter and the related matter *AIDS Healthcare Foundation, Inc. v. Carrel*, *et al.*, No. 15-cv-21546-KMW,[13] for June 10, 2015. On May 26, 2015, the deadline for response to the motion to dismiss the FAC, Relators filed a Second Amended Complaint ("SAC"). (DE 35). The next day, after inquiry from the Court regarding whether Relators had obtained AHF's consent to so file, Relators moved the Court for leave to file the SAC. (DE 37). The Court granted this motion for leave to file and in the same Order denied AHF's motion to dismiss the FAC as moot. (DE 38). On June 9, 2015, the day before the scheduled status conference, AHF filed a motion to dismiss the SAC. (DE 42).

During the status conference on June 10, 2016, the Court—without ruling on the pending motion to dismiss the SAC—noted the absence of specificity in the SAC and observed that Relators must articulate a plausible claim within the strictures of Rule 9(b) of the Federal Rules of Civil Procedure and the Eleventh Circuit's controlling *qui tam* case law. (DE 51 at 11:1-9, 12:19-21, 14:11-15:7, 21:3-20, 22:18-23:8, 23:25-24:8, 24:22-24). After this hearing, Relators elected to file the TAC rather than respond to AHF's motion to dismiss the SAC and requested an enlargement of time to do so. (DE 53). The Court granted the enlargement of time and denied AHF's motion to dismiss the SAC as moot. (DE 54).

Under procedures established in a stipulated protective order designed to protect the sensitive medical information of third parties (DE 65), Relators filed both redacted and sealed versions of the operative complaint, the TAC, on July 10, 2015. (DE 59, 62). AHF filed redacted and sealed versions of the motion to dismiss the TAC on August 7,

---

[13] *See* note 7, *supra*.

2015. (DE 70, 72). Relators filed redacted and sealed versions of a response (DE 79, 82) and AHF filed redacted and sealed versions of a reply (DE 85, 87). Relators then filed a motion for leave to file a sur-reply (DE 88), which the Court denied (DE 91) in light of the 26-page extension allowed to Relators for their response.

## II. LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead sufficient facts to state a claim that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The Court's consideration is limited to the allegations presented. *See GSW, Inc. v. Long Cty.*, 999 F.2d 1508, 1510 (11th Cir. 1993). All factual allegations are accepted as true and all reasonable inferences are drawn in the plaintiff's favor. *See Speaker v. U.S. Dep't of Health & Human Servs. Ctrs. for Disease Control & Prevention*, 623 F.3d 1371, 1379 (11th Cir. 2010); *see also Roberts v. Fla. Power & Light Co.*, 146 F.3d 1305, 1307 (11th Cir. 1998). Nevertheless, while a plaintiff need not provide "detailed factual allegations," the allegations must consist of more than "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555 (internal citations and quotations omitted). "Additionally, 'conclusory allegations, unwarranted factual deductions or legal conclusions masquerading as facts will not prevent dismissal.'" *U.S. ex rel. Keeler v. Eisai, Inc.*, 568 F. App'x 783, 792-93 (11th Cir. 2014) (*quoting Davila v. Delta Air Lines, Inc.*, 326 F.3d 1183, 1185 (11th Cir. 2003)). The "[f]actual allegations must be enough to raise a right of relief above the speculative level." *Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1295 (11th Cir. 2007) (quoting *Twombly*, 550 U.S. at 545).

In addition to the requirements of *Twombly*, *Iqbal*, and Federal Rules of Civil Procedure 8(a) and 12(b)(6), claims asserted under the False Claims Act (as well as other fraud claims) are subject to the pleading standards of Federal Rule of Civil Procedure 9(b). *See U.S. ex. rel. Clausen v. Lab. Corp. of Am., Inc.*, 290 F.3d 1301, 1309-10 (11th Cir. 2002); *Keeler*, 568 F. App'x at 802-03. That rule provides that "[i]n allegations of fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake" but that "[m]alice, intent, knowledge, and other condition of mind of a person shall be averred generally." Fed. R. Civ. P. 9(b). Rule 9(b) is satisfied if the plaintiff pleads "(1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud." *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001) (quoting *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1371 (11th Cir. 1997)).

In the context of the FCA, the complaint must set forth "facts as to time, place, and substance of the defendant's alleged fraud" and "the details of the [defendant's] allegedly fraudulent acts, when they occurred, and who engaged in them." *Clausen*, 290 F.3d at 1308 (internal quotation marks and citation omitted); *accord. U.S. ex rel. Sanchez v. Lymphatx, Inc.*, 596 F.3d 1300, 1302 (11th Cir. 2010); *U.S. ex rel. Fox Rx, Inc. v. Omnicare, Inc.*, Case No. 1:11-CV-00962-WSD, 2012 WL 8020674, at *5 (N.D. Ga. 2012) (citing *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1262 (11th Cir. 2006)

(requiring relators to detail "the who, what, when, where, and how" of their claims)). "Underlying schemes and other wrongful activities that result in the submission of fraudulent claims are included in the 'circumstances constituting fraud or mistake' that must be pled with particularity pursuant to Rule 9(b)." *U.S. ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220, 232 (1st Cir. 2004).

Whether submission of the claims or payment by the government are sufficiently established are different questions than whether the scheme has been sufficiently pled. *See Keeler*, 568 F. App'x at 798 (citing *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1014 (11th Cir. 2005)); *see also Britton v. Lincare, Inc.*, Case No. 2:13-cv-00742-SGC, 2015 WL 1487134, at *4 (N.D. Ala. March 30, 2015) ("[T]he relevant inquiry for purposes of determining whether a complaint has pled the actual submission of a claim sufficiently is whether the relator purports to have direct, first-hand knowledge of the defendant's *billing practices*") (emphasis in original). As discussed herein, the Eleventh Circuit has recognized that while the requirements of Rule 9(b) may, in practice, make it difficult for a *qui tam* plaintiff to bring an action, they are necessary to prevent "[s]peculative suits against innocent actors for fraud" and charges of guilt by association. *Clausen*, 290 F.3d at 1308 (quoting *U.S. ex rel. Cooper v. Blue Cross & Blue Shield of Fla., Inc.*, 19 F.3d 562, 566–67 (11th Cir. 1994) (per curiam)).

**III. DISCUSSION**

The FCA "was enacted in 1863 with the principal goal of stopping the massive frauds perpetrated by large private contractors during the Civil War." *Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 781 (2000) (quotations omitted); *see also Ragsdale v. Rubbermaid, Inc.*, 193 F.3d 1235, 1236 n.1 (11th Cir. 1999) ("The purpose

of the Act, then and now, is to encourage private individuals who are aware of fraud being perpetrated against the government to bring such information forward."). "The Florida FCA, is modeled after and tracks the language of, the federal False Claims Act." *U.S. ex rel. Heater v. Holy Cross Hosp., Inc.*, 510 F. Supp. 2d 1027, 1034 (S.D. Fla. 2007) (internal quotation marks and citation omitted). Private persons such as Relators may maintain an action to enforce these laws. 31 U.S.C. § 3730(b); Fla. Stat. § 68.083(2).

As explained below, the Court dismisses Counts III and VI of the TAC because they fail to state a claim as a matter of law. The Court also grants in part the motion to dismiss as to Counts I, II, IV, and V of the TAC, but will allow the Parties to proceed on certain articulated claims under Counts I, II, IV, and V, which the Parties must litigate pursuant to a schedule consistent with this Order.

**A. Counts III and VI**

Counts III and VI of the TAC allege that the FCA and FFCA impose liability on AHF for "reverse false claims." The relevant statutory provisions impose such "reverse false claim" liability on any person who:

> knowingly[14] makes, uses, or causes to be made or used, a false record or statement material to an obligation[15] to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly

---

[14] "Knowingly" means a person who (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information; and no proof of specific intent to defraud is required. *See* 31 U.S.C. § 3729(b)(1); Fla. Stat. § 68.082(1)(c).

[15] "Obligation" means "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment." 42 U.S.C. § 3729(b)(3); Fla. Stat. § 68.082(1)(e).

> avoids or decreases an obligation to pay or transmit money or property to the Government.

31 U.S.C. § 3729(a)(1)(G); Fla. Stat. § 68.082(2)(g). Section 3729(a)(1)(G) of the FCA "is known as the 'reverse false claim' provision of the FCA because liability results from avoiding the payment of money to the government, **as opposed to submitting to the government a false claim**." *U.S. ex rel. Matheny v. Medco Health Solutions, Inc.*, 671 F.3d 1217, 1222 (11th Cir. 2012) (emphasis added) (citing *U.S. v. Pemco Aeroplex, Inc.*, 195 F.3d 1234, 1235-36 (11th Cir. 1999)). The FCA and FFCA separately impose liability for a "false claim" on any person who "knowingly presents or causes to be presented a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A); Fla. Stat. § 68.082(2)(a).

To survive a motion to dismiss, a complaint alleging a reverse false claim must plead five elements:

> (1) a false record or statement; (2) the defendant's knowledge of the falsity; (3) that the defendant made, used, or causes to be made or used a false statement or record; (4) for the purpose to conceal, avoid, or decrease an obligation to pay money to the government; and (5) the materiality of the misrepresentation.

*See Matheny*, 671 F.3d at 1222 (citing *U.S. v. Bourseau*, 531 F.3d 1159, 1164-70 (9th Cir. 2008)). The Court dismisses the TAC's reverse false claim counts, Counts III and VI, because Relators fail to allege the fourth element: that AHF acted with the purpose to conceal, avoid, or decrease an "obligation to pay" the government. *See id.* Relators argue that the TAC satisfactorily pleads this element because it alleges that "AHF was required by law or Medicare rules or regulations to repay to the federal government the payments it received for the ineligible claims, but it did not do so." (DE 62 ¶ 67). In

other words, Relators contend that by violating the FCA and FFCA's false claims provisions, AHF also violated the FCA and FFCA's reverse false claims provisions.

This argument fails because reverse false claims are not an automatic redundancy of false claims and not every complaint that successfully alleges a false claim will successfully allege a reverse false claim. *See Matheny*, 671 F.3d at 1222 (distinguishing FCA's reverse false claim provision from its false claim provision); *U.S. ex rel. Ruscher v. Omnicare Inc.*, Civ. Action No. 4:08-cv-3396, 2014 WL 2618158, at *28 (S.D. Tex. June 12, 2014) (dismissing all reverse false claims counts because the relator's "claims represent two sides of the same coin" and the "Reverse False Claims Act's purpose was not to provide a redundant basis to state a false statement claim") (internal quotation marks and citation omitted), *amended in part, Ruscher v. Omnicare Inc.*, Civ. Action No. 4:08-cv-3396, 2014 WL 4388726, at *4-7 (S.D. Tex. Sept. 5, 2014) (amending dismissal to allow reverse false claims counts based on the defendant's alleged breach of "Corporate Integrity Agreement" with the Department of Health and Human Services to proceed); *U.S. ex rel. Spay v. CVS Caremark Corp.*, 913 F. Supp. 2d 125, 171-72 (E.D. Pa. 2012) (Congress's purpose in adding the reverse false claim provision to the FCA "was not to provide a redundant basis to state a false statement claim.") (citing *U.S. ex rel. Thomas v. Siemens AG*, 708 F. Supp. 2d 505, 514 (E.D. Pa. 2010)); *U.S. ex rel. Cullins v. Astra, Inc.*, No. 09-60696-CIV, 2010 WL 625279, at *5 (S.D. Fla. Feb. 17, 2010). Accordingly, a conclusory statement that an "obligation to pay" arose from the AHF's submission of false claims does not suffice; to state a reverse false claim, Relators must plead facts sufficient to show that AHF acted with the purpose of concealing, avoiding, or decreasing an actual "obligation to pay" the

government. *See Davila*, 326 F.3d at 1185 ("conclusory allegations, unwarranted factual deductions or legal conclusions masquerading as facts will not prevent dismissal"); *Clausen*, 290 F.3d at 1308 (Rule 9(b) requires the complaint to plead "facts as to time, place, and substance of the defendant's alleged fraud" and "the details of the [defendant's] allegedly fraudulent acts, when they occurred, and who engaged in them.") (internal quotation marks and citations omitted).

Relying heavily on the facts of *U.S. ex rel. Schaengold v. Memorial Health, Inc.*, No. 4:11-cv-58, 2014 WL 6908856, at *15 (S.D. Ga. Dec. 8, 2014), Relators argue that the TAC alleges sufficient facts to establish an obligation to pay. (DE 82 at 51-52). In *Schaengold*, the plaintiff alleged that the defendant received improper referrals from physicians in violation of the Stark Act, 42 U.S.C. § 1395, *et seq.*, and that those referrals led the defendant to make claims that it was specifically obligated to refund under the Stark Act's implementing regulations, 42 C.F.R. § 411.353(d).[16] *Schaengold*, 2014 WL 6908856, at *15. The complaint in *Schaengold* also alleged that for the period from July 2008 through February 2011, the defendant certified and submitted false cost reports to Medicare, "thus concealing an obligation to refund overpayments . . . ." *Id.* On these facts, the *Schaengold* court allowed the plaintiff's reverse false claim count to survive a motion to dismiss. *Id.*, at *3.

However, *Schaengold* is readily distinguishable from this case. The complaint in *Schaengold* identified an applicable regulation that clearly obligated the defendant to refund reimbursements received for specific false claims. In this case, while the TAC

---

[16] The "Refunds" provision of the implementing regulations of the Stark Act provides that "[a]n entity that collects payment for a designated health service that was performed pursuant to a prohibited referral **must refund** all collected amounts on a timely basis." 42 C.F.R. § 411.353(d) (emphasis added).

references three purported bases for repayment, it does not allege that any of these instances specifically obligate AHF to repay the government when it receives overages or other unauthorized payments. First, the TAC alleges that the federal Ryan White grant program required compliance with the AKS (the basis for the false claim under Counts I and IV) and that AHF received reimbursements from Ryan White despite knowing that they were violating the AKS (DE 62 ¶¶ 105, 134), but does not allege that Ryan White's rules set forth particular circumstances which obligate AHF to refund reimbursements. Second, the TAC alleges that AHF had a duty to report fraud, waste, or abuse of Ryan White funds to HHS (DE 62 ¶ 55), but does not allege that this duty creates an express obligation to refund reimbursements. Third, the TAC cites the Florida Medicaid Program's Provider General Handbook, which requires participating providers to refund reimbursements for claims based on "inappropriate, medically unnecessary, or excessive goods or services." (DE 62 ¶¶ 73). However, the TAC never alleges that AHF sought reimbursement for claims based on "inappropriate, medically unnecessary, or excessive goods or services" from Florida's Medicaid Program, or even that AHF submitted a single identifiable claim to Florida's Medicaid Program. Instead, the TAC suggests that the Florida Medicaid Program's Provider General Handbook creates a broader obligation to refund reimbursements. (DE 62 ¶¶ 71-73). This blanket assertion, unsupported by specific cites to the Handbook or any statutory or regulatory authority that violation of Handbook provisions creates an independent obligation to repay, cannot sustain Counts III and VI beyond a Rule 9(b) motion to dismiss. *See U.S. ex rel. Heesch v. Diagnostic Physicians Group, P.C.*, No. 11-0364-KD-B, 2014 WL 2155363, at *9 (S.D. Ala. May 22, 2014) (dismissing reverse

false claim count where the plaintiff "simply alleged, without any specific factual support, that Defendants violated" the reverse false claim provision of the FCA).

Thus, the conclusory allegations in the TAC are insufficient to support the claims in Counts III and VI, *see Corsello*, 470 F.3d 1350, 1360 ("the public policies behind Rule 9(b), the FCA, and *qui tam* actions required the district court to dismiss [the plaintiff's] complaint under Rule 9(b); for it lacks sufficient indicia of reliability to haul the defendants into court"), and, consequently, dismissal of Counts III and VI is appropriate. *See Heesch*, 2014 WL 2155363, at *9 (dismissing reverse false claim count because complaint "does not contain any factual assertions that Defendants submitted false statements in order to conceal or avoid an obligation to the Government"); *U.S. ex rel. Wilson v. Crestwood Healthcare, L.P.*, No. CV-11-S-3361-NE, 2012 WL 1886351, at *8 (N.D. Ala. May 18, 2012) (dismissing reverse false claim count where the plaintiff failed "to allege any amounts owed to the government by . . . defendants or otherwise provide any other information that puts defendants on notice as to the substance of the . . . claims") (internal quotation marks and citation omitted; alterations in original); *Thomas*, 708 F. Supp. 2d 505, 514 (dismissing alleged reverse false claim count as redundant on false claim count). Accordingly, the Court **DISMISSES** Counts III and VI of the TAC **WITH PREJUDICE**. *See Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1057 (11th Cir. 2015) ("Three attempts at proper pleading are enough.").

**B. Counts I, II, IV, and V**

The TAC's remaining Counts conclude that AHF violated the "false claim" and "make or use" provisions of the FCA and FFCA. The "false claim" provisions of the FCA and FFCA impose liability on any person who "knowingly presents or causes to be

presented a false or fraudulent claim[17] for payment or approval[.]" 31 U.S.C. § 3729(a)(1)(A); Fla Stat. § 68.082(2)(a). The "make or use" provisions impose liability on any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim[.]" 31 U.S.C. § 3729(a)(1)(B); Fla Stat. § 68.082(2)(b).[18]

Federal Rule of Civil Procedure 9(b) requires that the plaintiff allege the scheme underlying both the "false claim" and the "make or use" violation with particularity. *See Keeler*, 568 F. App'x at 798 (citing *Corsello*, 428 F.3d at 1014); *see also Hopper v. Solvay Pharms., Inc.*, 588 F.3d 1318, 1328 (11th Cir. 2009) (A violation of the "make or use" provision requires relators to "allege with particularity, pursuant to Rule 9(b), that [the defendant's] false statements ultimately led the government to pay amounts it did not owe."); *U.S. ex rel. Klusmeier v. Bell Constructors, Inc.*, 469 F. App'x 718, 721 n.5 (11th Cir. 2012) ("Because Relators failed to establish a false or fraudulent claim or statement, which is a requirement of both [a "false claim"] and [a "make or use" violation], Relators have failed to properly plead both their FCA claims and we address them together."). Separately, to state a "false claim" under § 3729(a)(1)(A) and Fla Stat. § 68.082(2)(a), the plaintiff must also demonstrate that the complaint contains sufficient

---

[17] "Claim" means "any request or demand, whether under a contract or otherwise, for money or property that is presented to an officer, employee, or agent of the United States; or is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government provides or has provided any portion of the money or property requested or demanded." 31 U.S.C. § 3729(b)(2); *cf.* Fla Stat. § 68.082(1)(a).

[18] Relators allege the same violations of the FFCA based on claims made to the state of Florida. *See U.S. ex rel. Heater v. Holy Cross Hosp., Inc.*, 510 F. Supp. 2d 1027, 1034 (S.D. Fla. 2007) ("The Florida FCA, is modeled after and tracks the language of, the federal False Claims Act") (citation omitted).

"indicia of reliability . . . to support the allegation of an *actual false claim* for payment being made to the Government." *Clausen*, 290 F.3d at 1311 (emphasis in original). And to state a "make or use" violation under § 3729(a)(1)(B) and Fla Stat. § 68.082(2)(b), the plaintiff must demonstrate that "(1) the defendant made a false record or statement for the purpose of getting a false claim paid or approved by the government; and (2) defendant's false record or statement caused the government to actually pay a false claim[.]" *Hopper v. Solvay Pharms., Inc.*, 588 F.3d 1318, 1327 (11th Cir. 2009).

The particularized allegation that the defendant actually submitted a false claim, and by extension that the government actually paid, is at the heart of an FCA or FFCA violation:

> The submission of a [false] claim is . . . not . . . a "ministerial act," but the *sine qua non* of a False Claims Act violation. As such, Rule 9(b)'s directive that "the circumstances constituting fraud or mistake shall be stated with particularity" does not permit a False Claims Act plaintiff merely to describe a private scheme in detail but then to allege simply and without any stated reason for his belief that claims requesting illegal payments must have been submitted, were likely submitted or should have been submitted to the Government.

*Clausen*, 290 F.3d at 1311; *accord. Corsello*, 428 F.3d at 1014 ("In short, Corsello provided the 'who,' 'what,' 'where,' when,' and 'how' of improper practices, but he failed to allege the 'who,' 'what,' 'where,' when,' and 'how' of the fraudulent submissions to the government"); *Keeler*, 568 F. App'x at 798; *Britton*, 2015 WL 1487134, at *4. Conclusory allegations about the submission of a false claim without "indicia of reliability . . . in the complaint to support the allegation of *an actual false claim* for payment" do not meet the Rule 9(b) standard. *Clausen*, 290 F.3d at 1311 (emphasis in original).

Strict enforcement of this rule is rooted in the fact that "[l]iability under the False Claims Act arises from the submission of a fraudulent claim to the government, not the disregard of government regulations or failure to maintain proper internal procedures." *Corsello*, 428 F.3d at 1012 (citation omitted); *Urquilla-Diaz*, 780 F.3d at 1045, 1051-52 (11th Cir. 2015) (quoting *Corsello*, 428 F.3d at 1012); *Jallali v. Nova Se. Univ., Inc.*, 486 F. App'x 765, 766 (11th Cir. 2012). Accordingly, "[t]he False Claims Act does not create liability merely for a health care provider's . . . improper internal policies unless, as a result of such acts, the provider knowingly asks the Government to pay amounts it does not owe." *Clausen*, 290 F.3d at 1311; *see also Universal Health Servs., Inc. v. U.S.*, --- S. Ct. ---, 2016 WL 3317565 (U.S. June 16, 2016) ("The False Claims Act is not an all-purpose antifraud statute, or a vehicle for punishing garden-variety breaches of contract or regulatory violations.") (internal quotation marks and citation omitted). That is, a relator must show that the defendant actually submitted claims and that there was a nexus between the alleged improper practices and the submission of those claims. *See Clausen*, 290 F.3d at 1311; *Klusmeier*, 469 F. App'x at 721 (citing *U.S. ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1359 (11th Cir. 2006)).

Despite Rule 9(b)'s requirement for heightened specificity, Relators argue that the TAC is sufficient to withstand AHF's motion to dismiss. The TAC alleges that AHF's kickback schemes were pervasive, that AHF was a Ryan White grantee, and that a portion of AHF's general budget derived from federal healthcare programs. It also characterizes the Patient Spreadsheet—which does not memorialize any actual claims AHF submitted to government programs for services provided to illegally referred patients—as representative of AHF's submission of such claims. On these grounds,

Relators contend that AHF actually submitted claims for clinical, pharmacy, and insurance services provided to patients illegally referred under all four kickback schemes and that the government paid these claims. (DE 62 ¶¶ 38, 39, 40, 57, 60).

Again, these kinds of conclusory allegations do not sustain Relators' pleading burden under Rule 9(b). *See Clausen*, 290 F.3d at 1312, 1315 (holding that relator failed to adequately plead presentment of any false claim); *Hopper*, 588 F.3d at 1328 (holding that "improper practices standing along are insufficient to state a claim" under either the "false claim" or the "make or use" provisions of the FCA "absent allegations that a specific fraudulent claim was in fact submitted to the government"); *Corsello*, 428 F.3d 1008, 1013 (explaining that a submission of false claims cannot be inferred from a pattern of improper practices). Relators attempt to infer, from an internal (unauthenticated) spreadsheet and their discussion of AHF's overall internal practices and known funding sources, that AHF actually submitted claims and received payments for services rendered to patients illegally referred under the alleged schemes. The Court in *Clausen* explains that such inferences are unavailing where the relators have not alleged the submission of actual false claims, but instead that such claims "must have been submitted, were likely submitted or should have been submitted to the Government." *Clausen*, 290 F.3d at 1311; *see also Hopper*, 588 F.3d 1318, 1326 (dismissing "false claim" count and rejecting "statistical analysis" that suggested false claims were likely because the complaint did "not allege the existence of a single actual false claim"). Without details about the "who, what, when, where, and how," of a single actual false claim, the TAC fails to allege the *sine qua non* of an FCA and FFCA violation. *See Clausen*, 290 F.3d at 1312 n.21 (holding that "some of this information

for at least some of the claims must be pleaded in order to satisfy Rule 9(b)"). Dismissal of nonspecific allegations of fraud is appropriate because Rule 9(b) "serves an important purpose in fraud actions by alerting defendants to the precise misconduct with which they are charged and protecting defendants against spurious charges of immoral and fraudulent behavior." *Id.* at 1310 (quoting *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001)).

Relators argue that their collective personal knowledge of AHF operations supports their claims, citing the decision in *U.S. ex rel. Mastej v. Health Management Associates, Inc.*, 591 F. App'x 693 (11th Cir. 2014). The Eleventh Circuit found that the allegations in *Mastej* provided sufficient "indicia of reliability" under Rule 9(b) to justify the survival of two FCA counts on a motion to dismiss. *Mastej*, 591 F. App'x at 709-711. There, the relator, Mastej, was a 30-year healthcare industry veteran who had been the vice president of acquisitions and development at a hospital administrator called HMA. *Mastej*, 591 F. App'x at 695-96. Then, after leaving his role at HMA, Mastej worked as CEO of one of two hospitals run by one of HMA's subsidiary companies. *Id.* at 696. Based on knowledge he acquired in these positions, Mastej sued both HMA and its subsidiary, alleging that the hospitals run by the subsidiary were paying kickbacks to neurosurgeons for patient referrals. *Id.* at 699. The hospitals masked the kickbacks by characterizing them as payments to the neurosurgeons for being on call to perform "emergency or un-planned neurosurgery services" that neither hospital offered. *Id.* Mastej also alleged that both defendants "flew several Naples, Florida doctors—at the Defendants' expense and on [HMA's]

corporate jet—to an April 2008 golf tournament" as a kickback for patient referrals. *Id.* at 699-700. Although Mastej alleged these schemes in detail, "his allegations about the . . . Medicare claims for referred patients [were] generalized and mostly conclusory." *Id.* at 701. The district court granted the defendants' motion to dismiss all three counts in the complaint, but the Eleventh Circuit reversed and remanded as to two counts, reasoning that a "relator can also provide the required indicia of reliability" called for by *Clausen*'s interpretation of Rule 9(b) by "showing that he was personally in a position to know that actual false claims were submitted to the government and had a factual basis for his alleged personal knowledge." *Id.* at 707 (citing *U.S. ex rel. Walker v. R&F Properties of Lake Cty.*, 433 F.3d 1349, 1360 (11th Cir. 2005); *Hopper*, 588 F.3d at 1326).

Relators contend that *Mastej* heralds a new, relaxed standard for stating a claim under the FCA (DE 82 at 46), but the Court finds that it does not. Subsequent cases have not construed *Mastej*'s holding as such, and *Clausen*'s admonition about the particularity required by Rule 9(b) remains. *See, e.g.*, *U.S. v. Liberty Ambulance Servs., Inc.*, Case No. 3:11-cv-587-J-32MCR, 2016 WL 81355, at *3-5 (M.D. Fla. Jan. 7, 2016) (dismissing FCA claims based on violation of AKS where relators had no "supporting information from anyone 'with first-hand knowledge' of the defendant's internal billing practices") (citing *Mastej*, 591 F. App'x at 704-05); *Britton*, 2015 WL 1487134, at *4 ("[A]llegations that false claims 'must have been submitted, were likely submitted or should have been

submitted' without more are insufficient to satisfy Rule 9(b).") (citing *Mastej*, 591 Fed.Appx. at 704, 709).[19]

What *Mastej* stands for is the limited proposition that a relator's firsthand knowledge of a defendant's submission of actual false claims may, in the appropriate circumstances, provide "sufficient indicia of reliability" to substitute for the particularized allegations that Rule 9(b) generally requires. *Mastej*, 591 F. App'x at 708; *see also Hill v. Morehouse Medical Assocs., Inc.*, No. 02-14429, 2003 WL 22019936, at *5 (11th Cir. 2003) (reversing district court's dismissal of complaint that did not allege submission of a specific false claim because the relator was an employee "within the billing and coding department" who

[19] The Court is also unpersuaded by Relators' argument that recent FCA cases adopt a relaxed Rule 9(b) standard for cases involving allegations of kickbacks. (*See* Hearing Transcript (May 6, 2016) at 29:7-30:18); *see also U.S. ex rel. Bingham v. HCA, Inc.*, No. 13-23671-Civ-COOKE/TORRES, 2016 WL 344887, at *7-8 (S.D. Fla. Jan. 28, 2016) (denying motion to dismiss FCA claim based on hospital's kickbacks to physicians for Medicare patient referrals where relator provided "the names of referring physicians . . . along with each physician's aggregate number of Medicare patient referrals"); *U.S. ex rel. Bingham v. Baycare Health Sys.*, No. 8:14-cv-73-T-23EAJ, 2015 WL 4878456, at *3-6 (M.D. Fla. Aug. 14, 2015) (denying motion to dismiss similar FCA claim where relator provided "the names of referring physicians . . . along with the aggregate number of Medicare patients each physician referred"). It is true that fraud claims based on alleged kickbacks do "not depend as much on the particularized billing content of any given claim." *HCA*, 2016 WL 344887, at *8 (quoting *Baycare*, 2015 WL 4878456, at *4). However, *Clausen*, which also involved allegations of improper kickbacks, still requires that "some indicia of reliability must be given in the complaint to support the allegation of an *actual false claim* for payment being made to the Government." 290 F.3d at 1311 (emphasis in original). Consistent with this requirement, the complaints in *HCA* and *Baycare* identified illegally referred Medicare patients, which provided sufficient indicia of reliability that the defendant hospitals actually submitted claims to Medicare. In this case, aside from the Representative False Claims discussed in Part III.C *infra*, Relators do not provide the names of the referring AHF personnel, the names of illegally referred patients, or any facts demonstrating that these patients were participants in a government healthcare program.

"witnessed firsthand the alleged fraudulent submissions" thus providing the "indicia of reliability" required by Rule 9(b)); *Walker*, 433 F.3d at 1359-60 (affirming district court's denial of defendant's motion to dismiss where the relator, a nurse practitioner, did not have her own billing code and was instructed "which doctor she would be billing under each day"). It should be noted that the relator in *Mastej* acquired his firsthand knowledge of actual false claims by "attend[ing] case management meetings" as vice president of HMA, during which "every patient was reviewed, including how the services were being billed to each patient." *Mastej*, 591 F. App'x at 707. He was "intimately familiar with the payor mix at the hospitals, including the Medicare billing and payments at the hospitals[.]" *Id.* (internal quotation marks omitted). He knew the names of each of the doctors making illegal referrals and was "familiar with the Defendants' Medicare patients, services and, importantly, revenues." *Id.* at 708. Finally, the relator alleged that while he was CEO of one of the two hospitals run by HMA's subsidiary, the CEO of the other hospital run by the subsidiary asked him to split the costs (i.e., payment to doctors) of the scheme garnering illegal referrals but he declined, further demonstrating his personal knowledge of the matter. *Id.* at 707.

In contrast, Relators do not have the requisite "direct, first-hand knowledge of the defendants' submission of false claims" or of the government's payment of such claims. *Mastej*, 591 F. App'x at 704. The TAC alleges that Relators knew about AHF's compensation plans and referrals and were generally aware of AHF's funding sources and processes, not that Relators actually knew

the particular process employed to submit actual false claims based on illegal referrals, who made the referrals, what patients were involved, and whether the government paid such claims.

For example, Relator Carrel was "Director of Public Health, Southern Bureau for AHF" (DE 62 ¶ 3) and in that role "had broad program-related responsibilities over HIV testing, linkage to care, and mobile clinic services" including a "continually updated understanding of the numbers of patients being linked to AHF health services as well as the significance and meaning of the data entries contained in the [Patient Spreadsheet]." (DE 62 ¶ 42). The TAC goes on to recite several categories of meetings that Carrel had with various AHF employees and government entities that provide funding to AHF. (DE 62 ¶ 42a-42m). According to the TAC, these meetings made Carrel privy to discussions about "commission payments" (DE 62 ¶ 42) for referrals and AHF's general reimbursement procedures, but not to any discussions about AHF's submission of actual false claims. Based on these meetings, Carrel allegedly knew "that it was a matter of standard operating procedure at AHF" that the "illegally referred" patients received AHF services "paid for by Federal Health Care Programs, including Medicare, Medicaid, and Ryan White" (DE 62 ¶ 42; *see also* DE 62 ¶ 45). However, the TAC describes the meetings Carrel attended in such broad terms[20] that it is not clear how much Carrel understood that AHF's

---

[20] The TAC describes, without any particularity, meetings that allegedly gave Carrel in-depth knowledge of AHF's kickback schemes. For example, he met weekly with "Southern Bureau Public Health managers and coordinators" to discuss "issues regarding linkage to care" such as "protocol and procedure reviews, personnel issues, monthly performance reports of each program, and

reimbursement procedures constitute a kickback scheme, much less that Carrel had the "direct, first-hand knowledge of the defendants' submission of false claims" required to state a claim under Rule 9(b). *Mastej*, 591 F. App'x at 704.

Similarly, Relator Ferrer was a "Senior Program Manager in the Southern Bureau of AHF" and in that position was "responsible for supervising the daily functions and administrative operations of prevention and testing programs in the State of Florida[.]" (DE 62 ¶ 43). Ferrer knew about the alleged Linkage Coordinator Scheme because he

---

debriefing on past events[.]" (DE 62 ¶ 42a). He had "[p]eriodic meetings with the Southern Bureau Linkage staff" about "individual coordinators' numbers, cases, performance, . . . strategies to increase number of individuals linked to AHF services . . . commissions paid for linkage . . . and grant/contract reporting" (DE 62 ¶ 42b) and "[r]egular" meetings with "National Public Health Division Leadership" about "strategies for increasing number of positive test results and number of positive patients linked to AHF" (DE 62 ¶ 42c). Finally, he attended "[p]eriodic higher level finance meetings" at which "strategies to increase linkage to AHF services was discussed" (DE 62 ¶ 42i); and "[p]eriodic AHF clinic area meetings . . . at which patient numbers, the increase or decrease in patients linked to AHF pharmacies and Positive Healthcare were reviewed and discussed" (DE 62 ¶ 42l). These capacious illustrations, while suitable as descriptions, provide no detailed explanation of what the alleged protocols, strategies, or commissions were, who said what to whom during the meetings, or when and where these meetings were held.

The TAC similarly describes meetings that Carrel attended regarding AHF's reimbursement procedures. Carrel attended "[r]egular (usually weekly) meetings . . . at which overall policy and program issues were discussed" (DE 62 ¶ 42d); monthly "financial review meetings" at which "financial reports were analyzed" (DE 62 ¶ 42e); bi-weekly meetings with "site specific staff" at which "monthly performance, grant issues, and plans for referral sources were discussed" (DE 62 ¶ 42f); various meetings with Broward (DE 62 ¶ 42g), Miami-Dade (DE 62 ¶ 42h), and Duval Counties (DE 62 ¶ 42m), Ryan White Part C contract personnel at AHF (DE 62 ¶ 42j) and State of Florida contract personnel at AHF (DE 62 ¶42k) during which "protocols and procedures established by the funder were discussed." Again, there are no details about what the overall policy and program issues, financial reports, grant issues, or plans for referral were, who said what to whom during the meetings, or when and where these meetings were held.

was responsible for leading weekly meetings to discuss payments made for referrals and knew about the PHD Employee Scheme and Patient Scheme because he witnessed PHD employees being offered gift cards for referrals and saw a wall display related to the Patient Scheme. (DE 62 ¶ 43). However, the TAC does not allege that Ferrer had knowledge of AHF's reimbursement procedures or billing protocols, nor does it allege that Ferrer had first-hand knowledge about AHF's submission of false claims. Instead, the TAC posits that Ferrer understood "that the patients who were illegally referred to AHF . . . would, as a matter of course, receive various health services from AHF . . . *and that AHF would, in turn, seek reimbursement for those services from* Federal Healthcare programs." (DE 62 ¶ 43). This overall understanding is based on Ferrer's position at AHF and on his work as a member of the Broward Regional Planning Council, which received AHF's Ryan White grant applications. (DE 62 ¶ 43). But there is no explanation for why or how Ferrer's duties at AHF or at the Broward Regional Planning Council revealed anything about AHF's reimbursement procedures or, more critically, that Ferrer was aware that particular AHF employees submitted claims for services rendered to specific "illegally" referred patients.

Finally, Relator Loftis was the "Grants Manager for the Southern Bureau" and his "job required that he understand the sources of AHF grant funding, including Ryan White program funding, for all health-related services rendered by AHF to patients, as well as the manner in which such funding was obligated by AHF in the course of its operations." (DE 62 ¶ 44). As part of his job, he electronically logged services that AHF provided to Ryan White-eligible patients on a computer program called SDIS, pulled unspecified "billing information for the electronic entries for that month" from SDIS,

"certified they were a true and accurate accounting of services rendered and the payments AHF was entitled to, and mailed the documents" to Miami-Dade County each month from January through July 2013. (DE 62 ¶ 57). Loftis purportedly knew about the Linkage Coordinator Scheme from a single "March 2013 meeting with the AHF grants and public health divisions at which th[e] referral payment scheme was openly discussed" (DE 62 ¶ 44), although the TAC alleges nothing about where this meeting was conducted, who participated, what was said by whom, or whether anyone at the meeting discussed AHF's submission of false claims. Additionally, there is no allegation that Loftis had any way of knowing whether he was actually submitting claims for Ryan White funding for patients referred through the Linkage Coordinator Scheme. Nevertheless, Relators assert that the "payment requests [Relator Loftis] submitted included requests for payment for services rendered to patients as a result of AHF's illegal kickback scheme" (DE 62 ¶ 57) and that "in the ordinary course of business at AHF, the patients who are listed on [the Patient Spreadsheet] and for whom 'Ryan White' is listed as a funding source . . . would have received health services from AHF for which AHF sought reimbursement from Ryan White grant funds" (DE 62 ¶ 44). These conclusory allegations are insufficient because they rely only on Loftis's "belief that claims requesting illegal payments must have been submitted, were likely submitted or should have been submitted to the Government." *Clausen*, 290 F.3d at 1311.

In sum, despite their reliance on *Mastej*, Relators' TAC fails to heed that decision's clear instruction: "At a minimum a plaintiff-relator must explain the basis for [the] assertion that fraudulent claims were **actually submitted**" and

reimbursed if Relators are to successfully substitute their personal knowledge for the particularized allegations that Rule 9(b) requires. *See Mastej*, 591 F. App'x at 704 (emphasis added). "It is not enough for the plaintiff-relator to state baldly that he was aware of the defendants' billing practices . . . to base his knowledge on rumors, . . . or to offer only conjecture about the source of his knowledge." *Id.* at 704-05 (citations omitted). Relators' personal knowledge—either individually or in aggregate—does not provide any basis to infer that AHF actually submitted false claims or received payment on such claims. Indeed, Relators lack the type of firsthand knowledge of actual false claims that the relators in *Mastej, Walker*, and *Hill* all had.[21] In *Mastej* the relator knew of actual false claims from meetings involving review of claims submitted for individual illegally-referred patients and from contact with a counterpart who offered to split the costs of the underlying scheme. 591 F. App'x at 707-08. In *Hill*, the relator was an employee in the billing department who witnessed the defendant's employees altering billing codes and submitting actual false claims. 2003 WL 22019936, at *4. In *Walker*,

---

[21] This case is more analogous to *United States ex rel. Klusmeier v. Bell Constructors, Inc.*, 469 F. App'x 718 (11th Cir. 2012), in which the Eleventh Circuit affirmed the district court's dismissal, under Rule 9(b), of FCA and FFCA claims based on the defendant Bell's alleged violations of contracts with the Army Corps of Engineers. 469 F. App'x at 719. The Eleventh Circuit reasoned that the complaint did not allege an FCA violation because "[a]lthough Relators allege details as to how Bell violated its [government] contracts, and allege some details as to when the monthly invoices were submitted, Relators fail to establish that the contract violations actually resulted in the submission of false claims." *Id.* at 721 (citing *Atkins*, 470 F.3d at 1359). Moreover, as in this case, the relator in *Klusmeier* did not have the "type of knowledge that normally will support an FCA complaint" because his "personal knowledge of the contract violations is not relevant to whether Bell submitted fraudulent claims related to those contract violations." *Id.* at 721-22.

the relator nurse practitioner knew of the defendant clinic's actual false claims because she was instructed to falsely bill Medicare under a physician's billing codes and spoke with an office administrator about how the clinic "never" billed nurse practitioner services in any other way. 433 F.3d at 1360. Here, while Relators set forth a wide range of discussions and subjects they addressed during the course of their employment, they fail to identify any facts which would demonstrate their knowledge or awareness of AHF's billing of particular false claims.

The insufficiency of Relators' conclusory assertions to support Counts I, II, IV, and V also extends to the PHD Employee Scheme, the Test Scheme, and the Patient Scheme. Again, Relators offer only broad assertions to support the contention that AHF submitted false claims or received payment for services rendered to specific patients referred under these three schemes. Without particularized evidence of an actual false claim that satisfies Rule 9(b), an alleged FCA and FFCA violation cannot withstand a motion to dismiss. *Klusmeier*, 469 F. App'x at 721 (affirming district court's dismissal and requiring plaintiff to show that allegedly improper practices "actually resulted in the submission of false claims" pursuant to Rule 9(b)); *Clausen*, 290 F.3d at 1311 (Rule 9(b) "does not permit a False Claims Act plaintiff . . . to allege simply and without any stated reason for his belief that claims requesting illegal payments must have been submitted"); *Sanchez*, 596 F.3d 1300, 1302-03 (affirming dismissal because relator "failed to allege at least some examples of actual false claims") (internal quotation marks and citation omitted); *Atkins*, 470 F.3d at 1359

(affirming dismissal of FCA complaint where relator described alleged scheme but failed "to provide the next link in the FCA liability chain: showing that defendants *actually submitted* reimbursement claims for the services he describes") (emphasis in original); *Liberty Ambulance*, 2016 WL 81355, at *3-5 (dismissing FCA claims where relators had no "supporting information from anyone 'with first-hand knowledge' of the defendant's internal billing practices") (citing *Mastej*, 591 F. App'x at 704-05).

**C. The Exemplars**

Despite the deficiencies identified, Counts I, II, IV, and V of the TAC narrowly survive only as to the Linkage Coordinator Scheme because the TAC does include two exemplars or "Representative False Claims" (DE 62 ¶¶ 74-83) that, read in the light most favorable to Relators, satisfy the Rule 9(b) standard. *See U.S. ex rel. Bingham v. HCA, Inc.*, No. 13-23671-Civ-COOKE/TORRES, 2016 WL 344887 (S.D. Fla. Jan. 28, 2016); *U.S. ex rel. Bingham v. Baycare Health Sys.*, No. 8:14-cv-73-T-23EAJ, 2015 WL 4878456 (M.D. Fla. Aug. 14, 2015). The *HCA* and *Baycare* cases involved allegations that separate hospital systems had used complex real estate transactions to funnel kickbacks to independent physicians in return for Medicare patient referrals. *HCA*, 2016 WL 344887, at *2-3; *Baycare*, 2015 WL 4878456, at *1-3. The courts in both cases found that details such as the names of the referring physicians and the number of Medicare patients that each referred gave sufficient "indicia of reliability" to satisfy Rule 9(b). *HCA*, 2016 WL 344887, at *7-8; *Baycare* 2015 WL 4878456, at *4-5.

Similarly, here, Relators advance two Representative False Claims which name two AHF employees, [redacted],[22] whom AHF paid to refer patients John Doe #1[23] and John Doe #2 to AHF services.[24] (DE 62 ¶¶ 74, 79). After these referrals, AHF billed the Ryan White program for services provided at later visits that John Doe #1 made to an AHF facility (DE 62 ¶ 78),[25] and indirectly billed the Ryan White program through Blue Cross Blue Shield for services of a later visit that John Doe #2 made to an AHF facility (DE 62 ¶ 83).

As AHF points out, there is a gap in time between the alleged bonus payments made to [redacted] and [redacted] in connection with the initial visits and the bills submitted to the Ryan White program for subsequent services rendered to John Doe #1 and John Doe #2. Citing this gap, AHF urges a reading of the TAC that would sever the link

---

[22] [redacted] submitted an affidavit (DE 72-1) disputing the allegation that he was an AHF linkage coordinator. Relators argue that the Court cannot consider documents outside of the TAC without converting this motion to dismiss into a motion for summary judgment. (DE 82 at 29 n.6, 49 n.16, 50 n.17). Relators are correct that on a motion to dismiss, a court normally must not consider anything beyond the face of the complaint and documents attached thereto. *Financial Sec. Assurance, Inc. v. Stephens, Inc.*, 500 F.3d 1276, 1284 (11th Cir. 2007). As such, the Court will not consider [redacted] affidavit at this stage.

[23] As noted previously, *supra* note 12, John Doe #1 [redacted].

[24] AHF contends that the TAC does not allege that [redacted] or [redacted] were "paid" but merely that AHF "directed" its accounts payable department to cut checks for both. (DE 72 at 16-18). At this juncture of the litigation, this argument is unpersuasive. It is reasonable to infer from the allegation that AHF directed accounts payable to pay [redacted] and [redacted] that AHF actually paid both.

[25] AHF attached to its motion to dismiss the full billing ledger excerpted by Relators to show that John Doe #1 had Ryan White insurance coverage for these later visits (DE 72 ¶ 78). Relators again argue that the Court should not consider documents outside of the TAC. *See* note 22, *supra*. As to this document, the excerpted ledger is central to the TAC, but the parties dispute what the document shows and so the Court will not consider the full document at this stage.

between the referral payments and the submission of claims to AHF. (DE 72 at 16-18). However, viewing the TAC in the light most favorable to Relators counsels the opposite view: that the payments to [redacted] and [redacted] were to induce John Doe #1 and John Doe #2 to use AHF's clinical services for the purpose of billing these later services to Ryan White. These distinct allegations provide sufficient "indicia of reliability . . . to support the allegation of *an actual false claim* for payment" and receipt of payment for services rendered to John Doe #1 and John Doe #2. *Clausen*, 290 F.3d at 1311 (emphasis in original). Because the Representative False Claims are the only allegations in the TAC that meet the Rule 9(b) standard, the Court denies the Defendant's motion to dismiss as to Counts I, II, IV, and V with respect to the Linkage Coordinator Scheme and claims regarding the Ryan White program only as they relate to the two Representative False Claims.

## IV. CONCLUSION

For the reasons stated above, it is **ORDERED AND ADJUDGED** that Defendant's motion to dismiss (DE 70, 72) is **GRANTED IN PART AND DENIED IN PART**. Counts III and VI of the TAC are **DISMISSED**. The Defendant's motion to dismiss Counts I, II, IV, and V is **GRANTED IN PART** but **DENIED** with regard to the specific claims identified in this Order. By separate Paperless Order, the Court will set a pre-discovery status conference to be held within two weeks of the date of this Order.

**DONE AND ORDERED** in chambers in Miami, Florida, this 27th day of June, 2016.

KATHLEEN M. WILLIAMS
UNITED STATES DISTRICT JUDGE

cc: Counsel of record