**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| UNITED STATES OF AMERICA and THE STATE OF FLORIDA *ex rel.* JACK CARREL, MAURICIO FERRER and SHAWN LOFTIS,<br><br>Plaintiffs,<br><br>v.<br><br>AIDS HEALTHCARE FOUNDATION, INC.,<br><br>Defendant. | Case No. 14–cv–61301–KMW<br><br>Judge Kathleen M. Williams<br><br>**[REDACTED PUBLIC VERSION]** |

**AIDS HEALTHCARE FOUNDATION, INC.'S MOTION FOR SUMMARY JUDGMENT ON THE EMPLOYEE SAFE HARBOR AND INCORPORATED MEMORANDUM OF LAW**

# TABLE OF CONTENTS

**Page**


I. INTRODUCTION .......... 1

II. SUMMARY OF UNDISPUTED FACTS .......... 2

A. Ryan White Provides Federal Funding To Treat And Fight The Spread Of HIV, The Gravest Public Health Crisis Of The Last Fifty Years. .......... 2

B. The Federal Government Instructs Ryan White Grantees And Sub-Grantees That It Is "Imperative" To Link Those Living With HIV/AIDS Into Care. .......... 3

C. In Accordance With The Direction And Policy Goals Of The Federal Government, AHF Receives Federal Ryan White Funds For Providing Linkage Services To HIV Patients. .......... 4

D. Relators' Remaining Claims Concern Two Representative Claims, And The Services Provided By Mr. Rodriguez, An AHF Linkage Coordinator. .......... 6

E. AHF Employs Mr. Rodriguez To Provide Linkage Services In Accordance With The Federal Government's Mandate. .......... 8

F. The Government Funds A Portion Of Mr. Rodriguez's Salary, And Even Reimbursed AHF For Certain Linkage Bonuses. .......... 11

III. ARGUMENT .......... 12

A. The Employee Safe Harbor Immunizes From Liability Any Payments Made To Bona Fide Employees In The Provision Of Covered Items Or Services. .......... 12

B. Mr. Rodriguez Is A Bona Fide Employee Of AHF. .......... 13

C. Mr. Rodriguez Is Employed In The Provision Of Covered Items Or Services. .......... 14

D. Relators' Anticipated Arguments As To The "Covered Items Or Services" Element Of The Safe Harbor Miss The Mark. .......... 16

IV. CONCLUSION .......... 20

APPENDIX A .......... 22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*U.S. ex rel. Baklid-Kunz v. Halifax Hosp. Med. Ctr.*,
2013 WL 6196562 (M.D. Fla. Nov. 26, 2013),
*reconsideration denied* 2013 WL 6284765 (M.D. Fla. Dec. 4, 2013)..............................16, 20

*U.S. ex rel. Burlbaw v. Orenduff*,
548 F.3d 931 (10th Cir. 2008) ..........................................................................................11

*Demers v. Adams Homes of N.W. Fla.*,
321 F. App'x 847 (11th Cir. 2009) ....................................................................................14

*Hericks v. Lincare Inc.*,
2014 WL 1225660 (E.D. Pa. Mar. 25, 2014)......................................................................17

*Nationwide Mut. Ins. Co. v. Darden*,
503 U.S. 318 (1992)............................................................................................................14

*Romano-Murphy v. Comm'r of Internal Revenue*,
816 F.3d 707 (11th Cir. 2016) ..........................................................................................20

*State v. Harden*,
938 So. 2d 480 (Fla. 2006)..........................................................................16, 17, 19, 20

*United States v. Borrasi*,
639 F.3d 774 (7th Cir. 2011) ....................................................................................... *passim*

*United States v. Crinel*,
2015 WL 3755896 (E.D. La. June 16, 2015)...............................................................19, 20

*United States v. Job*,
387 F. App'x 445 (5th Cir. 2010) ......................................................................................14

*United States v. Luis*,
966 F. Supp. 2d 1321, 1327 (S.D. Fla. 2013),
*aff'd on other grounds*, 564 F. App'x 493 (11th Cir. 2014),
*vacated*, 136 S. Ct. 1083 (2016),
*and remanded*, 653 F. App'x 904 (11th Cir. 2016) .............................................16, 17, 18

*United States v. Sanford-Brown, Ltd.*,
840 F.3d 445 (7th Cir. 2016) ............................................................................................12

*United States v. Shaw*,
106 F. Supp. 2d 103 (D. Mass. 2000) ...........................................................................12, 20

**TABLE OF AUTHORITIES (CONT'D)**

**Page(s)**

*United States v. Starks*,
157 F.3d 833 (11th Cir. 1998) ....................................16, 17, 18, 19

*U.S. ex rel. Wall v. Vista Hospice Care, Inc.*,
2016 WL 3449833 (N.D. Tex. June 20, 2016) .................................... *passim*

*Wolf v. Coca-Cola Co.*,
200 F.3d 1337 (11th Cir. 2000) ....................................14

**Statutes & Regulations**

26 U.S.C. § 3121(d)(2) ....................................13

42 U.S.C. § 300ff et seq. ....................................1, 15

42 U.S.C. § 1320a-7b....................................12, 14

42 C.F.R. § 1001.952(i) ....................................12, 13, 14

**Other Authorities**

54 Fed. Reg. 3088 (Jan. 23, 1989) ....................................13, 15

56 Fed. Reg. 35952 (July 29, 1991)....................................13, 15

H.R. Rep. No. 95-393 (1977)....................................12

S. Rep. No. 95-453 (1977) ....................................12

S. Rep. No. 100-109 (1987) ....................................12

Defendant AIDS Healthcare Foundation ("AHF") moves for summary judgment in its favor under Federal Rule of Civil Procedure 56. The grounds for this motion are set forth below.

## I. INTRODUCTION

This case concerns federal funds distributed by the federal government under the Ryan White CARE Act (42 U.S.C. Section 300ff *et seq*.) to states, local governments, and non-profit entities like AHF to combat HIV/AIDS. Over 1.2 million people are currently living with HIV/AIDS in the United States, with most of these individuals (approximately 60%) *not* engaged in care. As the government has recognized in combating the disease, the failure of affected individuals to engage in care perpetuates the epidemic and presents a public health threat. Various barriers—economic, social, and otherwise—can prevent persons living with HIV from obtaining care, and all levels of government have made it a priority to link those persons to care. As early as 2010, acting at the direction of the White House, federal agencies began emphasizing that it was "imperative" for HIV patients to be "quickly linked" to care (state and local governments promptly followed suit). In accordance with this mandate, and with the government's encouragement, AHF received federal funding to provide HIV/AIDS linkage-to-care services, which are the services at issue in this case.

To provide linkage services, AHF employs Linkage Coordinators. These employees have a number of job functions, with the principal goal of working with patients to overcome any barriers to them obtaining care. The relevant Linkage Coordinator here is Julio Rodriguez, who works for AHF in Broward County, and provided linkage services to John Doe #1 and John Doe #2 (collectively, the "Does")—the two Representative False Claims remaining in this case. Mr. Rodriguez's compensation includes a base salary, plus a $100 payment (also referred to as a "bonus") each time Mr. Rodriguez "links" a patient into AHF care. Relators contend that such bonuses violate the Anti-Kickback Statute ("AKS"). The Court has invited an early summary

judgment motion on the applicability of the employee safe harbor, which immunizes from liability "any amount paid by an employer to an employee (who has a bona fide employment relationship with such employer) for employment in the provision of covered items or services."

For the safe harbor to apply, Mr. Rodriguez must be (a) a bona fide employee who is (b) paid for employment related to items or services covered under a federal healthcare program. These elements are satisfied here. The undisputed facts show that Mr. Rodriguez is a bona fide employee of AHF—he is on AHF's payroll, and acts at the direction and supervision of AHF. He is also employed in the provision of covered items or services. The linkage services he provides are reimbursable (and thus "covered") under the Ryan White statute, and AHF actually received Ryan White funding to maintain its linkage program, and even to employ Mr. Rodriguez. Indeed, in nearly two dozen instances, AHF received Ryan White funding to pay Mr. Rodriguez the type of bonuses challenged in this case, all pursuant to a written agreement and with the knowledge and approval of the governmental entity administering the federal funds. The linkage services Mr. Rodriguez provides are also crucial to AHF's provision of other services directly covered under Ryan White, which is also sufficient to satisfy the requirement.

## II. SUMMARY OF UNDISPUTED FACTS

### A. Ryan White Provides Federal Funding To Treat And Fight The Spread Of HIV, The Gravest Public Health Crisis Of The Last Fifty Years.

The Ryan White Comprehensive AIDS Resources Emergency Act (the "Ryan White CARE Act") is one of the only federal statutes ever enacted to combat a specific health condition.[1] This is because no other disease in modern history has posed the type of public health

[1] The Ryan White CARE Act established a federal grant program for HIV/AIDS that is administered by the Health Resources and Services Administration ("HRSA"), an agency of the Department of Health and Human Services ("HHS"). The Centers for Disease Control and Prevention ("CDC") also provides federal funds for HIV prevention services. HRSA and CDC provide federal funds to community-based organizations, either directly or indirectly through

problem as HIV. As a sexually transmitted, communicable disease with no known cure (and fatal without treatment) and significant costs (both monetary and health) associated with treating it, HIV continues to be one of the biggest public health issues facing the United States and the world. For over a quarter century, Ryan White CARE Act grants have provided federal funding[2] to *identify, link, treat, and retain in care* those living with HIV/AIDS, and in the process reduce infectiousness in communities hit hardest by the epidemic.

### B. The Federal Government Instructs Ryan White Grantees And Sub-Grantees That It Is "Imperative" To Link Those Living With HIV/AIDS Into Care.

In recent years, the federal government has placed increased emphasis on the importance of recently-diagnosed HIV patients being promptly "linked" to medical care. On July 13, 2010, with input from the Office of National AIDS Policy, the White House released its National HIV/AIDS Strategy for the United States. Ex. 1.[3] One of the Strategy's "three primary goals" is "[i]ncreasing access to care." *Id.* at 1. "Step 1" in achieving that goal is ensuring that individuals with HIV are linked into care. *Id.* at 23 ("***Step 1: Establish a seamless system to immediately link people to continuous and coordinated quality care when they learn they are infected with HIV.***") (emphasis in original). In describing the reasons for this, the Strategy notes that "[i]t is *essential* to provide linkage coordination when and where HIV screening services are provided to help overcome barriers to obtaining care." *Id.* at 24 (emphasis added). With respect to linkage coordinators in particular, the Strategy recommends that "*HIV resources should be targeted to*

---

states or local governments, for programs designed to expand medical care for people living with HIV/AIDS and to increase awareness of HIV status. *See* ECF No. 95 at 6 n.8.

[2] The only remaining claims in this case relate to federal Ryan White funds. ECF No. 95 at 36 ("[T]he Court denies the Defendant's motion to dismiss as to Counts I, II, IV, and V with respect to the Linkage Coordinator Scheme and claims regarding the Ryan White program only as they relate to the two Representative False Claims."). There are no remaining claims relating to claims for state (not federal) funds. *Id.*

[3] Exhibit references are to the exhibits attached to the concurrently-filed Index of Exhibits.

*include support for linkage coordinators* in a range of settings where at-risk populations receive health and social services." *Id.* at 25 (emphasis added). In fact, the Strategy recommends that linkage services be co-located with testing and medical care services to reduce barriers to care. *Id.* at 24. This model—employing linkage coordinators to provide co-located services in settings where at-risk populations receive services—is the one AHF utilizes. *See* Kahane Decl. ¶ 3.

After releasing the Strategy, the federal government went to work encouraging the proliferation of linkage programs. In 2011, HRSA funded an initiative to evaluate "innovative models of linkage to and retention in HIV care," and in a February 2013 letter to Ryan White grantees and sub-grantees (including AHF), stressed that "the overarching goal is to diagnose and quickly link persons with HIV into high-quality medical care." Exs. 2, 3. In the same letter, HRSA emphasized that "[p]ursuant to the legislative intent of the [Ryan White CARE Act] and the Administration's National HIV/AIDS Strategy (NHAS), *it is imperative that individuals* . . . *are quickly linked* to [Ryan White]-funded medical care." Ex. 3 (emphasis added).[4]

### C. In Accordance With The Direction And Policy Goals Of The Federal Government, AHF Receives Federal Ryan White Funds For Providing Linkage Services To HIV Patients.

AHF is a nonprofit corporation that provides medical care and advocacy to people with HIV/AIDS regardless of their ability to pay. Statement of Material Facts ("MF") ¶ 1. Now in its 30th year, AHF is one of the largest private providers of HIV/AIDS services in Broward County. MF ¶ 2. AHF receives grants (as a sub-grantee) of federal Ryan White funds from the State of

[4] The federal and state governments have repeatedly emphasized that linking HIV patients to care is integral to the "continuum" of care. *See, e.g.*, Ex. 4 (July 15, 2013 Executive Order) (describing the fact that "one-third [of HIV positive individuals] are not linked to medical care" as a "significant gap[]" in the care continuum); Ex. 5 (HRSA Website) (listing "Linked to Care" as the second step in the continuum of care); Ex. 6 (Florida Department of Health Website) (explaining linkage's role in the continuum of care); Ex. 7 (HRSA update on "Efforts to Increase HIV Testing and Linkage to Care" under the HRSA linkage initiative).

Florida and Broward County. MF ¶¶ 4–7 & Exs. 8–14. In particular, AHF has received Ryan White grants that funded and supported the linkage services at issue in this case. MF ¶ 4. Both Broward County[5] and the State of Florida,[6] like the federal government, actively support linkage.

Relevant here, AHF received Ryan White Part A funds from Broward County (the "Ryan White Part A Contract") for "Outreach Services," including "clinical diagnostic services and referrals to appropriate providers of health and support services." MF ¶ 7; Ex. 11 at 66. As part of these Outreach Services, the Ryan White Part A Contract also required AHF to "create and implement policies for referring clients to ambulatory/medical care as requested by Client, if Client is not in medical care." *Id.* As AHF explained in submissions to the County, "Ryan White Part A Outreach provides linkage to those newly diagnosed as being HIV positive . . . to getting the medical attention clients need by making appointments for the clients." Ex. 14 at REL004402. AHF further explained to the County that Linkage Coordinators, including Mr. Rodriguez, would "be responsible for linking newly diagnosed HIV positive individuals to care." *Id.* at REL004394. The Ryan White Part A Contract also provided funding for AHF to provide medical services to those living with HIV/AIDS—even this section of the Contract required AHF to "develop a formal policy to ensure the rapid entry of newly identified HIV positive Clients into core medical services" with "a clear mechanism that provides access to service for

---

[5] The Broward County HIV Health Services Planning Council (HIVPC) establishes priorities for the use of Ryan White Part A funds. The HIVPC's Comprehensive HIV Health Services Plan emphasized that: "In 2012-2015, Part A and Part B will continue to collaborate to decrease the number of individuals aware of their status but not in care and to reduce overall infectiousness and community viral load by . . . *[d]eveloping a referral and linkage system between prevention and care* . . . ." Ex. 15 at 88 (emphasis added).

[6] The Florida Department of Health ("FL DOH"), in an April 11, 2013 memorandum, made clear that "[t]he overarching goal is to diagnose and quickly link persons with HIV into high-quality medical care . . . *as required in the Ryan White legislation, and as specified in the National HIV/AIDS Strategy*." Ex. 16 at AHF_0012188 (emphasis added).

Clients within a 48-hour period from the initiation of referral." MF ¶ 7; Ex. 11 at 54. This requirement was intended "[t]o ensure compliance" with a "HRSA strategy" for "the Early Identification of Individuals with HIV/AIDS." *Id.*

In addition, AHF received what it understands were Ryan White Part B funds from the State of Florida to "operate a free STD clinic including all administrative, client support and medical services" in Broward. MF ¶ 5; Ex. 8 at Attachment 1, §§ A.2.d. This contract ("Contract # BW266") also expressly covers linkage to care services. MF ¶ 5; Ex. 8 at Attachment 1, § B.1.a.11. AHF also obtained federal CDC funds from the State of Florida (the "CDC Contract") to operate a linkage program. MF ¶ 6; Ex. 10 at Attachment I §§ A.1.h–i, B.2.b.6.

**D. Relators' Remaining Claims Concern Two Representative Claims, And The Services Provided By Mr. Rodriguez, An AHF Linkage Coordinator.**

To carry out its linkage program, AHF employs Linkage Coordinators. MF ¶ 9. Both John Doe #1 and John Doe #2 had the same Linkage Coordinator, Julio Rodriguez. MF ¶ 10.[7]

[redacted]

[7] The only claims that survived AHF's motion to dismiss relate to two individuals, "John Doe #1" and "John Doe #2." ECF No. 95 at 36.

[redacted] [redacted]

[redacted]

[redacted]

---

8 During the time period at issue, AHF paid Mr. Rodriguez a bonus of $100 after a patient he linked to AHF was confirmed to have attended their initial two appointments with AHF. MF ¶ 31. These are the bonuses that Relators challenge in this case. *See* TAC ¶ 18.

[redacted]

**E. AHF Employs Mr. Rodriguez To Provide Linkage Services In Accordance With The Federal Government's Mandate.**

As a Linkage Coordinator since 2012 (and an AHF employee since 2010), Mr. Rodriguez has a number of job responsibilities. MF ¶¶ 13–14. In addition to ordinary employee tasks, such as completing HR paperwork and participating in employee and staff meetings, Mr. Rodriguez had multiple responsibilities as a Linkage Coordinator, including: (a) counseling a client who has just received news of a reactive HIV test; (b) explaining to the client the next steps he or she might take; (c) assessing barriers the client may face in accessing care; (d) reducing such barriers; and (e) assisting in making and adhering to medical appointments if the client requests him to do so. *Id*. Even that list fails to capture the full scope of Mr. Rodriguez's responsibilities, which vary from patient to patient—from dealing with issues of stigma, to addressing other barriers to care, such as mental health, substance abuse, and other issues. *Id*.

Mr. Rodriguez does not see his role as limited to generating referrals. MF ¶ 15.[9] The

[9] While Mr. Rodriguez scheduled appointments for patients at AHF if requested, patients were informed of other providers and made the ultimate decision. Ex. 27 (Rodriguez Dep. Tr.) at 106:7–17; 186:18–187:6; Ex. 28 (Ryan White Part A Provider Orientation and Freedom of Choice Provider List); Ex. 29 (Mar. 12, 2013 Email from J. Handy).

government does not see linkage that way either (*see* MF ¶ 8)—in official materials, for example, the FL DOH explains that "**Linkage is More Than a Referral**" on account of the substantive work that linkage personnel conduct with patients. Ex. 24 at 14 (emphasis in original); *see also* Ex. 25 at 12 (FL DOH: "Linkages differ from referrals because linkages require providers to take whatever steps are necessary to ensure that the client accesses needed services."); Ex. 26 (FL DOH handout: "Linkage: More Than A Referral").

John Doe #2—[redacted]

[redacted]

[redacted]

[redacted]

As a Linkage Coordinator, Mr. Rodriguez is a bona fide AHF employee. AHF sets the qualifications of his employment. MF ¶ 16. When Mr. Rodriguez first applied for employment with AHF, he completed an employment eligibility verification, credit check, and a criminal background check. MF ¶ 18. He acknowledged multiple employee policies, including an employee handbook, as well as policies and handbooks concerning confidentiality, injury and illness prevention, conflicts of interest, and information technology. MF ¶ 19. Upon being hired, he enrolled in AHF's direct deposit program. MF ¶ 20. AHF deducts taxes from his paychecks—including taxes on his linkage bonuses—and makes voluntary deductions at his election. *Id*. AHF provides Mr. Rodriguez with a W-2 for tax purposes that includes his base salary and earned linkage bonuses. MF ¶ 21. He is eligible for employee benefits, including a 401(k) and health insurance. MF ¶ 20. Mr. Rodriguez's offer of employment notes his position is a "full-time, regular" position, and he is an "at-will" employee. MF ¶ 22.

At all relevant times, Mr. Rodriguez was subject to AHF's supervision and control while at work. MF ¶ 28. His working hours were set (subject to legal requirements) by his direct and indirect supervisors. MF ¶ 24. He worked almost exclusively at either AHF facilities or AHF mobile testing clinics, and when interacting with patients, did so on behalf of AHF as its representative and employee. MF ¶ 25. Mr. Rodriguez worked using an AHF-provided computer and other AHF-provided office materials necessary to his job, and had an AHF-assigned desk and office space at AHF's Southern Bureau headquarters in Ft. Lauderdale. MF ¶ 26. At no time

during Mr. Rodriguez's employment with AHF did he ever have another job or conduct any other type of business. MF ¶ 27. Both AHF and Mr. Rodriguez consider Mr. Rodriguez to be in an employment relationship with AHF. MF ¶ 23.

### F. The Government Funds A Portion Of Mr. Rodriguez's Salary, And Even Reimbursed AHF For Certain Linkage Bonuses.

The federal funding that AHF receives relating to its linkage program, including Ryan White funding, includes reimbursements for compensation paid to Mr. Rodriguez. MF ¶ 4. Indeed, in connection with Contract # BW266, AHF even disclosed to the State of Florida that it pays the linkage bonuses challenged in this case, and included them as a line item in the budget incorporated into the contract. MF ¶ 5; Ex. 8 at Attachment 1 Ex. D. Specifically, the contract—signed by the FL DOH Interim Deputy Secretary for Statewide Services—describes a Linkage Coordinator as: "Links clients into care, *base plus $100 per linkage*." *Id.* (emphasis added). It further provides AHF with a right to seek reimbursement for linkage bonuses paid to Mr. Rodriguez, consistent with the budgeted amounts. *Id*. Relator Carrel himself (as well as another AHF employee) sent budgets disclosing the linkage bonuses to FL DOH, even before the contract was signed. Exs. 30–32. AHF specifically disclosed that the Linkage Coordinator under the contract would be Mr. Rodriguez, and AHF had discussions with FL DOH officials concerning its linkage program and how to invoice for linkage bonuses paid to Mr. Rodriguez. Exs. 33–37. AHF did, indeed, obtain reimbursements for nearly two dozen linkage bonuses paid to Mr. Rodriguez, after submitting itemized breakdowns and details of the bonuses paid, which reflected that such bonuses were paid for linking patients to AHF for care. Exs. 38–39.[10]

[10] These facts also support defenses on other grounds, including negating the materiality and scienter elements of Relators' claims. *See, e.g., U.S. ex rel. Burlbaw v. Orenduff*, 548 F.3d 931, 952 (10th Cir. 2008) (collecting cases discussing government knowledge inference and scienter); *United States v. Sanford-Brown, Ltd.*, 840 F.3d 445, 447–48 (7th Cir. 2016) (describing

## III. ARGUMENT

### A. The Employee Safe Harbor Immunizes From Liability Any Payments Made To Bona Fide Employees In The Provision Of Covered Items Or Services.

The AKS prohibits "offer[ing] or pay[ing] any remuneration . . . to refer an individual to a person" for furnishing items or services "for which payment may be made . . . under a Federal health care program . . . ." 42 U.S.C. § 1320a-7b(b)(2). The word "remuneration" was added as part of the 1977 amendments to the statute, which make clear that compensation provided by employers to their bona fide employees is excluded from the definition.[11] As enacted, the AKS does not apply to "any amount paid by an employer to an employee (who has a bona fide employment relationship with such employer) for employment in the provision of covered items or services." 42 U.S.C. § 1320a-7b(b)(3)(B). This is known as the employee safe harbor. *U.S. ex rel. Wall v. Vista Hospice Care, Inc.*, 2016 WL 3449833, at *21 (N.D. Tex. June 20, 2016).

In 1991, HHS finalized a *regulatory* employee safe harbor tracking the language of the *statutory* safe harbor. 42 C.F.R. § 1001.952(i).[12] HHS commentary accompanying the regulations makes clear that any form of payment to a bona fide employee is protected by the safe harbor. HHS explained that the safe harbor "permitted an employer to pay an *employee in*

---

materiality element). AHF intends to move for summary judgment on these and other grounds in a separate motion for summary judgment.

[11] *See* S. Rep. No. 95-453, at 12 (1977) ("The bill would define the term 'any remuneration' broadly . . . . The term would exclude any amount paid by an employer to an employee for employment in the provision of covered items and services if such employee has a bona fide employment relationship with the employer."); H.R. Rep. No. 95-393, Part I, at 49 (1977) (same); *id.*, Part II, at 53 (same). At the time of the 1977 amendments, two separate statutes governed kickbacks with respect to Medicare and Medicaid, respectively (42 U.S.C. §§ 1395nn and 1396h). The 1987 amendments to the AKS combined these sections and codified them in their current location, at 42 U.S.C. § 1320a-7b. *See* S. Rep. No. 100-109, at 17, 27 (1987) (discussing combination). The 1987 amendments also directed HHS to promulgate additional regulatory safe harbors. *See* 42 U.S.C. § 1320a-7b(3)(E).

[12] Because they are substantively identical, authority interpreting both safe harbors is relevant here. *Cf. United States v. Shaw*, 106 F. Supp. 2d 103, 113 (D. Mass. 2000).

*whatever manner he or she chose* for having that employee assist in the solicitation of program business." 56 Fed. Reg. 35952, 35953 (July 29, 1991). Employers are free, for example, to (1) pay salespersons "on the basis of the amount of business they generate" where those salespersons are employees and the employer "exert[s] appropriate supervision for the individual's acts," 54 Fed. Reg. 3088, 3093 (Jan. 23, 1989), and (2) pay bona fide employees on "a commission-only basis." 56 Fed. Reg. at 35981. HHS explained that the policy behind the exemption is that "the employer-employee relationship is unlikely to be abusive, in part because the employer is generally fully liable for the actions of its employees and is therefore more motivated to supervise and control them." *Id.*

Relators' theory of the case is directly at odds with HHS' stated position on the payments covered by the safe harbor. Relators challenge bonus payments Mr. Rodriguez received for linking John Doe #1 and John Doe #2 as improper remuneration, but not Mr. Rodriguez's base salary. Nothing in the safe harbor's text or history, however, distinguishes between different methods of paying a bona fide employee. As detailed below, because the undisputed facts establish that Mr. Rodriguez was a bona fide AHF employee and was employed in the provision of covered items or services, any payment to him—whether in the form of a base salary or a bonus—falls within the employee safe harbor, and is excluded from the purview of the AKS.

**B. Mr. Rodriguez Is A Bona Fide Employee Of AHF.**

The first requirement of the employee safe harbor is that the individual receiving payment (here, Mr. Rodriguez) is a bona fide employee of the payor (here, AHF). Under the regulations, the term "employee" is "any individual who, under the usual common law rules applicable in determining the employer-employee relationship, has the status of an employee." 42 C.F.R. § 1001.952(i); 26 U.S.C. § 3121(d)(2). Courts consider the following factors:

> [T]he hiring party's right to control the manner and means by which the product is accomplished. . . . the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

*United States v. Job*, 387 F. App'x 445, 455 (5th Cir. 2010) (discussing 42 U.S.C. § 1001.952(i)) (alteration omitted) (quoting *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323–24 (1992)); *see also Wolf v. Coca-Cola Co.*, 200 F.3d 1337, 1340 & n.1 (11th Cir. 2000) (citing the *Darden* factors for the definition of a common-law employee). Initially, Relators' own allegations label Mr. Rodriguez and others at AHF who received linkage payments as employees. *See, e.g.*, TAC ¶¶ 2, 10, 14, 19, 31, 60, 86, 89, 95, 102, 113, 122, 131. Moreover, as Appendix A and MF ¶¶ 9–30 make clear, the undisputed facts here establish that Mr. Rodriguez is a common-law employee of AHF under the *Job* factors. This record is more than sufficient. *Cf., e.g., Demers v. Adams Homes of N.W. Fla.*, 321 F. App'x 847, 851–52 (11th Cir. 2009) (affirming summary judgment that plaintiff was a common law "employee" where plaintiff was required to work a set amount of time and attend weekly meetings, and used employer-provided supplies and materials).

**C. Mr. Rodriguez Is Employed In The Provision Of Covered Items Or Services.**

The employee safe harbor excludes from the purview of the AKS any payments made to employees "for employment in the provision of covered items or services." 42 U.S.C. § 1320a-7b(b)(3)(B). "Covered items or services" are "item[s] or service[s] for which payment may be made in whole or in part under a Federal health care program" to which the AKS applies. 42 U.S.C. § 1320a–7b(b). Mr. Rodriguez was employed in the provision of covered items or services here, for two independently sufficient reasons.

*First*, the linkage services that Mr. Rodriguez provides are directly reimbursable under

Ryan White. Part A of the Ryan White statute allows funds to be used for "core medical services," which include "early intervention services." 42 U.S.C. § 300ff–14(a)(2)(A), (c)(3)(E), (e)(1). "Early intervention services" include "referrals," defined as "referrals of individuals with HIV/AIDS to appropriate providers of health and support services, including . . . to entities receiving amounts under [Ryan White] part A or B . . . ." 42 U.S.C. § 300ff–51(e)(1)(C), (e)(2). Part B of the Ryan White statute also includes "referrals" as part of the "early intervention services" and "core medical services" that may be funded using Part B funds. 42 U.S.C. § 300ff–22(a)(1), (b)(3)(E), (d). Thus, there can be no dispute that the linkage services Mr. Rodriguez provided are "covered items or services" under the safe harbor.[13] And in fact, as described above, AHF *actually received* Ryan White funding for its linkage program, and reimbursement for a portion of Mr. Rodriguez's salary, and even certain linkage bonuses. *See supra* at 5–6, 11.

*Second*, "[t]he statutory exception applies to payments *for employment in the provision* of covered services, not *for providing* covered services." *Vista Hospice Care*, 2016 WL 3449833, at *22 (emphasis in original). Mr. Rodriguez's involvement in connecting patients to *other* covered medical items and services renders him employed in the "provision" of covered items and services. In fact, the government has emphasized that linking HIV patients to care is a critical part of the "continuum of care." *Supra* at 2–5. It is undisputed that the care to which Mr. Rodriguez linked patients constitutes a covered item or service. Thus, Mr. Rodriguez was involved in the "provision" of a covered item or service. Courts have upheld payments to bona fide employees for referring patients to services that were covered under federal programs. *E.g., U.S. ex rel. Baklid-Kunz v. Halifax Hosp. Med. Ctr.*, 2013 WL 6196562, at *1, *8 (M.D. Fla.

---

[13] The safe harbor applies equally to salary and bonus compensation. HHS has explained that an employer may "pay an employee in whatever manner he or she chose," including payments to employees on "a commission-only basis." 56 Fed. Reg. 35952, 35953; 54 Fed. Reg. at 3093.

Nov. 26, 2013), *reconsideration denied* 2013 WL 6284765 (M.D. Fla. Dec. 4, 2013) (safe harbor applied to "incentive bonus" paid by hospital to employee doctors because "[s]imply stated, the Bona Fide Employment Exception provides that the normal prohibition on payments to induce referrals does not apply where the payments are made to a (for lack of a better word) legitimate employee"); *Vista Hospice Care*, 2016 WL 3449833, at *9–10, *21–24 (bonus payments to employees, including per-patient bonuses after a threshold was met, were within safe harbor); *State v. Harden*, 938 So. 2d 480, 493–95 (Fla. 2006) (paying employees on a per-patient basis to solicit patients and transport them to employer's facilities was within the federal employee safe harbor). The facts here are even more compelling. The linkage services that Mr. Rodriguez provided as part of his employment at AHF go beyond the simple referrals upheld in these cases—including, for example, his role in counseling patients and helping them address various issues and barriers to accessing medical care. *See supra* at 8–9.

### D. Relators' Anticipated Arguments As To The "Covered Items Or Services" Element Of The Safe Harbor Miss The Mark.

In previous briefing, Relators argued that although Mr. Rodriguez was a bona fide AHF employee, the bonuses paid to him "do not constitute remuneration paid for the 'furnishing of any item of service' or the 'provision of covered items or services.'" ECF No. 79 at 30–31 (emphasis in original). This argument, which relies on an incorrect reading of three cases involving criminal defendants—*United States v. Starks*, *United States v. Borrasi*, and *United States v. Luis*—was wrong at the pleadings stage, and it would still be wrong if Relators (as anticipated) reassert it at this stage of the proceedings.

Foremost, none of the three cases cited by Relators have application to linkage services provided under Ryan White. As described above, Ryan White expressly provides that *referral services are reimbursable with Ryan White funds*. Whether or not Mr. Rodriguez's provision of

linkage services included compensation "for referrals," Relators' contention that such services are not "covered services" is belied by the language of the Ryan White statute itself. No party in *Starks*, *Borrasi*, or *Luis* ever argued—nor did the opinions ever suggest—that any statute *expressly authorized* the direct billing of the referrals at issue. This alone is dispositive. The Court need not even consider the other numerous reasons that those cases have no bearing here.

Even if there was not explicit statutory authorization for referrals (and there is), Mr. Rodriguez was *not* employed only to provide referrals. MF ¶¶ 13–15; *see supra* at 8–9. His duties went well beyond that. *Id.* This is again independently sufficient to distinguish Relators' case law from the linkage payments here. *Cf. Hericks v. Lincare Inc.*, 2014 WL 1225660, at *14 n.17 (E.D. Pa. Mar. 25, 2014) (distinguishing *Starks* from a situation where employees received bonuses as part of their compensation, but were "employed . . . for more than simply referrals"). But Relators' cited cases are inapposite for additional reasons.

In *Starks*, two Florida Department of Health employees solicited a private entity for "available work" after their government work hours were "threatened." *United States v. Starks*, 157 F.3d 833, 836 (11th Cir. 1998). The individuals agreed to refer patients from their state employer to a private provider—sometimes threatening the patients with taking their babies away if they didn't comply—in exchange for fixed cash payments made under-the-table in parking lots and bathrooms. *Id.* at 836–37. They provided no other services. *Id.* In *Borrasi*, the owner of a medical provider received "bribes" from a hospital in exchange for referrals—to cover up such payments, he was placed on the hospital's payroll, "given false titles and faux job descriptions, and asked to submit false time sheets" with no real responsibilities. *United States v. Borrasi*, 639 F.3d 774, 777 (7th Cir. 2011). Finally, in *Luis*, at a preliminary injunction hearing to restrain a criminal defendant's assets, the court observed that the referrals at issue led to

services "not medically necessary or [] not actually provided." *United States v. Luis*, 966 F. Supp. 2d 1321, 1327 (S.D. Fla. 2013), *aff'd on other grounds*, 564 F. App'x 493 (11th Cir. 2014), *vacated*, 136 S. Ct. 1083 (2016), *and remanded*, 653 F. App'x 904 (11th Cir. 2016).

Not surprisingly, given the egregious facts in these cases, none of them included any detailed discussion or analysis of the "covered services" portion of the employee safe harbor. Relators have nonetheless taken a few statements from those cases out of context to argue that they apply here. In particular, Relators rely on the following statement from *Starks*:

> [E]ven if [the individuals] believed that they were bona fide employees, they were not providing "covered items or services." As the government has shown, [the individual] received payment from [the medical provider and its president] only for referrals and not for any legitimate service for which the Hospital [where the individual was located] received any Medicare reimbursement.

157 F.3d at 839. Relators also seize on language from *Borrasi* that any "part of [a] payment" that compensates or induces a referral violates the AKS, and that "it did not matter if any portion of [the hospital's] payments to [the defendant] . . . was pursuant to legitimate employment relationships because the statute was violated if any portion of the payments were for patient referrals." *Id.* at 781. *Luis* merely reiterates these two statements. 966 F. Supp. 2d at 1331.

Relators stretch this language. The statement in *Starks* was in response to the defendants' attempt to challenge their convictions on the grounds that the AKS was unconstitutionally vague. The defendants argued that they could have believed that they were employed by the medical provider from whom they were secretly receiving cash payments under the table, but the Eleventh Circuit rejected that challenge because "persons in either [the medical provider's or the individual's] position could hardly have thought that either [individual] was a bona fide employee [of the medical provider]." *Id.* at 839. As the language quoted above makes clear, *Starks* made its broader statement about referrals only as a secondary alternative—*i.e.*, as dicta—"even if" the defendants could have believed they were bona fide employees (which the Eleventh

Circuit made clear they could not have). In addition, *Starks* spent essentially no time explaining Relators' quoted statement, likely because it was plain that the individuals were never bona fide employees of the medical provider and there was no need to delve further.

Indeed, two recent opinions have described *Starks* as not engaging in any "substantive analysis" of the "covered items" element. *Vista Hospice Care*, 2016 WL 3449833, at *23; *United States v. Crinel*, 2015 WL 3755896, at *5 (E.D. La. June 16, 2015). And both *Vista Hospice Care* and *Harden* (a Florida Supreme Court opinion) viewed *Starks* as ultimately turning on the individuals obviously not being bona fide employees, rather than the nature of the referrals. *Vista Hospice Care*, 2016 WL 3449833, at *23 ("[*Starks*] commented on the 'covered items or services' clause without relying on it—the defendants in that case clearly were not bona fide employees . . . ."); *Harden*, 938 So. 2d at 495 ("We note a glaring distinction between the arrangements upheld . . . and those deemed prohibited in *Starks* . . . . The payments deemed legal involved payments to *bona fide employees*. . . . In contrast, the payments found in violation of the federal anti-kickback statute involved payments to *nonemployees*." (emphasis in original)).

*Borrasi* also did not need to reach any conclusion about the "covered services" prong of the employee safe harbor given the defendant's obvious falsification of employment records and failure to provide actual employment services. And the Seventh Circuit's opinion should be read more narrowly than Relators suggest: in rejecting the defendant's arguments about what the "primary motivation" for the payments he received was, the court observed that all that was needed for a conviction was that "some amount was paid not pursuant to a bona fide employment relationship." 639 F.3d at 782. That statement itself does not foreclose the conclusion that a referral payment could in fact be paid pursuant to a bona fide employment relationship—the outcome contemplated by HHS and the very reason for the existence of the safe harbor.

Relators' argument also misses the mark more generally. The specific purpose of the AKS safe harbors is to protect certain practices that might otherwise include proscribed referrals. For the employee safe harbor, "[i]f the exception did not apply to payments intended to induce referrals or business for the program, it would be superfluous." *Vista Hospice Care*, 2016 WL 3449833, at *9–10, *21–24; *see also Shaw*, 106 F. Supp. 2d at 116 ("It cannot be the case then, that *any* and *every* remuneration is illegal. If that were so, the various exceptions to the [AKS] would be meaningless." (emphasis in original)). Citing the HHS commentary quoted above, one court has noted that "[a] contrary reading would make all payments to . . . sales, marketing, and other staff for involvement in patients securing [medical] services from their employer illegal . . . leaving such providers unable to promote their businesses by rewarding employees based on success." *Vista Hospice Care*, 2016 WL 3449833, at *23; *see also Harden*, 938 So. 2d at 493. Reading the employee safe harbor as not applying to payments to bona fide employees for referral services would "allow[] the rule to swallow the exception." *Crinel*, 2015 WL 3755896, at *5. As one court in this Circuit has explained the fallacy of Relators' argument:

> Relator would change [the safe harbor] to read that the prohibition on payments to induce referrals does not apply where the payments are made to a legitimate employee *unless they are payments to induce referrals*. . . . The Relator's interpretation of the Bona Fide Employment Exception would eviscerate it.

*Halifax Hosp. Med. Ctr.*, 2013 WL 6196562, at *8 (emphasis in original). The Court should not adopt an argument that nullifies the safe harbor in this way, and should instead "interpret statutory text so as to give effect to every provision enacted by Congress." *Romano-Murphy v. Comm'r of Internal Revenue*, 816 F.3d 707, 715–16 (11th Cir. 2016).

## IV. CONCLUSION

For the foregoing reasons, the Court should grant this motion and enter summary judgment in AHF's favor on Relators' remaining claims in this case.

DATED: February 16, 2017

Respectfully Submitted,

By: /s/ Michael A. Pineiro

Michael A. Pineiro (Bar No. 041897)
mpineiro@mnrlawfirm.com
Jeffrey A. Neiman (Bar No. 544469)
jneiman@mnrlawfirm.com
MARCUS NEIMAN & RASHBAUM LLP
100 Southeast Third Avenue, Suite 805
Fort Lauderdale, Florida 33394
Telephone: (954) 462–1200
Facsimile: (954) 688–2492

David I. Horowitz
david.horowitz@kirkland.com
Jay L. Bhimani
jay.bhimani@kirkland.com
Gavin C.P. Campbell
gavin.campbell@kirkland.com
KIRKLAND & ELLIS LLP
333 South Hope Street
Los Angeles, CA 90071
Telephone: (213) 680-8400
Facsimile: (213) 680-8500
*Admitted Pro Hac Vice*

*Attorneys for Defendant AIDS Healthcare Foundation, Inc.*

## APPENDIX A: MR. RODRIGUEZ IS A BONA FIDE EMPLOYEE OF AHF

| ***Job* factor** | **Undisputed Facts with Respect to Mr. Rodriguez's Employment with AHF** |
|---|---|
| "[T]he hiring party's right to control the manner and means by which the product is accomplished" | Mr. Rodriguez was under AHF's supervision and control as a linkage coordinator. MF ¶ 28. |
| "[T]he skill required" | Mr. Rodriguez was trained by AHF and obtained his skills on the job. MF ¶ 17. |
| "[T]he source of the instrumentalities and tools" | Mr. Rodriguez used AHF technology equipment and office supplies. MF ¶ 26. |
| "[T]he location of the work" | Mr. Rodriguez worked at AHF facilities (whether fixed or mobile). MF ¶ 25. |
| "[T]he duration of the relationship between the parties" | Mr. Rodriguez was an at-will employee of AHF who was employed indefinitely, not for a specified or limited period. MF ¶ 22. |
| "[W]hether the hiring party has the right to assign additional projects to the hired party" | AHF could assign Mr. Rodriguez new tasks and responsibilities. MF ¶ 28. |
| "[T]he extent of the hired party's discretion over when and how long to work" | Mr. Rodriguez was a full-time employee, and did not have discretion over when and how long he could work, subject to applicable laws and regulations. MF ¶ 24. |
| "[T]he method of payment" | Mr. Rodriguez was paid as a regularly-salaried employee of AHF through AHF's payroll system. MF ¶ 20. |
| "[T]he hired party's role in hiring and paying assistants" | Mr. Rodriguez had no assistants and could not hire assistants. MF ¶ 30. |
| "[W]hether the work is part of the regular business of the hiring party; whether the hiring party is in business" | The linkage services Mr. Rodriguez provided as part of his employment were part of AHF's regular business providing critical HIV and AIDS treatment to patients. MF ¶¶ 3, 4, 9, 13. |
| "[T]he provision of employee benefits" | AHF provided Mr. Rodriguez with employee benefits, including a 401(k) and health insurance. MF ¶ 20. |
| "[T]he tax treatment of the hired party" | Mr. Rodriguez applied to AHF using an I-9 form, which is used for employees (and not independent contractors) and provided him with a Form W-2 at the end of the year. MF ¶¶ 18, 21. |

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on February 16, 2017, I served a true and correct copy of the foregoing document on all counsel of record via CM/ECF.

/s/ Michael A. Pineiro